DECLARATION OF GINA LOREDO

I, Gina Loredo, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called on to testify I could and would do so competently and truthfully to these matters.

2. I am a staff attorney in the Children's Legal Program of Americans for Immigrant Justice (AIJ). AIJ serves members of Florida's immigrant community through a combination of direct representation, impact litigation, advocacy and outreach. As part of its immigrants' rights work, AIJ and its lawyers provide removal defense, asylum assistance, and family-based immigration services. AIJ represents people held in carceral and detention facilities due to their perceived or actual immigration status to advocate for their fundamental constitutional and human rights.

3. I am an attorney in good standing in the state of Florida. I've been a member of the Florida Bar since October of 2016. I specialize in the practice of immigration law.

4. One of my clients is currently detained at Alligator Alcatraz.

5. My client is a young man with no prior criminal record, who in 2023 was granted Special Immigrant Juvenile Status (SIJS with a grant of deferred action. SIJS is a form of immigration relief reserved for young noncitizens who suffered childhood abuse, abandonment or neglect, and for whom return to their country of origin would not be in their best interest.

6. My client currently has SIJS with a grant of deferred action, which means that he has a work permit and has been granted protection against deportation for a period of four years. Additionally, this means he will be able apply to adjust his status to become a Lawful Permanent Resident (LPR) as soon as he reaches a "priority date" when there are available visas in category for SIJS applicants who were approved on his date of approval. Prior to obtaining SIJS, my client was in removal proceedings, and he has a pending appeal before the Board of Immigration Appeals (BIA). This pending appeal also makes him not removable from the U.S.

7. On July 8, 2025, my client was stopped and detained by Customs and Border Patrol (CBP). He was not violating any traffic laws at the time of the stop, and no traffic citation was issued. He was held in CBP custody until July 11, 2025. Upon information and belief, on July 11, 2025 he was briefly transferred to the Krome Detention Center and then transferred to Alligator Alcatraz later that same day.

8. On Friday, July 11, I emailed Krome Deportation Officer Kristy Zamir. I informed her that that I represent my client, that he is a Special Immigrant Juvenile beneficiary with a grant of deferred action (and as such, cannot be removed from the U.S. unless his deferred action is revoked by the Department of Homeland Security (DHS)). I also requested access to my

client as soon as possible. Officer Zamir responded via email and called me to discuss the case. She asked me to provide her with a signed Form G-28 and wanted to confirm that my client was not a minor. The call ended and I immediately sent her an email with a copy of my client's SIJS Deferred Action Approval Notice and a Form G-28 signed by my client and my supervisor Marianna Delgado, who had previously handled his case. Officer Zamir did not respond to this email.

9. On Tuesday, July 15, I received a call from my client's mother, who was very frightened. She had received a call from a person who identified themselves as a deportation officer calling from Krome, who told her that her son was not represented by an attorney, and that ICE was going to begin the process to deport him either the next day or within two days.

10. I was confused by the information provided by my client's mother about this call, because my client had contacted me on July 11, 2025 and confirmed that he was detained at Alligator Alcatraz. I was in contact with him every day since then, through the calls he would make me via the monitored facility phone line at Alligator Alcatraz.

11. After concluding my call with my client's mother, I immediately emailed Officer Zamir again. In my email, I described the call my client's mother had received and reiterated that my client cannot be removed from the United States based on his grant of SIJS with deferred action and his pending appeal with the BIA. I also asked Ms. Zamir to confirm whether or not my client was being held at Krome, because to my knowledge he was in Alligator Alcatraz and I was still unable to find him on the ICE online detainee locator. Since learning on July 10, 2025, that my client had been detained, I have been checking the ICE Online Detainee Locator System multiple times each day.

12. On July 16 pursuant to information that I received from a colleague who drove to Alligator Alcatraz and was denied in-person access to the facility, I submitted a Legal Counsel Visitation Request Form via email. I submitted the request form to the following emails: legal@privacy6.com; admin@southerndetention.com; and Southfacility@em.myflorida.com. I requested a virtual attorney visit and provided my windows of availability. I also attached a copy of my Florida driver's license and Florida Bar Membership ID Card. I received a confirmation email from legal@privacy6.com, that my attorney visitation request had been received.

