## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:25-cv-23182

C.M., *et al.*,

*Plaintiffs*, on behalf of themselves and all others similarly situated,

v.

Kristi Noem, in her official capacity, *et al.,*

*Defendants*.

## PLAINTIFFS' REPLY IN SUPPORT OF
## RENEWED MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Since July 3, 2025, Defendants have rounded up and held hundreds of immigrants at "Alligator Alcatraz," a hastily constructed temporary detention facility made of tents, chain-link fence, and barbed wire in the middle of a swamp in the Florida Everglades. Nothing about this detention facility is normal: the manner and location in which it was built; the legal arrangement and claimed authority for the detention of people at the facility; or the conditions of confinement in which people are held. The same is true for detainees' inability to meaningfully communicate with legal counsel, and their inability to file and seek release on bond from the immigration court.

Although Defendants suggest that recent improvements to attorney access at the facility have solved the problem, the reality is that detainees at Alligator Alcatraz, as well as their attorneys, continue to lack a meaningful ability to communicate with one another, in violation of their First Amendment rights. Defendants' representations of vastly improved attorney access are belied by the experience of detainees and their counsel. Access to counsel at Alligator Alcatraz is

dramatically more restrictive than at other immigration facilities and runs afoul of the requirements that ICE has in place for contracted detention facilities. Scheduling delays for attorney videoconferences and in-person visits have been so lengthy that some detainees are unable to speak to counsel in advance of key deadlines, or have never had the opportunity to meet with counsel, even if their attorney has attempted to arrange a legal visit for *over a month*. The facility's requirement that in-person visits are scheduled in advance is unlike the in-person access at other immigration detention facilities, and it has significantly hindered the ability of attorneys to meet with clients in person. Attorney-client communication is not confidential or private. Outgoing phone calls from detainees are monitored and recorded. Legal videoconferences are not private or confidential. Attorneys cannot confidentially review key documents with clients or obtain necessary signatures. Defendants have not publicly posted any information regarding attorney access protocols to the public or provided this information to detainees, leaving attorneys and detainees in the dark about how to properly communicate with each other. Attorneys cannot confirm whether their detained clients are held at the facility, because ICE's detainee locator continues to omit information about detainees held at Alligator Alcatraz.

Likewise, Defendants do not meaningfully contest that detainees' widespread inability to file and have hearings on bond motions violates the Fifth Amendment's guarantee of procedural due process. Instead, Defendants vaguely state that subclass members can file bond motions in the immigration courts "that were already handling their cases" before they were detained at Alligator Alcatraz, and that courts are "scheduling bond hearings." Not only is this entirely vague and unclear, but for many detainees this has proven to be untrue, or is simply impossible, as some people were not before any immigration court before their detention at Alligator Alcatraz.

Defendants' recent attempts to address these issues in response to this litigation are wholly inadequate. They do little to protect against the continuing grave harm faced by detainees held at Alligator Alcatraz as a result of these constitutional violations. This harm is not hyperbolic and is at a wholly abnormal scale of injury than that typically experienced by immigrants in detention. In the limited time since Plaintiffs filed their Renewed Motion for Preliminary Injunction, officers have circulated the facility, successfully pressuring desperate detainees to sign voluntary removal orders, without the opportunity to speak to counsel. In the past week, an infectious respiratory disease outbreak at Alligator Alcatraz has sickened detainees to the point where at least one person required emergency hospitalization, fueling the sense of desperation at the facility. On August 1, 2025, immigration counsel learned that his client, E.G.V., whose bond hearing had been canceled on July 25, 2025 due to his detention at Alligator Alcatraz, had been erroneously deported, even though he was still in proceedings and had no final order of removal. E.G.V. remains in Guatemala, despite his attorney's repeated requests to ICE to return him to the United States.

Plaintiffs and members of the putative class and subclass require urgent intervention and protection by this Court from this ongoing harm. The Court should therefore grant Plaintiffs' motion for preliminary injunction.

## BACKGROUND

### I.      Immigrants Detained at Alligator Alcatraz Face an Extraordinary Risk of Harm.

In the two weeks since the Plaintiffs filed their Renewed Motion for Preliminary Injunction, immigrants detained at Alligator Alcatraz have experienced extraordinary forms of harm, including uninformed or erroneous deportation, that could have been ameliorated by meaningful attorney access and the regular adjudication of bond petitions in the immigration court. In recent weeks, officers at Alligator Alcatraz have circulated the facility, going from cell to cell, pressuring

detainees to sign voluntary removal orders, without the opportunity to speak to counsel. Decl. of Vilerka Bilbao ¶ 31. One intellectually disabled detainee was told to sign a paper in exchange for a blanket, but was then deported subject to voluntary removal after he signed, without the ability to speak to his counsel. Suppl. Decl. of Anna Weiser ¶ 5. Luis Manual Rivas Velasquez, a Venezuelan immigrant, signed a voluntary deportation order without counsel, although he is eligible for bond and has an immigration court date in February 2027. Decl. of Eric Lee ¶ 4.

E.G.V., an immigrant who was previously detained at Alligator Alcatraz, was erroneously deported by ICE after the immigration court cancelled his bond hearing on July 25, 2025 for lack of jurisdiction.  Decl. of Alex Solomiany ¶¶ 7-9. E.G.V. is still in immigration proceedings and has no final order of removal, and should not have been deported. *Id.* ¶¶ 10-11. Prior to his detention and deportation, E.G.V. lived in the United States for over twenty years, worked as a handyman, and has a wife and four children, three of whom are U.S. citizens. In early July 2025, ICE agents and Florida Highway Patrol officers stopped his car on his way home from work, and the ICE agents took him directly to Alligator Alcatraz. *Id.* ¶¶ 4-5. Because of his erroneous deportation, he remains in Guatemala, despite his attorney's repeated requests to ICE to return him to the United States for the pendency of his proceedings. *Id.* ¶ 12.

Recent conditions at Alligator Alcatraz have fueled a sense of desperation among detainees. In the past week, an infectious respiratory disease outbreak at Alligator Alcatraz has sickened a substantial number of detainees. Facility officials, however, have not provided prompt medical attention, and have denied detainees' requests for masks. Lee Decl. ¶¶ 6-7. On August 5, 2025, Mr. Rivas Velasquez had difficulty breathing, collapsed, and lost consciousness. *Id.* ¶ 5. Dozens of guards stood by as detainees begged for medical attention, so a Cuban detainee who had been a nurse provided CPR to Mr. Rivas Velasquez instead. *Id.* ¶ 6. Mr. Rivas Velazquez was then

hospitalized. *Id.* ¶ 7. After Mr. Rivas Velasquez was returned from the hospital to Alligator Alcatraz, he asked officials for his medical records, but they denied his request. Instead, guards came to his bed, searched his property, and confiscated his personal papers, including poems that he had written and stored in his pillowcase, and informed him that he was not allowed to write anything down. *Id.* ¶ 7. He has since been transferred to another detention facility in El Paso, where he continues to have emergent symptoms and seeks medical care. *Id.* ¶¶ 9-10.

## II.        Detainees at Alligator Alcatraz Lack Meaningful Attorney Access.

Since the filing of this case, Defendants have enacted some new measures for detainees to communicate with counsel that they claim are sufficient to "fully comply[]" with their First Amendment obligations. State Defs.' Opp. To Pls.' Mot. Prelim. Inj. ("Fla. Opp.") 14, ECF No. 49. These measures consist of a method for attorneys to request scheduled videoconference calls and in-person legal visits with detained clients. Defendants, however, continue to impose significant barriers to attorney access at the facility and have failed to fully implement the measures they have claimed to put in place. Immigrant detainees and their attorneys thus remain unable to meaningfully engage in confidential attorney-client communication at Alligator Alcatraz.

Defendants' attorney access restrictions have significant practical implications for legal representation at Alligator Alcatraz. Even after July 15, 2025, delays in scheduling attorney videoconferences and in-person visits have been so lengthy that some detainees have been precluded from speaking with counsel in advance of key deadlines. Bilbao Decl. ¶ 25; Suppl. Decl. of Johan Gutierrez ¶ 9. Some detainees have never had the opportunity to meet with counsel while they were held at the facility because of the length of time it has taken to receive a facility response to attorney requests for a legal videoconference or in-person visit. Suppl. Decl. Catherine Perez ¶ 4.

The facility's insistence that attorneys schedule in-person visits days in advance stands in stark contrast to other immigration detention facilities, which do not require advance clearance to meet with a client in person on the same day. Perez Suppl. Decl. ¶ 11; Velazquez Suppl. Decl. ¶ 13; Gutierrez Suppl. Decl. ¶ 12. This requirement has significantly hindered the ability of attorneys to meet with clients in person. For example, Anna Weiser, attorney for Plaintiff Gonzalo Almanza Valdes, waited for three weeks after multiple requests for an in-person visit to receive a response, and on August 5, 2025, was finally scheduled to meet with him in person on August 15. However, on August 11, Mr. Almanza Valdes was transferred from Alligator Alcatraz to the Miami Federal Detention Center. Due to these lengthy delays, Mr. Almanza Valdes never had the opportunity to have a confidential visit with his attorney during the 30 days he was held at the facility, despite zealous and repeated attempts by his counsel to arrange a visit. Weiser Suppl. Decl. ¶ 21.

Similarly, on July 30, 2025, Mich Gonzalez, an attorney from Organizational Plaintiff Sanctuary of the South ("SOS"), visited the facility to meet with Plaintiff Michael Borrego, but was turned away from the facility. An officer instructed him to send an email to legal@privacy6.com email instead. Mr. Gonzalez did so, and on July 31, received an email from the facility stating that he could not be accommodated to visit clients in person at the facility until August 4, 2025. On August 1, 2025, Mr. Borrego was transferred from Alligator Alcatraz to the Krome Detention Center. Suppl. Decl. of Katherine H. Blankenship ¶¶ 10-11.

