# DECLARATION OF KATHERINE H. BLANKENSHIP

I, Katherine H. Blankenship, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently and truthfully to these matters.

2. I am an attorney and co-founder of Sanctuary of the South, PLLC, ("SOS"), a legal services organization with offices in New Orleans, Louisiana, Miami, Florida and Chattanooga, Tennessee. SOS provides direct pro bono and low-cost immigration legal services and civil rights representation to people in Florida and throughout the Southeast. As part of its immigrants' rights work and mission to provide legal representation and counsel to immigrants, SOS and its lawyers provide deportation defense, asylum assistance, and family-based immigration services. SOS also represents and advocates for individuals harmed in federal custody, families of people who died wrongfully in ICE custody, and individuals physically abused by law enforcement. SOS represents people held in carceral and detention facilities due to their perceived or actual immigration status to advocate for their fundamental constitutional and human rights.

3. I am an attorney in good standing in the states of Tennessee and Florida. I am admitted in all United States District Courts in Florida and the Eleventh Circuit Court of Appeals. I specialize in the practice of immigration law. This declaration supplements my prior declaration filed in this case on July 17, 2025, at ECF No. 05-1.

4. Since July 2025, SOS has had eight prospective or retained clients held at the facility known as "Alligator Alcatraz." This includes a named Plaintiff in this case, Michael Borrego Fernandez ("Mr. Borrego"), who was detained at Alligator Alcatraz since July 5, 2025. Mr. Borrego was transferred to Krome North ICE Processing Center ("Krome") in Miami, Florida on or about midnight on August 2, 2025, where he remains at present. SOS currently represents two detained clients at Alligator Alcatraz, and plans to continue representing additional clients at the facility.

5. Since July 10, 2025, when I went in person to Alligator Alcatraz to visit five people and was turned away, I followed up to facilitate legal visits with these same individuals. I never received a response, and in fact, I was never able to make any contact whatsoever with four out of five of these individuals.

6. Michael Borrego is the only client SOS has been able to speak with from that initial list of clients and potential clients, and this consists of a single video call that was interrupted

at least twice by technological failures. After this case, *C.M. v. Noem*, was filed, I received emails from legal@pravacy6.come to facilitate a video call with Mr. Borrego. However, despite multiple assertions from legal@privacy6.com that my office would be able to schedule a video call with Mr. Borrego, the TNT facility failed to facilitate any of these legal calls, leaving myself and my staff waiting for calls that never came. SOS was not able to speak to Mr. Borrego until July 23rd via Zoom. At that time, Mr. Borrego was shackled at his ankles, wrists, and waist-chained, inhibiting his ability to fully participate in this legal visit and the call was interrupted at least twice by technical failures. Additionally, it was visible in the video call that Mr. Borrego was not in a private, enclosed room, but a cage with TNT staff walking by throughout the approximate 50 minute call. Mr. Borrego stated during the call that he felt they were intermittently listening to the conversation.

7. Although it seems like Alligator Alcatraz has allowed more attorney access since this lawsuit was filed, such as by allowing some video calls, my clients and I are still facing significant and unreasonable restrictions on attorney-client communication. SOS and our clients are unaware of any formal process to submit a complaint or grievance to the facility and have seen no such process posted to any website or communicated to those held at the facility or their attorneys.

8. It remains unclear who has custody of SOS clients, and it is impossible to find individuals at the facility on the ICE Locator, https://locator.ice.gov/odls/, or the Florida Department of Corrections "Inmate Population Information Search" at https://pubapps.fdc.myflorida.com/OffenderSearch/Search.aspx?TypeSearch=AI. Not only can I not find my clients, I am completely unable to identify immigration points of contact such as detention officers or file court papers. For example, I cannot file E-28 notices of representation on the online ECAS filing systems, as is typical, and I have no idea how or to whom I am supposed to file or submit E-28 forms.

9. SOS attorneys and legal staff continue to be blocked from in-person visits. On July 16, 2025, a SOS paralegal attempted to visit the facility to collect signatures on time sensitive documents. She was turned away and told that the facility had no legal mail set up so that she could confidentially deliver the documents. The only option she was given was to leave the documents with TNT staff, giving up all confidentiality, and return at an unknown date and time to retrieve them.

10. On July 30, 2025, SOS attorney Mich Gonzalez visited the facility to meet with one SOS client (Mr. Borrego) and two prospective clients and was again denied access. At the front gate of the facility, Mr. Gonzalez was stopped by two armed members of the Florida National Guard and asked to pull over. At that point Attorney Gonzalez spoke to

the officers,who appeared confused at his presence and was put in touch with an individual in "dispatch." The officer with dispatch explained that she was "not deputized" and therefore "did not know the law," but that Attorney Gonzalez would have to seek approval from the legal@privacy6.com email to be allowed access. Attorney Gonzalez asked the dispatch officer who in fact was responsible for responding to that email address, and she replied that she did not know. Attorney Gonzalez expressed that he had the right to visit with his client the same day and that people inside the facility were being denied their right to access counsel. At that point one of the officers stated that the only attorney visit he had seen was one approved with an attorney the day prior (July 29, 2025) where an attorney visited with nearly thirty clients. He stated therefore Attorney Gonzalez just needed to get the required approval for in-person visitation. Upon information and belief, the July 29, 2025 visit was in fact by an official from the Mexican consulate slated to meet with 29 detainees, and not attorney-client visitations.