13. On July 18, 2025 Officer Zamir responded to my email from July 15, 2025. She wrote: "The person you are inquiring about is under the custody of the State of Florida, and not under ICE ERO custody; therefore, we cannot address your request." She advised me to direct any inquiries to legal@privacy6.com.

14. On that same day, July 18, 2025, I wrote to legal@privacy6.com following up on my initial visitation request from July 16, 2025. I received a response from that email on July

20, 2025 stating that my appointment was being verified and I would be contacted within the next few days to confirm.

15. On July 21, 2025, I sent another email to legal@privacy6.com forwarding the email I had received from Deportation Officer Zamir on July 18, 2025, directing me to contact this email address with any requests relating to my client since he was not under ICE ERO custody. In this email, I requested confirmation of who the deportation officer assigned to my client's case was, along with their contact information.

16. In response to my question about my client's deportation officer, the "Southern Detention Coordination Team" emailed me back from the address legal@privacy6.com on July 22, 2025. This email stated that "Deportation officers are assigned by the Miami ICE Field Office" and that I could reach them at (305) 789-422. I called this number and learned that it is actually the main number for the Miami Immigration Court.

17. Seeing as the contact information I was provided was the Miami Immigration Court number, I emailed the Office of the Principal Legal Advisor's Miami Dutty Atorney today, July 24, 2025, to request that they provide me with the identity of the deportation officer in charge of my client's case. I also sent the same email to the Assistant Field Office Director.

18. I am very scared for my client. He has called me and his mother repeatedly from Alligator Alcatraz on a monitored, non-confidential phone line. I can tell by his voice that he is scared to be there and desperate to be released. The conditions he describes are horrific.

19. He told me that mosquitos are a constant problem, and that when it rains, the leaks are so bad that his mattress becomes soaked, so he tries to move it so it doesn't get as wet. Air conditioning and water shut off intermittently at the facility, and he and the other men he is detained with are only allowed access to showers every few days—and sometimes cannot get clean clothes after showering. He has a sore throat and has been unable to get cough drops when he requested them, because guards told him that he does not have a medical request on file. And he says he and the men he is detained with are hungry every day—they frequently have to wait for up to 10 or 11 hours between meals.

20. He also described witnessing instances of intentional cruelty by guards. In one instance, guards confiscated an apple and a cookie that two detainees had to tried to save in their cage to avoid going hungry—and ate them in front of the detainees. Also, guards sometimes intentionally disturb detainees' sleep by clacking handcuffs on the cage bars late at night. And one guard told a detainee who woke up, "Go to sleep, dog."

21. On July 25, 2025, I was finally provided a video call with my client. On screen, I saw that his wrists were shackled and that he appeared frightened. He was in a metal cage that was surrounded by a plastic tarp.

22. During this call he informed me that on July 23, 2025, my client was moved to a different section within the Alligator Alcatraz detention facility. He was not provided with any explanation for the transfer. In the new holding area, the beds are enclosed by a cage made of a metal material that causes scratches and cuts if touched. My client's bed is positioned directly adjacent to the metal enclosure, and he reported that during the night, he was scratched while sleeping when his hand touched the metal. He also informed me that one of the bathrooms in this section became backed up, causing feces, urine, and toilet paper to overflow onto the floor. This unsanitary condition persisted for more than three hours before staff arrived to clean the area and permitted the detainees to use the showers. During this time, the detainees, including my client, were not removed from the holding cell and were forced to remain in the contaminated environment.

23. He also informed me that officers at Alligator Alcatraz have been going around the facility asking detainees to sign documents that appear to be agreements to accept deportation, or self deport. According to him, people are feeling desperate and are signing these forms without knowing what other options they have. There is no list of pro bono immigration counsel available at the facility, nor any posted information about legal service providers or access to counsel options. My client also informed me that he has never been asked by any of the officials at Alligator Alcatraz if he has legal counsel.

24. I do not understand why, almost two weeks after my client was detained by immigration authorities—and despite my ongoing efforts—I have not been able to communicate with his deportation officer. Moreover, the delay in scheduling a confidential attorney-client meeting has been unreasonable and prejudicial to my ability to prepare my client's case. And I do not understand why, given that he is not currently removable from the U.S., he is suddenly being detained.

Executed this __25th__ day of July, 2025, at __Miami-Dade County__, Florida

_____
Gina Loredo