Attorney-client communication is not confidential or private. All outgoing phone calls placed by detainees to their attorneys are monitored and recorded. Perez Suppl. Decl. ¶ 8; Gutierrez Suppl. Decl. ¶ 8; Blankenship Suppl. Decl. ¶ 15. Detainees have confirmed that they are unable to speak freely with counsel because legal videoconferences are not private or confidential. Legal

videoconferences do not take place in an enclosed space; instead, detainees are held in a cage, with officers in close, auditory proximity. Gutierrez Suppl. Decl. ¶ 6; Blankenship Suppl. Decl. ¶ 6, 15.

Restrictions on legal document exchange mean that attorneys cannot confidentially review key documents with clients or obtain signatures necessary for legal matters. Suppl. Decl. of Saman Movassaghi Gonzalez ¶ 8; Weiser Suppl. Decl. ¶ 17; Bilbao Decl. ¶ 30. As Defendants admit, there is no legal mail system at the facility. Fl. Opp. 15. Legal staff who have attempted to visit the facility to collect signatures on time-sensitive documents have been turned away and informed that because there is no legal mail system, documents can be left at the facility to be picked up with a client's signature in the future at an unknown date and time. Blankenship Suppl. Decl. ¶ 9.

The "Legal Counsel Visitation Request Form" that the facility requires attorneys to complete for an attorney visit requires attorneys to "[a]ttach copies of legal documents you intend to bring for approval. All items are subject to inspection and must be pre-approved." Decl. of Mark Saunders ¶ 12, Ex. 6 at 36, ECF No. 49-1. Detainees are prohibited from bringing documents to video calls with attorneys. Bilbao Decl. ¶ 30. This restriction delays attorneys' ability to review documents with clients, and to obtain critical information for filings. Bilbao Decl. ¶ 30.

Defendants maintain that they are not obligated to provide basic information about attorney access protocols at the facility to detainees and the public, leaving many detainees and attorneys alike in the dark as to the proper means to communicate with one another. Fl. Opp 13 n.5; Suppl. Decl. of Zareefa Khan ¶ 4; Suppl. Decl. of Aida Ramirez ¶ 4; Perez Suppl. Decl. ¶ 6; Velazquez Suppl. Decl. ¶ 10; Gutierrez Suppl. Decl. ¶ 7; Weiser Suppl. Decl. ¶ 12. This is in clear contrast to ICE's website, which includes a webpage that lists attorney visitation protocol for all other immigration detention facilities nationwide.[1] Unlike all other immigration detention facilities,

---

[1]     U.S. Immigration and Customs Enforcement, Detention Facilities, https://www.ice.gov/detention-facilities [https://perma.cc/YY7F-U9QN] (last updated Jun. 24,

ICE's detainee locator continues to omit any information about detainees held at Alligator Alcatraz, so attorneys cannot confirm whether detained clients are held at the facility. Perez Suppl. Decl. ¶ 9; Velazquez Suppl. Decl. ¶ 6; Weiser Suppl. Decl. ¶ 13; Blankenship Suppl. Decl. ¶ 8.

Defendants claim that they have received "no complaints" about attorney access at the facility, but have not identified any clear avenues by which attorneys or detainees may raise concerns. Fl. Opp. 2; Bilbao Decl. ¶ 13; Blankenship Suppl. Decl. ¶ 7. In contrast, ICE's website provides instructions and points of contact to resolve complaints regarding attorney visitation at immigration detention facilities nationwide.[2]

### III. Those Detained at Alligator Alcatraz Continue to Face Denials of Bond Hearings.

Plaintiffs' motion presented evidence that Defendants' failure to identify an immigration court with jurisdiction over people detained at Alligator Alcatraz was depriving the putative subclass—people who seek bond hearings—the ability to schedule and access them. Pls.' Renewed Mot. Prelim. Inj. ("PI Mot.") 6–10, ECF No. 29. Defendants' oppositions do not dispute this evidence. *See* Fed. Defs.' Opp. to Mot. Prelim. Inj. ("Fed. Opp.") 11-12, ECF No. 50; Fla. Opp. 27.

Instead, Defendants claim that bond subclass members "can file bond requests with the immigration courts that were already handling their cases" before they were detained at Alligator Alcatraz. Fed. Opp. 11. But even those attorneys who have been able to file bond motions in the

---

2025). This website includes links to webpages for individual detention facilities, which in turn, include information regarding attorney visit protocol on the "Hours of Visitation" section. *See, e.g.* U.S. Immigration and Customs Enforcement, Krome North Service Processing Center, https://www.ice.gov/detain/detention-facilities/krome-north-service-processing-center [https://perma.cc/Z67Q-722E] (last updated Jun. 24, 2025).

[2]      U.S. Immigration and Customs Enforcement, Attorney Information and Resources, Contact Legal Access Team, https://www.ice.gov/detain/attorney-information-resources [https://perma.cc/6PQU-LRJC] (last updated Aug. 4, 2025).

immigration court that had previously heard their clients' cases identified by Defendants have had their hearings cancelled for lack of jurisdiction over detainees held at Alligator Alcatraz. Gutierrez Suppl. Decl. ¶ 13 (cancellation of bond hearing at Broward Immigration Court); Decl. of Michelle Borton ¶¶ 8-10, ECF No. 29-1 (same for Krome Immigration Court).

In addition, some detainees have no courts that have handled their cases before arriving at Alligator Alcatraz, because they have never had a case before an immigration court. For instance, attorney Zareefa Khan explains that her client "had never been in proceedings before any immigration court" prior to his detention at Alligator Alcatraz. Khan Suppl. Decl. ¶ 11. *See also* Weiser Suppl Decl. ¶ 20 (Plaintiff Almanza Valdes had no case pending before any immigration court prior to detention at Alligator Alcatraz). Federal Defendants' oppositions leave this evidence undisputed, and offers no contrary evidence.

## STANDARD OF REVIEW

The Court should grant a preliminary injunction if Plaintiffs establish: (1) "a substantial likelihood of success on the merits," (2) "that the preliminary injunction is necessary to prevent irreparable injury," (3) "that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant[s]," and (4) "that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014). Where a mandatory, rather than prohibitory, injunction is sought, the moving party has the burden of making a "clear" showing as to each element. *FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172, 1192 (S.D. Fla. 2011) (describing "clear" as a higher showing than the preponderance of the evidence standard).

Where such a clear showing is made, courts should grant the requested preliminary relief to avoid harm to the plaintiffs. *See e.g. Hoffer v. Jone*s, 290 F. Supp. 3d 1292, 1306 (N.D. Fla.

2017) (granting mandatory injunction to treat prisoners with Hepatitis C); s*ee also K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1280 (S.D. Fla. 2011) (granting mandatory injunction). Where plaintiffs are detained or incarcerated, many injunctions will necessarily, and commonly, become mandatory injunctions because the government has special duties to affirmatively provide services to people inside detention that they do not owe to those outside their care and custody. *See e.g. Farmer v. Brennan*, 511 U.S. 825, 825, (1994) (holding that a prison has a duty to protect people in custody from harm and that a plaintiff may obtain a mandatory injunction against a facility to enforce that duty); *Hoffer*, 290 F. Supp. 3d at 1306 (granting mandatory injunction).

## ARGUMENT

I.      **This Court Has Authority and Jurisdiction to Hear This Properly Justiciable Case.**

A.  **Venue is Proper in This District, and the Court Need Not Determine Venue Issues Before Resolving Plaintiffs' Motion for a Preliminary Injunction.**

"Venue is not a jurisdictional prerequisite and its presence or absence does not affect [the] [C]ourt's authority to adjudicate" Plaintiffs' motion for a preliminary injunction. *Harris Corp v. Nat'l Iranian Radio and Television*, 691 F.2d 1344, 1349 (11th Cir. 1982). Given the urgent issues Plaintiffs raise, the significant effort by all parties put into briefing these issues on an expedited timeline, and the work the Court has put into managing this case, the Court should resolve the motion for preliminary injunction before addressing venue. Order at 8, *Friends of the Everglades, Inc. v. Noem*, No. 1:25-cv-22896 (S.D. Fla. Aug. 7, 2025), ECF No. 104 (ruling on a TRO motion given "the urgency Defendants' actions create, and the possibility of additional evidence being adduced relevant to the Court's venue analysis"); *So. Visions, LLP v. Red Diamond, Inc.*, No. 18-cv-04566, 2018 WL 8221528, at *4–5 (N.D. Ga. Dec. 10, 2018) (deciding that venue was improper and the case would be transferred, but nonetheless ruling on plaintiff's motion for preliminary

injunction "in the interest of justice and judicial economy"); *Arval Serv. Lease S.A. v. Clifton*, No. 14-cv-1047, 2014 WL 12614422, at *1 (M.D. Fla. Nov. 14, 2014) (deferring ruling on defendants' motion to transfer venue until after resolving plaintiff's motion for preliminary injunction due to the "urgency of the issues").

If the Court finds it necessary to address venue before ruling on Plaintiffs' preliminary injunction motion, it should find venue proper in this District.

A district court evaluates venue based on factual allegations in the complaint, which are "taken as true unless controverted." *Reyes v. JA & M Developing Corp.*, No. 12-61329-CIV, 2012 WL 3562024, at *3 (S.D. Fla. Aug. 17, 2012). Plaintiffs need only establish "a prima facie showing of venue." *Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990). If the plaintiff meets this "light" standard, then the burden shifts to the defendant to show why venue is improper. *Canal Ins. Co. v. Yelder*, No. 2:10-cv-185, 2010 WL 2640241, at *1 (M.D. Ala. June 22, 2010); *Goodwyn, Mills & Cawood, Inc. v. Black Swamp, Inc.*, 956 F. Supp. 2d 1323, 1327 (M.D. Ala. 2012).