11. On July 31, 2025, Attorney Gonzalez and I received correspondence from the legal@privacy6.com email stating that Mr. Gonzalez could not be accommodated to visit with clients in-person at the facility, including Mr. Borrego, until August 4, 2025 because other attorneys had visits slated for all times available in the dates prior to Monday the 4th of August. On the evening of August 1, 2025, Attorney Gonzalez received a message from Mr. Borrego's family member stating that he had been transferred out of the Alligator Alcatraz facility. After being processed at the Krome facility around midnight on August 2, 2025, Mr. Borrego finally appeared on the ICE detainee locator website. Attorney Gonzalez then immediately visited Mr. Borrego at Krome in-person on the morning of August 2, 2025, without providing any prior written notice to ICE or Krome security. This was the first time SOS was able to meet with Mr. Borrego in person since his initial detention at Alligator Alcatraz on July 5, 2025.

12. Scheduling legal video calls continues to be incredibly difficult and untimely. The facility is unable to schedule legal calls within any reasonable period of time, often taking over a week to schedule a legal video call. The facility also repeatedly fails to facilitate legal video calls, either not showing up for the call at all or dropping the call due to technical difficulties.

13. The only way that my clients have been able to call me is on a monitored, recorded outgoing phone line from Alligator Alcatraz. These calls are limited to 15-20 minutes and every 2-3 minutes a recorded voice interrupts the call with a notice that the call is being recorded and monitored. I feel speaking with my clients on this line violates my ethical obligations to maintain attorney client confidentiality and makes it impossible for my clients to have a private legal call. My clients have told me that access to this phone line

has been severely restricted lately, and that the phone is only available to all individuals detained at the facility for only 3 hours per day.

14. The facility's refusal to allow in-person visits and the extreme delay and problems with legal video calls have harmed my clients. For example, Mr. Borrego suffered two medical emergencies at the facility and reported that he was suffering life threatening medical neglect. Because of the impediments at Alligator Alcatraz SOS was unable to verify his health and safety, secure critical medical and detention records, or speak with anyone responsible for his custody regarding his acute medical condition and need for medical care and accommodation.

15. When I have been able to obtain a video call with my client at Alligator Alcatraz, it is clear that the calls are not confidential. Although the facility has provided a headset for clients to use during their calls, everything that clients say to me is clearly heard by guards who are a mere few feet from my clients. My client, Mr. Borrego, informed SOS staff that the video calls are not confidential, and that others, including guards, can clearly hear what he is saying during legal calls. This has affected my ability to have a confidential conversation with my client necessary for preparation of his case.

16. It also remains impossible to exchange legal documents confidentially with my clients at the facility. As set forth above, SOS staff were informed that there was no mechanism to send or receive legal mail from the facility and that the only way to deliver legal documents was to drop them off at the facility, without any assurance or mechanism to ensure confidentiality, to be picked up at an unknown date and time. Further, the facility often refuses to schedule legal calls unless attorneys can submit a G-28 form executed by client. The execution of this form is made impossible by the facility, thus inhibiting all legal contact with clients and prospective clients. The lack of legal mail and complete inability to exchange confidential legal documents has delayed my ability to review documents and to obtain signatures.

17. Although the facility has never allowed SOS staff access, staff at "Alligator Alcatraz" now allege that attorneys can schedule in-person meetings with detained individuals. Although SOS staff have yet to successfully schedule such visits, the requirement to pre-schedule legal visits is unlike any other detention facility. For example, for every other immigration detention center in Florida, I am able to travel to such facilities for legal visits every day of the week without and prescheduling requirements.

18. SOS clients who are detained at Alligator Alcatraz are prevented from having access to the Immigration Courts. For example, prior to being transferred to the facility a non-plaintiff SOS client was in removal proceedings before the non-detained Miami

Immigration Court and his proceedings were fully accessible to counsel via the ECAS system. However, once he was detained at the facility, his proceedings were no longer accessible via ECAS. Even after his subsequent transfer to Krome, SOS was unable to file any motions in his case via the ECAS portal. SOS had a similar problem with client, E.R., a recently retained SOS client who has been detained at Alligator Alcatraz for over two weeks. E.R. is a DACA recipient who has never been placed into removal proceedings. E.R. was served with a Notice to Appear while in ICE custody in Orlando. However, upon arriving at Alligator Alcatraz, these documents were taken from him and no one at the facility explained to him what would happen in his case. SOS had a video legal call with E.R. on August 7, 2025 during which he stated that days prior, upon seeing the rare sight of an ICE officer walking through the facility, he asked what happened to the Notice to Appear he had been given with a hearing date to which the officer replied that this paperwork meant nothing now and he would simply have to wait. When SOS staff search for E.R. in the EOIR case status website, there are no results. Thus it appears E.R. has been deprived of his liberty at Alligator Alcatraz with no clear authority or due process. Had E.R. been held at a regular immigrant detention center, his NTA would likely have been filed and SOS would have the ability to file a bond motion in his case. In short, we are being prevented from providing E.R. the legal representation he has retained SOS to provide.

19. I have discussed with Mr. Borrego his participation as a class representative in this case, and the responsibilities that accompany being a class representative. He is willing and eager to continue to represent the class, even though he was transferred from Alligator Alcatraz. This includes considering the interests of other detainees in the class as equal to mine, the need to stay in contact and work with the attorneys in this case, preserve evidence in this case, and evaluate any settlement agreements.

Executed on August 11, 2025, at Chattanooga, Tennessee.

/s/ _Katie Blankenship_

Katherine H. Blakenship