Plaintiffs brought this suit against federal, state, and county officials. Venue against Defendant Sherea Green of Miami-Dade County is no longer relevant because Plaintiffs have dismissed her from the case. *See* Stipulation of Dismissal, ECF No. 65; Order, ECF No. 66. Venue is proper against both the Federal Defendants and the State Defendants if "a substantial part of the events or omissions giving rise to the claim occurred" here. 28 U.S.C. § 1391(b)(2) (as to the State Defendants), (e)(1)(B) (as to the Federal Defendants).[3]

---

[3]     Venue is independently appropriate against the Federal Defendants because Plaintiffs properly named Garrett Ripa, the director of ICE's Miami Field Office, as a defendant in his official capacity, and he resides in this District. Suppl. Compl. ¶ 69, ECF No. 28. Defendants argue that this Miami Field Office Director "is not the proper official representative for the agency," but they have not sought to dismiss him from the action, and have relied solely on a lower-ranking declarant from the Miami Field Office to support their opposition to Plaintiffs' motion for a

Section 1391 "contemplates some cases in which venue will be proper in two or more districts." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003). The Court "is not required to weigh the events" that occurred in one district versus another or "choose which venue is more proper." *Goodwyn*, 956 F. Supp. 2d at 1326. Rather, venue is proper in "any" district where a "substantial part of the events or omissions giving rise to" a claim occurred, even if the same may be said as to other districts. *Id.*

A substantial portion of the relevant actions and omissions giving rise to this case took place in this District. Defendant Ripa is the ICE Field Office Director for the Miami Field Office, which is located in this District. The Federal Defendants' sole declarant is Juan Lopez Vega, the Acting Field Office Director of ICE's Miami Field Office, which is located in this District. Lopez Vega Decl. ¶¶ 1-2. Mr. Lopez Vega admits that the responsibilities of that office include "overseeing . . . detention facility operations within the Miami [Area of Responsibility], including those at [Alligator Alcatraz]." *Id.* ¶ 3. ICE's Miami Field Office is responsible for "ensur[ing]

---

preliminary injunction. Fed. Opp. 8, ECF No. 50; *see* Decl. Juan Lopez Vega ¶ 1, ECF No. 50-1. So long as the local Field Office Director remains "a defendant in the action," venue remains proper. 8 U.S.C. § 1391(e)(1)(A). Federal Defendants' case law does not involve a local official as a named defendant and is thus irrelevant. *Trujillo v. Garland*, No. 22-CV-23980, 2023 WL 2374445, at *6 (S.D. Fla. Mar. 6, 2023) (no local official named as a defendant); *Brahim v. Holder*, No. 13-23275-CIV-COHN, 2014 WL 2918598, at *3 (S.D. Fla. June 26, 2014) (same); *Hernandez v. USCIS*, No. 21-20355-CIV, 2021 WL 9408841, at *2 (S.D. Fla. Aug. 31, 2021) (same).

Likewise, venue is proper against the Federal Defendants because this action does not involve real property and several plaintiffs reside in this district. 8 U.S.C. § 1391(e)(1)(C); Suppl. Compl. ¶¶ 16, 17, 21, 22, 42, 49, 51, 54, 57, 60, ECF No. 28 (identifying residence of individual and organizational plaintiffs); *see also Ellingburg v. Connett*, 457 F.2d 240, 241 (5th Cir. 1972) ("For purposes of the venue statute, [o]ne does not change his residence to the prison by virtue of being incarcerated there.") (cleaned up).

Federal Defendants' sole counter to venue under 28 U.S.C. § 1391(e)(1)(C) is that this suit involves real property. Fed. Opp. 8. But this suit does not involve a dispute over real property. *Jewish War Veterans of U.S. v. United States*, 695 F. Supp. 1, 2 (D.D.C. 1987) (finding a suit involves real property for purposes of Section 1391(e)(1)(C) only if it "center[s] directly on the real property, as with actions concerning the right, title or interest in real property" and noting that "courts have permitted parties to sue in the district of their residence when real property is only tangentially related to the dispute.").

compliance with detention standards," which include requirements related to access to counsel. *Id.* ¶ 5; *infra* n.11. ICE also "makes decisions regarding transfer into" the facility. Lopez Vega Decl. ¶ 6.

The Federal and State Defendants represent that the people held at Alligator Alcatraz are detained pursuant to agreements under 8 U.S.C. 1357(g) ("287(g)"). Fed. Defs.' Resp. Pls.' Expedited Discovery Request 2, ECF No. 53; State Defs.' Resp. Pls.' Expedited Discovery Request ("State Discovery Response") 2, ECF No. 52. As the 287(g) agreements show, the Miami Field Office Director is responsible for providing authorization to state personnel at Alligator Alcatraz under the agreements, and for reviewing complaints regarding law enforcement activities authorized by the agreements at the facility. State Discovery Response 70, 78, ECF No. 52.

Defendants and other authorities have directed attorneys seeking information about communicating with clients at Alligator Alcatraz to ICE's Miami Field Office and the ICE Office of Chief Counsel in Miami. Suppl. Compl. ¶¶ 27-28, 93, ECF No. 28. When attorneys have looked up class members in ICE's detainee locator, it has listed the Miami Field Office and has given a phone number for the Krome Detention Center (also located in this District). Suppl. Compl. ¶¶ 5, 92, 93. The State Defendants, too, have taken actions directed at this District with respect to Plaintiffs and proposed class members. For instance, they have directed attorneys to the ICE "Miami Field Office" with questions about "decisions to deport, transfer, or release detainees," "credible fear interviews," and "bond/parole/appeal." Saunders Decl. 65, 129, 131, 201-202, 257, 265.

The Krome Immigration Court, located in this District, is the primary court where Bond Plaintiffs and subclass members have attempted to file bond petitions or attend bond hearings.

Suppl. Compl. ¶¶ 26–27, 34, 36, 38, 40, 44–45, 48, 50, 112, ECF No. 28; Miami Krome (Detained) Immigration Court, https://www.justice.gov/eoir/miami-krome-immigration-court [https://perma.cc/J22T-7AB7] (last visited Aug. 12, 2025) (listing address in this District). Even if Plaintiffs' due process claim will revolve around the immigration courts that had jurisdiction before subclass members were transferred to Alligator Alcatraz, for many subclass members this court was either Krome or another court in this District. Borton Decl. ¶ 8 (Krome Immigration Court for Plaintiff F.B.); Bilbao Decl. ¶ 9 (Miami Immigration Court); Suppl. Gutierrez Decl. ¶ 13 (Broward Transitional Center). Defendants cite nothing in the Middle District that has any bearing on Plaintiffs' procedural due process claim. Fed. Opp. 9 (claiming the relevant acts and omissions took place in Virginia—not in Federal Defendants' proposed transferee district).

### B.  This Court Has Subject Matter Jurisdiction Over This Case.

Federal Defendants argue that 8 U.S.C. § 1252(g) removes jurisdiction over this case. Fed. Opp. 5. Section 1252(g) bars judicial review of "any cause or claim by or on behalf of any alien arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders." 8 U.S.C. § 1252(g). Defendants argue that the Detained Plaintiffs' claims "arise from" the categories specified in Section 1252(g) because the detainee plaintiffs "are at Alligator Alley [sic] in connection with categories set out in § 1252(g) and their claims arise from those jurisdictionally barred categories." Fed. Opp. 6 (same argument for Organizational Plaintiffs).

Defendants' argument fails. Plaintiffs are not challenging any of the discretionary decisions listed in Section 1252(g), i.e. decisions to commence proceedings, adjudicate cases, or execute removal orders. They are challenging Defendants' failure to provide access to counsel and identify the relevant immigration court—neither of which are mentioned in Section 1252(g).

Defendants' argument assumes that any claim with some unspecified "connection" to the "categories set out" in Section 1252(g) triggers the jurisdictional bar, Fed. Opp. 6, which would sweep in virtually any claim related to removal. But the Supreme Court has been clear that Section 1252(g) does not cover the "universe of deportation claims," is not a "shorthand way of referring to all claims arising from deportation proceedings," and is not a "general jurisdictional limitation." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 482 (1999). Instead, Section 1252(g) bars challenges only related to the "three discrete actions" enumerated in the statute. *AAADC*, 525 U.S. at 482. And Defendants rightly do not claim that Plaintiffs are challenging one of those three discrete actions. That resolves this issue.

The Eleventh Circuit has likewise rejected attempts like Defendants' to broaden the statute beyond those three specific decisions. *Canal A Media Holding, LLC v. United States Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1257–58 (11th Cir. 2020) (emphasizing that Section 1252(g) is "narrow," rejecting "impermissibly broad reading," instructing courts to "focus on the action being challenged"). And the Eleventh Circuit, along with other courts, has held that claims about detention, bond, and access to counsel are not barred by Section 1252(g). *See, e.g.*, *Madu v. U.S. Atty. Gen.*, 470 F.3d 1362, 1367-68 (11th Cir. 2006) (Section 1252(g) "does not apply" to "constitutional challenges to [ ] detention"); *Ibarra-Perez v. United States*, No. CV2201100PHXDWLCDB, 2024 WL 216769, at *7 (D. Ariz. Jan. 19, 2024) (statute does not bar review of "ancillary rights during detention, such as the right to periodic bond hearings"); *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 125 (D. Conn. 2010) (challenges to "lack of access to counsel" in detention "are not barred by Section 1252(g)"). This court properly has jurisdiction over Plaintiffs' claims.

### C.    Named Plaintiffs Have Standing to Seek Preliminary Relief and Their Claims Are Not Moot.

The Named Plaintiffs have standing to sue on behalf of themselves and the putative class and subclass. For standing, "the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). Federal Defendants argue that because "some named plaintiffs have already been released or soon will be transferred" to other ICE facilities, this "call[s] into question their continued standing" to sue. Fed. Opp. 12. But "Article III standing must be determined as of the time at which the plaintiff's complaint is filed." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003). The Named Plaintiffs were held at Alligator Alcatraz at the time of filing, and they properly have standing. Compl. ¶¶ 11, 17, 21, 22, ECF No. 1; Suppl. Compl. ¶¶ 16, 17, 25, 29, 33, 35, 37, 42, 46, 49.[4]

To the extent that Defendants argue that Plaintiffs' transfer from Alligator Alcatraz renders the case moot, the "inherently transitory" exception to mootness applies. "Some claims are so inherently transitory" that even when "there is no chance that the named plaintiff's expired claim will reoccur, mootness still can be avoided." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398-399 (1980) (citing *Gerstein v. Pugh*, 420 U.S. 103, 110, n.11 (1975)). The inherently transitory exception for putative class actions applies "where [(1)] it is 'certain that other persons similarly

---

[4]     The Eleventh Circuit has not explicitly determined its approach to determining standing in the context of a supplemental complaint under Federal Rule of Civil Procedure 15(d). *See* Carson E. Miller, *Please Remain Standing: Using Fed. R. Civ. P. 15(d) Supplemental Pleading to Cure Defects in Standing*, 88 U. CIN. L. REV. 857, 864 (2019) (The Tenth, Seventh, and Eighth Circuits determine standing at the commencement of the suit, and the First, Second, Fourth, Ninth, and Federal Circuits, determine standing based on facts alleged in the supplemental pleading). However, the Court need not resolve this question, as at least some Named Plaintiffs had standing both at the time of the original and the supplemental complaint. Compl. ¶¶ 11, 17, 21, 22, ECF No. 1; Suppl. Compl. ¶¶ 16, 17, 25, 29, 33, 35, 37, 42, 46, 49.

situated' will continue to be subject to the challenged conduct and [(2)] the claims raised are 'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *Genesis Healthcare Corp. v. Symzyk*, 569 U.S. 66, 76 (2013). If the exception applies, class certification relates back to the filing of the complaint, giving the named plaintiff standing to pursue certification despite the intervening mootness of his individual claim. *Geraghty*, 445 U.S. at 404. "The Supreme Court specifically 'crafted the exception in injunctive class actions,' such as this one, 'challenging criminal and immigration detention procedures.'" *Mons v. McAleenan*, No. 19-1593 (JEB), 2019 WL 4225322, at *6 (D.D.C. Sep. 5, 2019) (citations omitted). Notably, "a district court may provisionally certify a class for purposes of a preliminary injunction." *Fla. Immigrant Coal. v. Uthmeier*, No. 25-21524-CV, 2025 WL 1423357, at *2 (S.D. Fla. Apr. 29, 2025).

Plaintiffs satisfy both requirements. First, even if all the Named Plaintiffs were released or moved out of the detention facility, it is "certain that other persons similarly situated" in the facility will continue to be subjected to the same unconstitutional conduct. *Genesis Healthcare*, 569 U.S. at 76. There are reportedly close to 700 people held at Alligator Alcatraz, and the Defendants plan for the facility to detain 3,000 people.[5] Second, Defendants transferred the Named Plaintiffs from the facility before they have submitted their responses to the class certification motion. *See* Status Rep., ECF No. 58; Order, ECF No. 62 (setting class certification briefing schedule).

**D.      Plaintiffs Have Multiple Causes of Action.**

---

[5]      *See* Ana Ceballos, Claire Healy, Shirsho Dasgupta, and Ben Wieder, *Hundreds at Alligator Alcatraz Have No Criminal Charges, Miami Herald Learns*, Miami Herald, Jul. 13, 2025, https://www.miamiherald.com/news/local/immigration/article310541810.html; C. Balley, et al., *'Alligator Alcatraz': What to Know About Florida's New Controversial Migrant Detention Facility*, CNN, July 13, 2025, https://www.cnn.com/2025/07/01/us/what-is-alligator-alcatraz-florida.

The State Defendants argue that Plaintiffs cannot sue under 42 U.S.C. § 1983 for Counts II and IV of the Supplemental Complaint, because officers deputized under 8 U.S.C. § 1357(g)(1) are not acting under color of state law. Fl. Opp. 11-12 (citing 8 U.S.C. § 1357(g)(8)). Defendants' Section 1983 argument is irrelevant, because Plaintiffs have an *equitable* cause of action to assert both of their constitutional claims regardless of whether Defendants are acting under color of state or federal authority. Defendants do not even address Plaintiffs' equitable cause of action. *See* Supp. Compl. Counts I and III (asserting cause of action at equity). Plaintiffs thus need not rely on Section 1983. But in any event, Plaintiffs have that cause of action as well, because only individual deputized officers can act under color of federal law pursuant to Section 1357(g)(1)—not the agencies themselves or their non-deputized employees and contractors.

It is well established that "courts of equity" may "enjoin unconstitutional actions by state and federal actors." *Armstrong v. Exceptional Child Center*, Inc., 575 U.S. 320, 327 (2015) (describing "long history of judicial review of illegal executive action"). This is true regardless of whether unconstitutional actions are taken pursuant to state or federal law. Courts of equity may enjoin *both* "violations of federal law by state officials" *and* "violations of federal law by federal officials." *Id.* at 326-27; *see Ex parte Young*, 209 U.S. 123, 156 (1908) (holding that unconstitutional acts "may be enjoined by a Federal court of equity"); *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (explaining that "[c]ourts have long recognized" this cause of action, including in the context of detention by federal officers); *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231 (10th Cir. 2005) ("[F]ederal courts have long exercised the traditional powers of equity, in cases within their jurisdiction, to prevent violations of constitutional rights."); *Farmworker Ass'n of Fla. v. Uthmeier*, No. 23-cv-22655, 2025 WL 775558 (S.D. Fla. Mar. 11, 2025) (recognizing equitable cause of action). The Court thus need not resolve whether Defendants

are acting under color of state or federal law, because either way, Plaintiffs have an equitable cause of action to challenge their violations of the First and Fifth Amendments.

While not necessary to decide Plaintiffs' claims, Defendants are wrong to argue that Section 1983 is inapplicable here. 8 U.S.C. § 1357(g)(8) only deems an *individual* "officer or employee of a State" to be acting under color of federal law for determining the liability or immunity of *that* "officer or employee." The statute thus only affects those individual officers who have actually been deputized after training and certification. *See id.* § 1357(g)(2), (g)(5).  It does not alter the liability of non-deputized officers and contractors. Nor does the statute deem entire state agencies—like the Defendants in this suit—to be acting under color of federal authority, because the statute does not grant authority to agencies as a whole, only to an individual "officer or employee." *Id.* § 1357(g)(1); *see id.* § 1357(g)(5) (referring to "individual" deputized officers). Additional discovery may be needed to determine which Defendants have non-deputized employees or contractors working at the facility, who might render the agency subject to a Section 1983 cause of action. But Plaintiffs' equitable cause of action means they do not need to rely on Section 1983 for the relief they seek here.

## II.   Plaintiffs Are Likely to Succeed on Their Motion for Class Certification.

Defendants argue that the Court should deny the preliminary injunction because the classes have not yet been certified and are not likely to be certified. *See* Fl. Opp. 27-28; Fed. Opp. 12. Their arguments are meritless, as Plaintiffs are likely to succeed in their class certification motion.

***First***, as a threshold matter, the Court can issue a preliminary injunction on behalf of a provisionally certified class, pending a final ruling on permanent class certification. Should the Court have any outstanding questions about class certification, Plaintiffs ask that, given the urgent nature of Plaintiffs' requested relief given the deprivation of their access to counsel and

immigration courts, that the Court begin by provisionally certifying the classes for the purpose of issuing a preliminary injunction, as is common in these circumstances. *Fla. Immigrant Coal.*, 2025 WL 1423357, at *16-17 (provisionally certifying two classes of immigrants for purposes of issuing a preliminary injunction); *Tefel v. Reno*, 972 F. Supp. 608, 617-18 (S.D. Fla. 1997) (provisionally certifying class of immigrants who were denied suspension of deportation orders); *see also Strawser v. Strange*, 105 F.Supp.3d 1323, 1329-30 (S.D. Ala. 2015) (collecting cases related to provisional certification for purposes of injunctive relief).

**Second**, State Defendants' contention that the Court cannot issue preliminary injunctive relief or certify a class because it is "premature" to do so until class discovery has occurred is meritless. Fl. Opp. at 28. Courts routinely issue preliminary class relief prior to certifying a permanent class, *see supra*, and courts also often certify classes without necessitating extensive discovery. State Defendants quote *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) as stating that a "district court must conduct a rigorous analysis" and that it is "virtually impossible" for a court to certify a class without discovery, Fl. Opp. 28, but those words appear nowhere in the opinion. Holding aside the nonexistence of those words in *Mills*, that case also does not stand for the proposition for which Defendants cite it, and it is inapposite to the facts at hand here. *Mills* involved an appeal of a denial of class certification: the Eleventh Circuit found that the district court had erred in denying class certification in a damages case prior to allowing the plaintiffs to take discovery. The Eleventh Circuit, however, did not hold that class claims discovery must be conducted in every case prior to issuing classwide preliminary relief or prior to certifying a class. *Mills*, 511 F.3d at 1309, 1311 ("[W]e conclude only that the district court erred in determining that class action treatment was inappropriate as a matter of law from the face of the

Millses' particular complaint, and we remand for further proceedings. In so holding, we express

no opinion as to whether class certification is or is not appropriate in this case.").[6]

*Third*, both Federal and State Defendants identically argue that the proposed class "is

facially overbroad and unworkable. It includes unnamed, hypothetical future detainees who not

only cannot be identified, but more importantly, do not yet have standing to sue. Courts have

repeatedly held that such overinclusive definitions are impermissible." Fed. Opp. 12; Fl. Opp. 28.

Both Federal and State Defendants cite the Southern District of Florida's decision in *Fla.*

*Immigrant Coal*., 2025 WL 1423357, at *16, in support of that assertion. *See id*. But again,

Defendants' citation is not well taken, as it misstates what Judge Williams held—Defendants'

citation is to the part of the Court's opinion summarizing the state defendants' arguments and

proffered cases, which Judge Williams rejected, holding that "Defendants misperceive what is

required in a case like this for classes to be deemed ascertainable." *Fla. Immigrant Coal*., 2025

WL 1423357, at *16. Indeed, Judge Williams noted that "courts within the Eleventh Circuit have

expressed 'serious reason to doubt that the judicially created ascertainability requirement applies

to Rule 23(b)(2) classes.'" *Id*. (quoting *Braggs v. Dunn*, 317 F.R.D. 634, 671 (N.D. Ala. 2016)).

---

[6]     State Defendants' citation to *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d
1566, 1570 (11th Cir. 1992) to bolster their citation to *Mills* raises additional concerns. Fl. Opp.
28. It is unclear what in the *Washington* opinion they are citing to, as it was an employment case
related to disparate practices based on race; the Eleventh Circuit held that it was not an abuse of
discretion for the district court to cut off the pre-certification discovery related to class claims after
three years of discovery practice.
        State Defendants also cite to *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234
(11th Cir. 2016) for their contention that "Rule 23 demands more than bare assertions or
rhetoric," Fl. Opp. 28, but this case simply emphasized the uncontroversial proposition that
"[t]he party seeking class certification has the burden of proof, not a burden of pleading" and that
the district court in that case had erred by stating in a class certification order that it was
"draw[ing] all inferences and [...] all evidence in the light most favorable to plaintiffs." *Brown*,
817 F.3d at 1234.

Regardless, classes that—like this one—include future detainees are common and pose no ascertainability issue. *E.g.*, *Walker v. City of Calhoun, Georgia*, No. 4:15-CV-170-HLM, 2016 WL 361580, at \*6, 10 (N.D. Ga. Jan. 28, 2016) (rejecting ascertainability challenge to class of people "who are or will be in the custody" of the defendant); *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 1577811, at \*28 (D.D.C. June 4, 2025) ("The Government's argument that the inclusion of future claimants renders a class non-ascertainable is at odds with existing law on Rule 23(b)(2) actions, which often include future members."); Definition of Class, Ann. Manual Complex Lit. § 21.222 (4th ed.) ("A class may be defined to include individuals who may not become part of the class until later.").

**Fourth**, Federal Defendants summarily assert—without citation to any law or facts—that "it appears that a class is not likely to be certified due, at minimum, to lack of commonality." Fed. Opp. 12. This argument fails because it ignores the body of law holding that the commonality inquiry does not require that all class members suffer a factually identical injury. *See, e.g. Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009); *see also Fla. Immigrant Coal.*, 2025 WL 1423357, at \*14 (rejecting state defendants' argument that commonality did not exist when immigrant class members had individualized differences in their situation) (citing *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 359 (2011)). Here, all legal and factual questions revolve around the same core practices, the class members share a common injury, and all class members' claims can be resolved through the relief sought. In *Dukes*, the Supreme Court made clear that even in fact-intensive workplace discrimination cases seeking damages, commonality and typicality are met when a company "operated under a general policy of discrimination." 564 U.S. at 353. The common contention of injury "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the

validity of each one of the claims in one stroke." *Id.* at 350; *Fla. Immigrant Coal.*, 2025 WL 1423357, at *14 ("For purposes of commonality, even a single common question will do.") (quoting *Dukes*, 564 U.S. at 359).

Federal Defendants contend that "defendants [sic] are in varying stages of their immigration proceeding, some with final orders." Fed. Opp. 12. But even if true, this is irrelevant and does not render the case inappropriate for classwide resolution. That the named plaintiffs and various putative class members may be in different stages of their individual immigration cases does not negate their challenge to Defendants' systemic practices that severely limit or deny them confidential access to counsel and to the immigration courts. *See* Pls.' Renewed Mot. Class Cert. 13-14, ECF No. 30; *Cooper v. Southern Co.*, 390 F.3d 695, 714 (11th Cir. 2004) ("Neither the typicality nor the commonality requirement mandates that all putative class members share identical claims, and . . . factual differences among the claims of the putative class members do not defeat certification.") (quotation marks and citation omitted), *overruled in part on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006); *Fla. Immigrant Coal.*, 2025 WL 1423357, at *14 (discussing the commonality requirement when provisionally certifying class); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 173, 181 (D.D.C. 2015) (provisionally certifying a class where a uniform "unlawful [immigration] detention policy aimed at deterring mass migration" applied to all class members).[7]

---

[7]      For example, in a case where state officials argued that classwide relief was inappropriate in a case challenging the prison health care system, the Supreme Court took pains to explain the distinction between challenges to the medical care received by an individual incarcerated person, and challenges to the systemwide policies that put all prisoners at substantial risk of serious harm. *Brown v. Plata*, 563 U.S. 493, 505 n.3 (2011); *see Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) (affirming certification of statewide class of people in Arizona's prison system, rejecting the argument that class members had differing medical, dental, or mental health diagnoses, and explaining that the defendants' characterization of the class's claims "as little more than an aggregation of many claims of individual mistreatment" misstated the commonality inquiry); *see also Yates v. Collier*, 868 F.3d 354, 362–63 (5th Cir. 2017) (affirming class certification even where

**Fifth**, State Defendants argue that the class here does not meet the requirements of a Rule 23(b)(2) case for injunctive relief, relying upon a single Nebraska district court case. Fl. Opp. 28. Again, this is without merit. "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) class actions. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *see also* Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment ("[A]ctions in the civil-rights field" are paradigmatic Rule 23(b)(2) class actions). Rule 23(b)(2)'s requirements are satisfied when, as here, members of a proposed class seek common injunctive and declaratory relief from policies and practices that are generally applicable to the class as a whole. *Fla. Immigrant Coal.*, 2025 WL 1423357, at *15 ("The critical inquiry is whether the class members have suffered a common injury that may properly be addressed by class-wide injunctive or equitable relief.") (quoting *Ibrahim v. Acosta*, 326 F.R.D. 696, 701 (S.D. Fla. 2018)); *see also Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.") (quotation marks and citation omitted).[8]

## III. Preliminary Injunctive Relief is Warranted as Plaintiffs Are Likely To Succeed on the Merits of Their Claims.

### A. Plaintiffs Are Likely to Succeed in Their First Amendment Claims.

---

no two incarcerated class members had "the exact same risk" of harm from exposure to high temperatures because the relevant policy regarding heat-mitigation measures was alleged to pose an unconstitutional risk of serious harm to all class members in violation of the Eighth Amendment).

[8]     Adequacy under Rule 23 is a different jurisprudential argument than mootness, and if class representatives are found later to be inadequate representatives, the Court may simply allow addition or substitution of new representatives. *See, e.g.*, *Stewart v. Winter*, 669 F.2d 328, 334 (5th Cir. 1982) (if post-certification circumstances render a class representative inadequate, "the solution is to permit his substitution by a new representative, not to dismiss the class claims.").

Defendants do not dispute the well-settled proposition that detained immigrants have a First Amendment right to communicate with their attorneys. *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008). Nor do they dispute that policies that unreasonably impede communication between attorneys and detainees violate an attorney's First Amendment rights. *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (citation omitted).[9] Instead, they argue that no preliminary injunction is necessary, claiming that they are "fully complying with the First Amendment by facilitating video and in-person meetings between detainees and their counsel." Fl. Opp 14. Defendants describe how attorneys may request video and in-person meetings with detainees, and claim that they plan to construct new spaces for attorney-client meetings and establish postal service for detainees. *Id.* at 14-18.

Defendants' claims miss the mark. Although Defendants suggest that recent changes to attorney access have solved the issue, the reality is that detainees and their attorneys continue to lack a meaningful ability to communicate with one another, in violation of the First Amendment. The Court should look with skepticism at Defendants' assertions that no injunctive relief is necessary because the facility has now started to provide some people with limited access to counsel. *See United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("It is the duty of the

---

[9]     Defendants mistakenly assert that the limits discussed in *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1513 (11th Cir. 1992) *and Cuban Am. Bar Assoc. Inc. v. Christopher*, 43 F.3d 1412, 1429 (11th Cir. 1995) apply to Organizational Plaintiffs in this case. Fed. Opp. 10; Fl. Opp. 13. In those cases, the court concluded that the individuals with whom the organizational plaintiffs sought to communicate lacked any statutory or constitutional rights underlying the groups' First Amendment right to solicit clients for the purposes of litigation as a form of political expression. *Haitian Refugee Ctr.* dismissed a legal organization's claim to compel access to people held outside of the United States, with whom they had no attorney-client relationship, and whom the court had found had "no recognized substantive due process rights under the laws or Constitution of the United States." 953 F.2d at 1513. *Cuban Am. Bar Assoc.* similarly concluded that the individuals with whom the legal organizations sought to communicate lacked "any of the statutory or constitutional rights . . . that might sustain the attorneys' claims to right of association." 43 F.3d at 1429.

courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."); *City of Mesquite v. Aladdin's Castle, Inc*., 455 U.S. 283, 289 (1982) (same). Defendants' promises that access to counsel and the immigration court has marginally improved for a few detainees at the detention facilities are hardly material changes that rise to denial of injunctive relief.

Defendants' assertion of mootness by virtue of their voluntary decision to discontinue the contested behavior bears a "heavy burden" and must meet a "stringent" standard that requires showing that "subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 189 (2000). (citations omitted); *see Jews for Jesus, Inc. v. Hillsborough County Aviation Auth*., 162 F.3d 627, 629 (11th Cir.1998) (explaining that voluntary cessation of challenged practice renders case moot only if there is no reasonable expectation that challenged practice will resume after lawsuit is dismissed). Moreover, Defendants' "promise of some future action cannot redress [Plaintiffs'] injury *now*," and "supports no more than a prediction that this case could be moot in the future." *Malik v. United States Dep't of Homeland Sec*., 78 F.4th 191, 199 (5th Cir. 2023) (emphasis in original).

## 1.  Defendants Impose Significant Restrictions on Attorney-Client Communication at Alligator Alcatraz.

A close examination of detainees' experience demonstrates that Defendants continue to impose significant barriers to attorney access, and, in practice, have not actually implemented many of the measures they have claimed to put in place.[10]

---

[10]     The State Defendants' citation to *Smego v. Payne*, 854 F.3d 387, 391 (7th Cir. 2017), Fl. Opp. 19, is inapplicable here, as the "right of access" in question in that case referred to the right

**Attorneys face prolonged delays in scheduling attorney videoconferences and in-person visitation, prejudicing detainees' cases.** Defendants claim that facility staff "make their best efforts to address or at least respond scheduling requests within 24 hours," and that "[o]nce Facility staff respond to a scheduling request, counsel are typically able to meet with their clients within 24 hours for virtual meetings, and within 24 hours for in-person meetings." Saunders Decl. ¶¶ 9-10. However, Defendants' "best efforts" fall demonstrably short, as attorneys face prolonged delays in scheduling visits, often prejudicing detainees' cases.

Scheduling delays are so significant that some detainees are unable to speak with counsel in advance of key deadlines. For example, attorney Vilerka Bilbao submitted a request for a legal visit on July 16, 2025, and on July 17, received a message instructing her to complete a visit request form. She returned the form less than an hour later, but did not receive a reply. She sent another email message on July 18, and July 21, again without reply. On July 22, she received a response confirming an appointment to take place on July 24—eight days after her initial request. Bilbao Decl. ¶¶ 20-24. Ms. Bilbao once again reached out on August 6, to request a follow-up call. However, the appointment was scheduled for August 11, the day that her client's appeal brief was due. *Id.* ¶ 25. Similarly, attorney Johan Gutierrez sent an urgent request for a video call on July 23, 2025, because his client had a bond hearing scheduled on July 25. He was informed, however, that no appointments were available until July 29, four days after the hearing (which was ultimately canceled by the court for lack of jurisdiction over detainees at Alligator Alcatraz). Gutierrez Decl. ¶ 9.

Scheduling delays are so significant that some detainees never have the chance to meet with counsel while detained at Alligator Alcatraz. For example, Attorney Catherine Perez made multiple

---

to personal appearance at court in civil cases. Moreover, Plaintiffs in this case have been unable to engage in confidential attorney-client communication at the facility. *See infra* pp. 29-31.

email requests to visit Plaintiff E.R., including submission of the "Legal Counsel Visitation Form," on July 16, 2025. She received no response. Perez Decl. ¶¶ 13-16, ECF No. 5-2. E.R. was transferred to a different facility six days later. Status Report ¶ 4, ECF No. 58. *Contra* Saunders Decl. ¶ 64(c) (acknowledging that she had submitted a request, noting that "Counsel did not subsequently request a meeting with E.R."). Attorney Amanda Velazquez sent an email request for an attorney visit with Plaintiff C.M. on July 11, 2025. However, she never received a response from the facility before he was transferred to another facility on August 1. Velazquez Decl. ¶ 10, ECF No. 5-3; Velazquez Suppl. Decl. ¶ 4; *contra* Saunders Decl. ¶ 64(a) (claiming that counsel for C.M. has "not e-mailed the legal inbox to request a meeting.").

**Requests for in-person attorney visitation are extremely delayed, such that some detainees never have the opportunity to meet with their attorneys at all.** Alligator Alcatraz requires attorneys to submit a scheduling request for in-person visits, which, according to Defendants, "have occurred as soon as reasonably possible after the request." Saunders Decl. ¶ 37. This policy is starkly different from other immigration detention facilities, which allow attorneys to visit clients at the facility on the same day without a pre-scheduled appointment. Perez Suppl. Decl. ¶ 11; Velazquez Suppl. Decl. ¶ 13; Gutierrez Suppl. Decl. ¶ 12. This requirement has significantly hindered the ability of attorneys to meet with clients in person. For example, Anna Weiser, attorney for Plaintiff Gonzalo Almanza Valdes, initially went to the facility on July 11, 2025, and was turned away. She then emailed the facility on July 16 and July 23, to request a visit, but did not receive a response until August 4. The facility scheduled her for an in-person visit on August 15, more than a month after her first initial visit. On August 11, 2025, Defendants transferred him to the Miami Federal Detention Center. During the 30 days that Mr. Almanza

Valdez was held at Alligator Alcatraz, he was never able to meet with his attorney, despite her zealous and repeated efforts to obtain an attorney visit. Weiser Suppl. Decl. ¶ 11.

Similarly, on July 30, 2025, Mich Gonzalez, an attorney from Organizational Plaintiff Sanctuary of the South ("SOS"), visited the facility to meet with Plaintiff Michael Borrego, but was turned away from the facility. An officer, who appeared confused by his presence and who explained that she "was not deputized" and therefore "did not know the law" told him that he needed to request approval from the legal@privacy6.com email to be allowed access. Mr. Gonzalez did so, and on July 31, received an email from the facility stating that he could not be accommodated to visit clients in person at the facility until August 4, 2025. On the evening of August 1, 2025, Mr. Borrego was transferred from Alligator Alcatraz to the Krome Detention Center, where Mr. Gonzalez was able to meet with him in person the next day, without having to prearrange a visit. This visit at Krome was the first time that SOS was able to meet with Mr. Borrego in person since his initial detention at Alligator Alcatraz on July 5, 2025. Blankenship Suppl. Decl. ¶¶ 10-11.

**Detainees cannot speak confidentially with counsel in legal videoconferences.** Defendants claim that videoconferences take place in an "enclosed area that provides visual, but not auditory, observation," and that "[f]acility security staff are present just outside of the enclosure during a videoconference meeting, but they are stationed out of hearing range." Saunders Decl. ¶¶ 25, 29. However, it is clear that detainees cannot speak confidentially in legal videoconferences. As attorney Johan Gutierrez noted with respect to a videoconference with Plaintiff Gustavo Adolfo Lopez Hernandez, "it appeared that he was in an open cage with other people in the vicinity, and that others could hear what he was saying." Gutierrez Suppl. Decl. ¶ 6.  Mr. Lopez Hernandez confirmed that "whatever he said . . . was not private." *Id*. Similarly, attorney Katherine

Blankenship confirmed of her videoconference with Plaintiff Michael Borrego that "it was visible in the video call that Mr. Borrego was not in a private, enclosed room, but a cage with TNT staff walking by throughout the . . . call." Blankenship Suppl. Decl. ¶ 6. According to Mr. Borrego,  the "video calls are not confidential, and that others, including guards, can clearly hear what he is saying during legal calls." *Id.* ¶ 15. *See also* Perez Suppl. Decl. ¶ 10 ("from what my client has told me and what I could see, he is not in a private, closed room.").

**Detainees cannot speak confidentially with counsel in outgoing phone calls.** Defendants do not contest that detainees cannot speak confidentially in outgoing phone calls, as they are monitored and recorded. Perez Suppl. Decl. ¶ 8; Gutierrez Suppl. Decl. ¶ 8; Blankenship Suppl. Decl. ¶ 13. Unfortunately, these calls are the only way that detainees can affirmatively reach out to contact counsel. This stands in stark contrast to other ICE detention facilities, which require the provision of telephones for outgoing legal calls where detainees "can make such calls without being overheard by staff or other detainees," and which "staff may not monitor."[11]

**Detainees cannot confidentially exchange legal documents and have no way to receive legal mail.** Defendants admit that there is no legal mail system at the facility. Fl. Opp. 15; Saunders Decl. ¶ 55. Legal staff who have attempted to visit the facility to collect signatures on time-sensitive documents have been turned away and informed that because there is no legal mail system, documents can be left at the facility to be picked up with a client's signature in the future at an unknown date and time. This process is not confidential. Blankenship Suppl. Decl. ¶ 8.

In addition, the "Legal Counsel Visitation Request Form" that the facility requires attorneys to complete for an attorney visit instructs attorneys to "[a]ttach copies of legal documents you

---

[11]     U.S. Immigration and Customs Enforcement, Performance Based National Detention Standards 2011 389 (2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

intend to bring for approval. All items are subject to inspection and must be pre-approved." Saunders Decl. ¶ 12, Exh. 6. Detainees are prohibited from bringing documents to video calls with attorneys. Bilbao Decl. ¶ 30. This prohibition delays attorneys' ability to review documents with clients, and obtain critical information for filings. *Id.*

**Defendants refuse to make basic information regarding attorney access protocols necessary for communication to detainees and the public.** Defendants have failed to make publicly available basic information about attorney access policies or protocols at the facility, or to provide that information to detainees. Khan Suppl. Decl. ¶ 4; Ramirez Suppl. Decl. ¶ 4; Perez Suppl. Decl. ¶ 6; Velazquez Suppl. Decl. ¶ 10; Gutierrez Suppl. Decl. ¶ 7; Weiser Suppl. Decl. ¶ 11. Instead, Defendants argue that the First Amendment does not entitle Plaintiffs to information regarding how attorneys and detainees may communicate with each other for purposes of legal representation. Fl. Opp. 13 n.5. This argument fails. The cases cited by Defendants addressed attempts by media and advocacy organizations to gain special access to a facility for reporting purposes, and to obtain lists of the identities of detained people at a facility, which are inapplicable here. *Id.* (citing *Houchins v. KQED, Inc*., 438 U.S. 1, 15 (1978); *Cuban Am. Bar Ass'n. Inc. v. Christopher*, 43 F.3d 1412, 1430 (11th Cir. 1995).

Without this information, attorneys and detainees do not know how to communicate with each other. For this reason, this information is a necessary precondition for Plaintiffs to enforce their First Amendment right to consult with one another for purposes of legal representation. *Al-Amin*, 511 F.3d at 1334; *Procunier*, 416 U.S. at 419. Indeed, attorneys have been unable to contact clients at Alligator Alcatraz because they lacked the correct information. *See, e.g.* Khan Decl. ¶ 4, ECF No. 21-2. Publication of this information is routine for immigration detention facilities, as ICE's

website includes a webpage that lists attorney visitation protocol for all other detention facilities nationwide.[12]

**Attorneys cannot locate detained clients at Alligator Alcatraz.** Unlike all other immigration detention facilities, ICE's detainee locator continues to omit any information about detainees held at Alligator Alcatraz, so attorneys cannot confirm whether detained clients are held at the facility. Perez Suppl. Decl. ¶ 9; Velazquez Suppl. Decl. ¶ 6; Weiser Suppl. Decl. ¶ 13; Blankenship Suppl. Decl. ¶ 8.

### 2. Penological Interests Do Not Apply to Consideration of the Constitutional Rights of Civil Immigrant Detainees.

Defendants cite to the four-factor test set out in *Turner v. Safley*, 482 U.S. 78, 89 (1987), and modified in *Pesci v. Budz* (*Pesci I*), 730 F.3d 1291, 1299 (11th Cir. 2013), to argue that attorney access restrictions imposed on the immigrant detainees at Alligator Alcatraz are reasonable and do not violate First Amendment protections. Fl. Opp. 21-22. This argument fails. *Turner* involved the rights of convicted prisoners, and *Pesci I* involved the rights of so-called "sexually violent predators" who the State of Florida continued to incarcerate in carceral facilities under civil commitment laws upon expiration of serving their criminal sentences. Under *Turner*, courts examine whether the prison's restriction on communication is "reasonably related to legitimate penological interests."[13] And in *Pesci I*, the Eleventh Circuit held that in the case of a civilly-

---

[12]     U.S. Immigration and Customs Enforcement, Detention Facilities, https://www.ice.gov/detention-facilities [https://perma.cc/YY7F-U9QN] (last updated Jun. 24, 2025). This website includes links to individual detention facilities, which in turn, include information regarding attorney visit protocol on the "Hours of Visitation" section. *See, e.g.* U.S. Immigration and Customs Enforcement, Krome North Service Processing Center, https://www.ice.gov/detain/detention-facilities/krome-north-service-processing-center [https://perma.cc/Z67Q-722E] (last updated Jun. 24, 2025).

[13]     Under *Turner*, courts examine whether the prison's restriction on communication is "reasonably related to legitimate penological interests" using four factors: (1) whether there exists "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of

committed "sexually violent predator," that the *Turner* standard "must be modified to reflect the salient differences between civil detention and criminal incarceration" and "the range of legitimate governmental interests is narrower" and the "government's interests in retribution and generally deterrence—plainly legitimate justifications for prison regulations—decidedly are *not* a proper foundation for the restriction of civil detainees' constitutional rights." 730 F.3d at 1297 (emphasis in original).

Immigrant detainees, of course, are civil detainees held pursuant to civil immigration laws, not criminal laws. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). They are not convicted prisoners serving their criminal sentences like the plaintiffs in *Turner* and *Pesci I*, nor are they pre-trial detainees facing criminal charges held in local jails. Rather, immigrant detainees in proceedings seek relief from deportation, which the Supreme Court explicitly held is not of a punitive nature. *See Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("We have long recognized that deportation is a particularly severe 'penalty'; but it is not, in a strict sense, a criminal sanction.") (internal citation omitted). Accordingly, the "legitimate penological interests" at issue with convicted prisoners have little or no application here. *Benjamin v. Fraser*, 264 F.3d 175, 187 n.10 (2d Cir. 2001) ("Penological interests are interests that relate to the treatment (including punishment, deterrence, rehabilitation . . . of persons convicted of crimes); *Demery v. Arpaio*, 378 F.3d 1020, 1028–29 (9th Cir. 2004); *In re Kumar*, 402 F. Supp. 3d 377, 383-84 (W.D. Tex. 2019).[14]

---

exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) "the absence of ready alternatives" to the prison regulation. *Turner*, 482 U.S. at 89-91.

[14]   Contrary to State Defendants' unsupported assertion that "many of the detainees in the Facility have criminal backgrounds[,]" Fla. Opp. 21, the vast majority of people detained at Alligator Alcatraz lack *any* criminal record, or at most they have been cited for traffic violations such as driving without a license. Ana Ceballos et al., *Hundreds at Alligator Alcatraz Have No Criminal Charges, Miami Herald Learns*, Miami Herald, Jul. 13, 2025.

**3. Defendants' Attorney Access Restrictions at Alligator Alcatraz Are Not Reasonably Related to the Stated Justifications.**

Even under *Turner*, however, the attorney access restrictions at issue at Alligator Alcatraz clearly violate Plaintiffs' First Amendment rights. Defendants mischaracterize the widespread restrictions as "minimal" and necessary for "maintaining order and security," and argue that the restrictions exist for the detainees' own protections. Fl. Opp. 24. But these arguments fail. Defendants' failure to identify legitimate penological interests other than a vague invocation of "security and order" is fatal: when analyzing the first of the four *Turner* factors, "if the connection between the regulation and the asserted goal is 'arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor." *Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001) (internal quotes omitted).

The restrictions to attorney access at Alligator Alcatraz are not rationally related to Defendants' blanket invocation of "maintaining order and security" at the facility. There is no security interest in a prolonged delay for scheduling attorney visits, nor are such delays orderly. Placing detainees in cages that are not soundproofed for confidential videoconferences, with staff in earshot throughout the call, is not reasonably related to order and security, given the availability of alternative options. Likewise, a failure to provide unmonitored, outgoing legal calls has little rational relationship to maintaining order and security, particularly as such phones are required to be provided in detention facilities nationwide. A policy that requires attorneys to attach documents to be reviewed in a legal visit for review by the facility has no relationship to order and security, and also blatantly violates attorney-client privilege, "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Nor is there any reasonable relationship between a prohibition on detainees' ability to bring documents to virtual legal visits and maintaining order and security in a facility. The publication

of attorney access guidelines to detainees and the public, as well as detainee locator information is a routine practice, and widespread understanding of facility protocols and a detainee's location would only help to promote order and security.

The other *Turner* factors look at whether there are "alternative means to exercise the right," and the impact of the accommodations on the allocation of prison resources. *See Turner*, 482 U.S. at 91 (holding that "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."). Here, there are clear alternative means to ensure attorney-detainee contact in compliance with the First Amendment, of which Defendants are aware. For example, Defendants suggest the existence of a Visitation Policy that is applicable to the facility. Saunders Decl. ¶ 45; Saunders Decl. Ex. 10 at 272 (watermarked with "DRAFT"). This Draft Visitation Policy outlines many of the very practices that Plaintiffs seek. For example, the Draft Visitation Policy requires the publication of a handbook that "includes comprehensive rules and schedules" "conspicuously posted in detainee housing units and common areas to ensure accessibility;" and "visitation schedules, rules, and procedures . . . readily available to the public." *Id*. at 272. The Visitation Policy also includes protocol for "Visits by Legal Representatives and Legal Assistants" that requires "detainees to meet privately with their current or prospective legal representatives . . . during legal visitation hours." *Id.* at 274. The draft policy includes provisions for legal visits "seven days per week . . . with minimum visitation hours of eight hours on regular business days;" and requirements that the facility "provide private consultation rooms to ensure confidentiality during legal visits." *Id.* It also requires that the facility "permit the exchange of documents between detainees and legal

representatives, even if contact visitation rooms are unavailable," where "[d]ocuments will be inspected but not read." *Id.* at 275.

In addition, ICE has promulgated guidelines to ensure detainee access to legal representation. ICE's "Legal Access in Detention" factsheet outlines the specific ways in which ICE's detention standards provide for attorney access.[15] These standards provide for in-person and videoconference legal visits, confidentiality of communication, exchange of legal documents, the provision of unmonitored outgoing legal calls, exchange of legal documents, and legal mail. *Id.* These standards "offer an example of less restrictive alternative measures" that Defendants could have—but did not—take to protect attorney access. *See S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-760, 2020 WL 3265533, at *30 (D.D.C. June 17, 2020) (finding that ICE's "fail[ure] to comply with ICE's own Detention Standards related to confidentiality . . . supports that these restrictions and conditions are punitive since there are less restrictive alternatives"); *Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp.3d 1036, 1065 (C.D. Cal. 2019) (finding allegations of attorney access not in compliance with ICE's detention standards stated a Fifth Amendment claim).

### B. Plaintiffs Are Likely to Prevail on Their Fifth Amendment Procedural Due Process Claim.

Plaintiffs' procedural due process claim asks Defendants Executive Office for Immigration Review and Sirce Owen ("EOIR Defendants") to take a very simple step.[16] The bond subclass is

---

[15]    Immigration and Customs Enforcement, Legal Access in Detention at a Glance (2021), https://www.ice.gov/doclib/detention/LegalAccessAtAGlance.pdf [https://perma.cc/9P9G-3HPF]; *see supra* n.11.

[16]    Plaintiffs' motion sought a preliminary injunction against all Defendants as to Plaintiffs' procedural due process claim. Federal Defendants' opposition papers, however, make clear that EOIR Defendants have the authority necessary to provide the relief Plaintiffs seek. Lopez Vega

undisputedly entitled under statute and regulation to seek release from detention before *an* immigration court. 8 U.S.C. § 1226(a)(2); 8 C.F.R. § 1003.19. All that Plaintiffs request is for EOIR Defendants to identify clearly and publicly *which* immigration court from which they can seek release.

The EOIR Defendants' brief attempts to identify which court subclass members can approach to file bond motions: subclass members "can file bond requests with the immigration courts that were already handling their cases" before they were detained at Alligator Alcatraz. Fed. Opp. 11-12. But this identification is neither clear nor workable. Many subclass members had no immigration case before they were detained, so there are no courts "that were already handling their cases." Fed. Opp. 11; *see* Khan Suppl. Decl. ¶ 11; Weiser Suppl. Decl. ¶ 20. Others have received no Notice to Appear or A-number, which their attorneys need to file a bond motion electronically. Khan Suppl. Decl. ¶ 11. In these cases, their attorneys are unable to file bond motions in *any* immigration court at all. *Id.* EOIR Defendants are also wrong that subclass members can file in these courts: even those who have been able to file in the courts "that were already handling their cases" have had their bond motions rejected. Gutierrez Suppl. Decl. ¶ 13 (Broward Immigration Court, which had previously handled Plaintiff Lopez Hernandez's case, canceled his bond hearing due to lack of jurisdiction); Borton Decl. ¶¶ 8-10, ECF No. 29-1 (F.B.

---

Decl. ¶ 11 (EOIR "oversees immigration courts," and ICE "does not decide . . . whether an immigration court has jurisdiction over detention facilities and their detainees"). Plaintiff thus proceeds only against EOIR Defendants on this claim. The Court therefore need not consider the State Defendants' argument that they are not subject to the due process clause of the Fifth Amendment. Fla. Opp. 27. Plaintiff notes for purposes of that argument that the State Defendants claim that they act under color of federal authority pursuant to a 287(g) agreement. Fla. Opp. 11-12. In addition, the State Defendants are indisputably subject to the due process clause of the Fourteenth Amendment, which requires the same protections. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (setting out the test for procedural due process under the "Fifth or Fourteenth Amendment").

was detained at Krome Detention Center before arriving at Alligator Alcatraz, but the Krome immigration court denied a bond hearing).

To comply with procedural due process, EOIR Defendants have to do better, and must afford all subclass members a clear identification of what court has jurisdiction over their bond motions. The legal analysis here is largely undisputed. EOIR Defendants do not dispute that members of the bond subclass have a strong liberty interest in using the procedures made available by statute and regulation to seek their "[f]reedom from . . . detention." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see* Fed. Opp. 11-12. EOIR Defendants also do not dispute that failing to make available an immigration court to hear subclass members' cases creates a high risk of erroneous deprivation that EOIR Defendants could readily cure if they wished to. *See* Fed. Opp. 11-12. Nor can they dispute this: in the past weeks, ICE has illegally deported a subclass member, underscoring the need to provide timely judicial supervision of custody determinations. *See supra* p. 4.

Plaintiffs are aware of one subclass member who had a bond hearing while detained at Alligator Alcatraz (Plaintiff N.M.B., on August 11, 2025). *See* Suppl. Decl. Victoria Slatton ¶ 6. However, "[a] good or lucky day is not a state of compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 69 (1987) (Scalia, J., concurring in part and concurring in the judgment). Importantly, the fact that a subclass member managed to secure a hearing does not cure the issue here: EOIR Defendants' failure to identify an immigration court that will hear subclass members' bond motions.

## IV.    Plaintiffs Will Suffer Irreparable Harm Absent the Requested Relief.

Plaintiffs have already illustrated the grave harm faced by detainees held at Alligator Alcatraz due to these constitutional violations. *See supra* pp. 3-9, PI Mot. 3-10, 18-21. The harm encountered by Plaintiffs and proposed class members is extraordinary, even among people held

in government custody. In the past two weeks alone, officers have pressured detainees to sign voluntary removal orders without the opportunity to speak to counsel. *See supra* p. 4.  Defendants erroneously deported E.G.V., whose bond hearing was canceled by the immigration court on the basis that it lacked jurisdiction over detainees held at Alligator Alcatraz, even though he is still in immigration proceedings and has no final order of removal. He remains in Guatemala, despite his attorney's repeated requests to ICE to return him to the United States. *See supra* p. 4.

These harms have not been substantively curbed by Defendants' efforts, and there is no reason to believe that these harms will not continue absent court intervention. As such, Plaintiffs, and putative class members have a "cognizable danger of future violations," particularly where Defendants' cited improvements have only followed pressure from the instant litigation. *Lutrario v. City of Hollywood, Fla.*, 683 F. Supp. 3d 1361, 1371 (S.D. Fla. 2023) (cleaned up; citation omitted); *Or. State Med. Soc'y*, 343 U.S. at 333.

The State Defendants argue that Plaintiffs and the proposed class will not suffer irreparable harm from Defendants' denial of access to counsel because "the Facility is facilitating and approving every request by counsel to meet with detainees in their preferred format." Fl. Opp. 29. But this assertion is not the case. Attorney access remains woefully inadequate. Plaintiffs have demonstrated that the facility has not, in fact, timely facilitated many requests by counsel to meet with detainees in their preferred format. *See supra* pp. 4-8. "Delays and substantially restricted access to counsel" in immigration detention facilities "pose irreparable harm . . . in the absence of preliminary injunctive relief." *S. Poverty L. Ctr.*, 2020 WL 3265533, at *32. Defendants' attorney access restrictions also place the Organizational Plaintiffs' clients at risk of irreparable harm, which suffices for their own First Amendment harm. PI Mot. 14-16, 20. The "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*

*v. Burns*, 427 U.S. 347, 373 (1976); *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (same); *Gayle v. Meade,* 614 F. Supp. 3d 1175, 1205 (S.D. Fla. 2020) (the "*alleged* violation of a constitutional right ... triggers a finding of irreparable harm.") (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d. Cir. 1996) (emphasis in original); *see also BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC,* 425 F.3d 964, 970 (11th Cir. 2005) ("[T]he loss of customers and goodwill is an irreparable injury" to a business) (quotation marks and citation omitted).

The Bond Plaintiffs and proposed subclass face irreparable harm as they are subject to unnecessarily prolonged detention because Defendants have rejected their bond petitions and canceled their bond hearings due to their detention at Alligator Alcatraz. *See supra* pp. 4, 8-9. The Federal Defendants assert that because the "defendants are following the procedures in place for immigration court filings," that there is no irreparable harm. Fed. Opp. 12. But it is unclear what "procedures in place" the government has in mind, let alone whether Defendants have implemented or is following them. Defendants do not dispute that the prolonged detention faced by Bond Plaintiffs and subclass members constitutes irreparable harm. *See United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988) (the "unnecessary deprivation of liberty clearly constitutes irreparable harm"); *Fla. Immigrant Coal.*, 2025 WL 1423357, at *12 (finding the risk of unlawful "detention" supported irreparable harm); *Grodzki v. Reno*, 950 F. Supp. 339, 342-43 (N.D. Ga. 1996) (continued detention without bond hearing constitutes irreparable injury). Even worse, proposed subclass member E.G.V. was erroneously deported after the immigration court canceled his bond hearing. *Jean v. Nelson*, 711 F.2d 1455, 1499 (11th Cir. 1983), *on reh'g,* 727 F.2d 957 (11th Cir. 1984), *aff'd,* 472 U.S. 846 (1985) (noting the irreparable harm of faulty deportations); *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021), *aff'd in part, rev'd in part*

*and remanded*, 27 F.4th 718 (D.C. Cir. 2022) (irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide").

Because the harms to the Plaintiffs and the proposed class and subclass are substantial, ongoing, and imminent, this Court should find that Plaintiffs have demonstrated the requisite irreparable harm for a preliminary injunction.

**V.     The Balance of Equities Weigh in Favor of Plaintiffs, and Any Harm to Plaintiffs Far Outweighs the Potential Harm to Defendants.**

The balance of equities and public interest weigh strongly in favor of Plaintiffs and the proposed class. "Where the government is the opposing party, balancing of the harm and the public interest merge." *Gayle*, 614 F. Supp. 3d at 1206  (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Plaintiffs and the proposed class face irreparable harm to their constitutional rights. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Gayle*, 614 F. Supp. 3d at 1206 (citing *Fraihat v. ICE*, 445 F. Supp. 3d 709, 749 (C.D. Cal. 2020). Where "the plaintiffs are likely to succeed on their [First Amendment] claims, the balance of equities and the public interest favor injunctive relief." *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1360 (N.D. Ga. 2022) (quoting *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 46 F. 4th 1075, 1098 (9th Cir. 2022)). Conversely, "it is always in the public interest to protect First Amendment liberties." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (quoting *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)).

Here, Plaintiffs would suffer irreparable harm without preliminary relief. *See supra* pp. 39-41. Defendants, on the other hand, will be minimally burdened. The only potential interest cited by Defendants is a general "interest in allowing the government discretion to carry out its authorized functions." Fl. Opp. 31. Even if the injunction were granted, the government would be able to carry out all detention functions. The only thing the government would be prevented from

is denying access to counsel and bond hearings to Plaintiffs and the putative class, which is not an authorized function.

The Court undoubtedly "must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell v. Wolfish*, 441 U.S. 520, 539 (1979). At the same time, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011).[17] This Court recently found that a far more invasive injunction was necessary against Alligator Alcatraz. *Friends of the Everglades v. Noem*, No. 1:25-cv-22896-KMW, ECF No. 104 (Order). In *Friends of the Everglades* this Court found it appropriate to enjoin planned expansion of the facility because of concerns raised by Plaintiffs in that case. *Id.*

This case presents a far easier case for the Court. Here the preliminary injunction simply requests two narrow forms of relief: regular access to confidential communications with their attorneys and identification of an immigration court that has jurisdiction over Alligator Alcatraz so that detained people can file petitions for bond or release. ECF No. 29 at 3. The requested relief is constitutionally required, narrow, and presents minimal burden to the government. to provide. For these reasons the balance of equities and public interest weigh in favor of Plaintiffs.

## CONCLUSION

For the aforementioned reasons, Plaintiffs' Motion should be granted.

---

[17] *See, e.g.* Temporary Restraining Order, *Barco Mercado v. Noem*, No. 1:25-cv-6568 (S.D.N.Y. August 12, 2025), ECF No. 65 (ordering ICE to provide attorney access and improved conditions of confinement at the 26 Federal Plaza, New York temporary holding facility).

Dated: August 13, 2025

Paul R. Chavez (Fla. Bar No. 1021395)
Christina LaRocca (Fla. Bar No. 1025528)
AMERICANS FOR IMMIGRANT
JUSTICE
2200 NW 72nd Ave
P.O. Box No 520037
Miami, FL 33152
786-218-3381
pchavez@aijustice.org
clarocca@aijustice.org

Amy Godshall, Fla. Bar No. 1049803
Daniel Tilley, Fla. Bar No. 102882
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA
4343 West Flagler Street, Suite 400
Miami, FL 33134
786-363-2714
agodshall@aclufl.org
dtilley@aclufl.org

Respectfully Submitted,

*/s/ Eunice H. Cho*
Eunice H. Cho*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. N.W., 7th Floor
Washington, DC 20005
202-548-6616
echo@aclu.org

Corene T. Kendrick*
Kyle Virgien*
Marisol Dominguez-Ruiz**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
ckendrick@aclu.org
kvirgien@aclu.org
Mdominguez-ruiz@aclu.org

*Counsel for All Plaintiffs and the Proposed
Class*

\* *Admitted pro hac vice*
\*\**Application for admission pro hac vice forthcoming*

43