UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 25-CV-23182-RAR

C.M., MICHAEL BORREGO FERNANDEZ, J.M.C., E.R., on behalf of themselves and all others similarly situated, et al., — Miami, Florida

Plaintiffs, — August 18, 2025

vs. — 10:00 a.m. - 12:31 p.m.

KRISTI NOEM, Secretary of the United States Department of Homeland Security, et al.,

Defendants. — Pages 1 to 130

---

PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE RODOLFO A. RUIZ, II
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFFS:

EUNICE HYUNHYE CHO
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 15th Street NW, 7th Floor
Washington, DC 20005

CORENE T. KENDRICK
KYLE A. VIRGIEN
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
425 California Street
Suite 700
San Fransisco, California 94104

(Appearances continued.)

FOR THE PLAINTIFFS:

AMY NICOLE GODSHALL
4343 W. Flagler Street, Suite 400
Miami, Florida 33134

CHRISTINA ISABEL LaROCCA
AMERICANS FOR IMMIGRANT JUSTICE
LITIGATION and ADVOCACY TEAM
2200 NW 72nd Avenue
Miami, Florida 33152

PAUL RAYMOND CHAVEZ
AMERICANS FOR IMMIGRANT JUSTICE
LITIGATION and ADVOCACY
6355 NW 36th Street, Suite 309
Miami, Florida 33166

FOR DEFENDANTS, RONALD DeSANTIS and KEVIN GUTHRIE

NICHOLAS JOHN PETER MEROS
SHUTTS & BOWEN, LLP
215 S Monroe Street, Suite 804
Tallahassee, Florida 32301

FRANK ZACHERL
SHUTTS & BOWEN, LLP
200 S. Biscayne Boulevard
Suite 4100
Miami, Florida 33131

FOR FEDERAL DEFENDANTS:

MARLENE RODRIGUEZ
UNITED STATES ATTORNEY OFFICE
99 NE 4th Street, Suite 300
Miami, Florida

STENOGRAPHICALLY REPORTED BY:

ILONA LUPOWITZ, RMR, CRR
Official Court Reporter to:
The Honorable Rodolfo A. Ruiz, II
United States District Court
Southern District of Florida
400 North Miami Avenue
Room 11-2
Miami, Florida 33128
(305) 523-5737

(Call to the Order of the Court.)

THE COURT: We are here this morning in Case No. 25-3181. This is the matter of C.M., et al., versus Noem, et al.

I do believe that folks are listening on the audio line. So before we proceed, I would just ask that anyone that is listening in on today's proceedings, as permitted by the Judicial Conference, please make sure you mute so that we don't get any feedback here in the courtroom.

With that, let's go ahead and get appearances on behalf of the plaintiffs.

MS. CHO: Good morning, Your Honor. Eunice Cho on behalf of the plaintiffs.

THE COURT: Good morning.

And on behalf of -- we have everybody here, I think. Let's get all our appearances. I know Ms. Cho is leading the charge, but go ahead.

MR. VIRGIEN: Good morning, Your Honor. Kyle Virgien on behalf of the plaintiffs.

MS. KENDRICK: Good morning, Your Honor. Corene Kendrick on behalf of the plaintiffs.

MR. CHAVEZ: Good morning, Your Honor. Paul Chavez on behalf of the plaintiffs.

MS. GODSHALL: Good morning, Your Honor. Amy Godshall, from the ACLU of Florida, for the plaintiffs.

THE COURT: Very good. Good morning. Good morning to you-all.

And on behalf of our defendants, go ahead, guys.

MR. MEROS: Good morning, Your Honor. Nick Meros on behalf of the state defendants.

MR. ZACHERL: Good morning, Your Honor. Frank Zacherl, with Shutts & Bowen, Miami, also for the state defendants.

MS. RODRIGUEZ: Good morning, Your Honor. Marlene Rodriguez on behalf of the federal defendants. With me at counsel table is Eileen Kelmet (phonetic), who will be assisting with the technology.

THE COURT: Very good.

All right. So we are set today to address the motion or renewed motion for preliminary injunction. The Court intends this morning to go through a couple of the key legal issues that have manifested themselves over the last few weeks by way of affidavits and supplemental filings.

As we discussed last Thursday, I anticipate that the entire hearing will be focused on certain legal concerns, certain issues on both the Fifth and the First Amendment, concerns regarding jurisdiction, and concerns regarding venue. So we're going to try to cover all of that this morning.

Certainly, I have a plan of attack, if you will, or way in which I think we can most expeditiously go through the key issues in the case. And perhaps the best way to start is with

the latest development.

So Docket Entry 83, filed on Saturday -- this was August 16, 2025 -- the federal defendants' notice of material development -- and I'm just going to read from it:

"The federal defendants notify the Court that the Executive Office for Immigration Review, EOIR, has designated Krome North Service Processing Center as the immigration court with administrative responsibility over the Alligator Alcatraz detention facility." And then there is a link posted below that. And, most importantly: "All Alligator Alcatraz detainees may file bond petitions with Krome."

Now, the federal defendants maintain that this has rendered Count 5, our Fifth Amendment count in the operative complaint, moot.

And going back to the relief requested in Count 5, I would like to address this argument first on the plaintiffs' side. Because if you look at the supplement, Docket Entry 28, at paragraph 150, the Fifth Amendment claim is premised entirely on the contention that, quote: "Defendants have failed to identify which immigration court has jurisdiction over Alligator Alcatraz."

And in fact, later on, paragraph 152 states that this Fifth Amendment violation could, quote: "Readily be cured by publicly identifying which immigration court has jurisdiction over Alligator Alcatraz." And in fact, I believe it's the only

non-declaratory relief that's sought in the Fifth Amendment claim. You see that later on, as well, in Docket Entry 67.

So I guess my first opening question, Ms. Cho, for plaintiffs, now that, as of Monday, the federal defendants have identified Krome as the facility or the court -- the immigration court with jurisdiction over those in Alligator Alcatraz, what does that do to your Fifth Amendment count?

Is it viable? Is it moot? What are we doing with that?

MS. CHO: Well, yes, Your Honor.

Would it be better for me to speak from here?

THE COURT: Whatever is easier. If you want to go from there -- because then I'm going to have you shuttling back and forth.

And then, you know, these courtrooms are lovely; they're cavernous. But, you know, they never thought about just putting two old plain, old podiums in the front so I could have everybody closer to me. So to make it easier, both sides just remain where you're at. As long as you speak into the microphone, we'll be good to go.

So go ahead, Ms. Cho.

MS. CHO: Of course, Your Honor.

Your Honor, the plaintiffs are happy to enter into a court-enforceable stipulation that designates the Krome Immigration Court as the court with jurisdiction over Alligator

Alcatraz.

The plaintiffs do not believe that this claim is moot because this is an instance of clear voluntary cessation, and in cases of voluntary cessation, defendants have a very high bar to show that wrongful behavior will not reoccur. And unfortunately, the record in this case provides little confidence that this will not change.

Over the last month, the defendants have changed their position as to which immigration court, if any, has jurisdiction over people held at Alligator Alcatraz three times. We initially began the month where the defendants claim that no immigration court had jurisdiction over detainees at Alligator Alcatraz.

Upon filing of the motion, the defendants again changed their tune, stating that immigration courts that had prior hearings with the detainees could have jurisdiction over detainees in Alligator Alcatraz, but, of course, this left out a wide swath of people who never had hearings before any immigration court. And upon the eve of this hearing, the defendants have now, again, changed their tune with respect to the Krome Immigration detention court.

Now, there is no guarantee, of course, that the defendants will not again change their tune at the conclusion of this hearing, and for that reason, we request that the Court issue a preliminary injunction to bind the defendants to that

position during the pendency of this litigation.

THE COURT: Thank you for that, Ms. Cho. That's very helpful.

And let me ask, just directly to my federal defendants, to see if we can get this clear on the record. I take it that there will be no change of position in this regard, in that Krome will be the facility with administrative responsibility over Alligator Alcatraz.

So I want to confirm that. Is that indeed the position, Ms. Rodriguez, that we have here on behalf of the federal defendants?

MS. RODRIGUEZ: Yes, Your Honor.

You know, I can't speak to, let's say, three years from now. You know, if the immigration court at Krome is overrun with immigration petitions, or, God forbid, something happens to the court there, the Executive Office for Immigration Review has the discretion and the duty to assign another court. We can't speak about speculative -- you know, we can't speak about future actions that are completely speculative. But right now, that is the only relief that was requested in the supplemental complaint.

Your Honor, may I -- may I use the PowerPoint?

THE COURT: Sure. If you need to, yeah. Yeah.

MS. RODRIGUEZ: You know, we ask the Court to take judicial notice of the posting that is on the Executive Office

for Immigration Review website --

If we can go to the next slide, please, and the next one, click again.

-- which identifies Alligator Alcatraz Florida Detention Center in Ochopee, Florida, as falling under the designation of Krome North Processing Detention Center.

Next one, please. Next one.

As Your Honor pointed out, in the supplemental complaint that is the only relief that was requested, that a court be designated. And as Your Honor also pointed out --

We can go to the next, please.

-- in the plaintiffs' reply on the preliminary injunction motion, plaintiffs' procedural due process claim asked the EOIR defendants to take a very simple step.

(Court reporter clarification)

THE COURT: Go ahead and repeat that.

MS. RODRIGUEZ: Yes. Plaintiffs' procedural due process claim asked the EOIR defendants to take a very simple step. All that plaintiffs request is for EOIR defendants to identify clearly and publicly which immigration court from which they can seek relief 7--

THE COURT: Right. Yeah. And I don't mean to cut you off, but that's what I stated in the beginning. We are well aware that Count 5 is only requesting this relief. All that we care about here is exactly what Ms. Cho mentioned, which is a

Voluntary Cessation Doctrine concern. Okay?

So we know that ordinarily this kind of situation raises the specter that the government could potentially change their position in the future. And so what plaintiffs are understandably concerned about is that it has to be clear, absolutely clear -- and this is from case law from the Eleventh Circuit -- that the allegedly wrongful behavior could not reasonably be expected to recur. So I want to just confirm again with the government.

And I understand that there could be unique circumstances at Krome having a problem being overrun, whatever it may be. But as we sit here today, I want to make sure that it's the government's decision to allocate these bond determinations and oversight over Alligator Alcatraz, by Krome, and that that decision is, to the extent possible, permanent and complete; it's unambiguous; there's a consistent commitment to it; and we're not going to have, for example, in two weeks a different facility designated or, perhaps worse, have a situation where no facility is designated, which is really how this all began in the first place, that there just wasn't any immigration court identified. And we had immigration judges saying they were without jurisdiction.

So can I get representation today, on the record, from the federal government, that we do have an allocation to Krome when it comes to Alligator Alcatraz, and we don't intend on --

or the EOIR defendants don't intend on reversing the determination that Krome has jurisdiction over Alligator Alcatraz?

MS. RODRIGUEZ: Yes, Your Honor.

THE COURT: All right.

So, Ms. Cho, let me ask you this: I know you mentioned the stipulation. The Eleventh Circuit, I know, in cases similar to this, has relied on representations like the one that I just extracted from the federal defendants, through Ms. Rodriguez, on behalf specifically of the EOIR, that the government's decision to terminate this problem of not allocating a decision-making body over Alligator Alcatraz is now no more. It's unambiguous that they have made a representation that this is going to be the facility that has oversight for bond determinations.

And so are you comfortable with that statement and that confirmation on the record, at this point?

MS. CHO: Well, we appreciate that the government has made that statement on the record. We expect that if the government deviates from that position that it purports, that we would be able to reinforce that with the Court, again, in the future.

THE COURT: Yes, no, absolutely. I think for purposes of the Court's determination today, though, I would like to refer to not only the filing on Saturday, but the direct answer

to the Court's question that there is, at least in my view, no concern from a voluntary-cessation issue because we now have representations made in writing, and from today's hearing, that they plan on having Krome be the entity with jurisdiction, and they publicized that information when it comes to Alligator Alcatraz. So I think that helps us quite a bit.

I know that your view would be it's not formally moot because of Voluntary Cessation Doctrine, but I would think that if we had the representation that we just got, that might change the equation a little bit for the Court. I'll look back and confirm, but I think that there is really no expectation that this would recur. I can tell you, though, that if for whatever reason the website changed or the determination disappeared, then the Court would have grounds to reengage the parties and find out exactly what's going on when it comes to the Fifth Amendment claim and the relief that you've requested.

Does that make sense?

MS. CHO: Thank you, Your Honor.

THE COURT: Okay. Good.

So now that we've taken care of, really, the Fifth Amendment issue, I think we can stay on the issue of mootness more generally because we -- we want to go to the First Amendment, I think, and talk a little bit about that because we're kind of already in the mindset on the First Amendment front.

Now, I want to make sure that I'm getting this right, Ms. Cho, in your view, because there have been arguments made -- this is more from the state defendants as opposed to the federal defendants -- that all the requests for detainees to meet with legal counsel have been granted. I believe that their position is that there's not a lot of controversy, if you will, between the parties.

But my understanding, from looking at your papers, is that the First Amendment claims persist, and they have not been mooted. And there's a couple of reasons why, and I think I can point to a number of these from Docket Entry 67.

You have argued that the defendants continue to impose significant barriers to attorney access; in particular, the delays that have persisted in scheduling videoconferences and in-person visitation, which you maintain prejudices the detainees' cases.

You've also pointed out that, in some instances, detainees haven't had the opportunity to speak with their attorneys at all. You have pointed out confidentiality concerns with legal videoconferences, as well as outgoing phone calls. And you've pointed out concerns as to confidentiality with exchanging legal documents and their ability to receive legal mail. And basic information has been difficult to find, if you will, when it comes to attorney-access protocols.

So am I right that the plaintiffs maintain that even

though we may have had some meetings, even though we may have had some communication, we continue to have an ongoing First Amendment violation, particularly because of delay and confidentiality safeguards?

I wanted you to tell me if I'm right, that that's the two kind of buckets that drive the First Amendment claim as it stands here today. Because as we talked about last week, we've moved from the total ban to something different.

Can you touch on that?

MS. CHO: That's correct, Your Honor. And I believe that your synopsis of the facts at play at Alligator Alcatraz with respect to attorney access is correct. There is, I think, detainees -- the defendants have begun a process of in-person visitation; however, these visits are not timely provided. And in many cases, the delay is tantamount to denial.

With respect to videoconferences, these videoconferences are not granted in a timely fashion. And they are not confidential, which does not allow for attorney-client privilege to take place.

In addition, detainees are not provided with confidential outgoing legal calls. The only way for detainees to call out of the facility is currently on the recorded, monitored line, and that does not provide the confidentiality required for outgoing legal communication. There is no means for confidential document exchange at the facility. The

defendants freely admit that there is no legal mail system existing at the facility.

When attorneys have attempted to provide documents, they are required to provide them in advance for review and approval by the facility. There is no way for attorneys to bring documents into the facility without having a preexisting appointment, which then also requires that review of the documents. There is no provision of these policies, the basic information of what phone number, what email to contact in order to request these visits. This is basic information that underlies the ability to even access these First Amendment protections in the first place. And attorneys aren't able to confirm whether or not their clients are actually at the detention facility because they are not showing up in the ICE detainee locator.

All of these issues still arise to the level of a First Amendment violation that violate both the detainees' rights to communicate with their attorneys, as well as the organizational plaintiffs' ability to communicate with their clients who are detained at Alligator Alcatraz.

THE COURT: Thank you for that.

So let me ask: On the state side, state defendants, Mr. Meros, I don't know if we're continuing to maintain a mootness argument. Obviously, I think the Fifth Amendment argument is all but moot with the stipulation, if you will,

from the federal defendants that we know Krome is a facility, and the scope of relief framed by the pleadings pretty much narrow the Fifth Amendment claim to that particular question. I mean, they were just seeking to know who has designation, if you will, or who has jurisdiction over Alligator Alcatraz.

On the First Amendment front, I would agree. The claims have changed, if you will; they've been narrowed. But I don't know that I am moot or have a mootness problem. There's still a live controversy with the nature of access.

Can you speak as to that? I know you've raised, kind of, the specter that some of the arguments or some of the relief has been mooted.

MR. MEROS: Yes, sir.

So I mean, we have not made a clear mootness argument. We have made the argument that all they sought in their complaint and, frankly, in their renewed motion for preliminary injunction was simply to have access to their counsel. And that has been provided. It's, in fact, undisputed that it was provided before they even filed their lawsuit, which plaintiffs did not let on to the Court. It was provided as soon as -- I believe, as soon as July 15th. It actually started to be provided as soon as July 10th, once (indiscernible) gained access over the legal inbox. So it has been clear that legal access has been provided. And legal access has been growing as the facility has been standing up. So we have not argued that

it is -- that it's moot.

What we've argued is as every day goes on, there's more access provided. As this Court has recognized, building an entire detention facility, you know, out of nothing will take time; it's not something that's going to happen immediately. But every day that goes by, there is more access that is provided.

So what they're requesting has been changing, which, you know, we do not believe is proper. But to the extent that they are allowed to make those changing claims, their claims are being denied or anything like that is simply false. They're relying on anecdotal examples that actually aren't correct.

The two biggest examples that they cite in their reply is the example of Ms. Anna Weiser, where she claimed that she had to wait more than three weeks to be able to have a meeting and did not have a meeting before her client was transferred; whereas, in fact, she did not actually send an email or contact the facility until July 23rd. And in that email, she did not actually request a meeting until August 4th. And in that email, the facility offered a meeting that same day. They responded on the 5th, offered a meeting on the 5th or the 6th, and Ms. Weiser actually declined and chose the August 15th date. So any, you know, delay there was on Ms. Weiser's behalf, not on the state.

And the same with Ms. Velazquez. The plaintiffs argued in their reply that she first contacted the facility on July 11th and did not receive a response before her client, Plaintiff C.M., was transferred on August 1st. The state defendants have checked multiple times. There's been no communication from Ms. Velazquez.

So we highlight that only to point out that the plaintiffs' -- the plaintiffs' arguments are based on anecdotal examples. But what is undisputed is that every request by the plaintiffs, and for all detainees at the facility, have been granted or scheduled, and that everyone that has requested a meeting has received one. There have been no complaints. The state defendants have not denied a single request for a meeting.

Now, on the additional claims they're making on confidentiality, document exchange, all those things, those are simply incorrect. They clearly contradict the declarations that the state defendants have provided. There absolutely are -- there absolutely is confidentiality in both the videoconference and the in-person meetings. I can tell you that in the declarations we provided, the videoconferences were occurring in booths with -- in private areas with booths with, you know, either drapes, you know, or some kind of covering.

Now, since then, the facility has continued to build more structure, and now the private rooms, where the in-person

meetings are occurring, are now in the same places where the videoconference rooms are occurring. So both the videoconference and the in-person meetings are now occurring in private rooms, with doors. And there is staff that is there monitoring, but staff are not inside the room. They are outside the room. They are not within hearing distance. So there absolutely is confidentiality in those rooms.

There also is absolutely the ability to exchange documents. Attorneys are allowed to bring documents to the facility. That is clear. They are allowed to either have the detainees sign the documents and take them with them, or they're allowed to leave the documents with the detainees. And while they are inspected when they come to the facility, they are not read. They are not -- they do not need to be approved. But they are inspected, as is the case at any other facility, to make sure that there is not contraband that they are bringing in, and that they can be left with detainees.

There's also the ability -- and the facility has also -- when attorneys have emailed documents to the facility, the facility will then provide those documents to the detainees. So there is -- although there is not a U.S. Postal Service at Alligator Alcatraz, there is the ability to provide documents. They are confidential to the extent that they are not approved; they are not reviewed. But they are provided to the detainees.

And while it's true that the phone calls being provided are recorded, there is not a requirement that every single mode of communication from the defendant facility has to be confidential. You know, at all sorts of facilities, all sorts of prisons -- obviously, this isn't a prison, but all sorts of facilities where there are phone calls, those are recorded and monitored.

And even more importantly I think -- I think the overarching issue the Court needs to recognize is that the plaintiffs have not cited a single case where, beyond legal access, that there is a First Amendment requirement to provide almost everything that they're asking for: You know, the legal mail, you know, the -- providing instructions in multiple languages. All these things that they're asking for, that they've shifted their relief in their renewed motion -- excuse me, not in their renewed motion, in their reply, there's not a single case cited for that requirement.

THE COURT: Well, let me first take a step back before we get into the ongoing nature of communication. I want to be clear. Although I don't disagree that the way in which the communication breakdown was described in the original complaint was characterized as a total ban, I want us all to be on the same page that concerns regarding legal mail, confidentiality, and the like were expressed in the original pleadings and in the supplement under 15(d).

So when you say to me, well, everything is being done that they're asking for, that sounds a lot like mootness. But then you're telling me, I'm not making a mootness argument. So I want to make sure I make this very clear. I don't believe you guys are saying anything is moot. I do believe you are arguing that the scope of relief may have changed. Now I know that on merit you're saying, we've done everything in terms of confidentiality, legal mail, and the like, so there's not really anything there from a merit-based determination.

But just so that I'm clear, you and I, I think, are on the same page that certainly concerns regarding confidentiality and legal mail were expressed in the operative pleadings, right?

MR. MEROS: Yes, sir.

THE COURT: Okay. All right. I just want to make sure. So it's not necessarily that you're making a mootness argument. I hear you there loud and clear. You're just saying that in many ways the relief or the narrative that's being put forth in the pleadings is rebutted by the nature of what's happening on the ground.

Now, I guess my concern is, to your point, just as you've noted confidentiality issues that you believe are being addressed at Alligator Alcatraz and concerns with communications, you know, obviously, I also have evidence in the record that would indicate some of the delays, for example,

are certainly still ongoing.

So, for example, Anna Weiser, an attorney for plaintiff Gonzalo Almanza Valdes, waited three weeks to receive a response to her request to meet with Almanza Valdes. The two then had a meeting scheduled for August 15, 2025, but then Mr. Valdes was transferred out of Alligator Alcatraz on August 11, 2025, before he had a chance to speak with his attorney.

My understanding is the same issue happened with Plaintiff Borrego and his legal counsel, which is Plaintiff Sanctuary of the South. They had a meeting scheduled for August 4, 2025. Borrego is ultimately transferred from Alligator Alcatraz on August 1, 2025, before he's ever able to meet with legal counsel.

So I say that because although there may be some argument here on the merit regarding the nature of confidentiality and legal mail, there does seem to be a live case for controversy about delays or timing issues. And certainly, I'm sure that there is arguments on the other side that I've seen in the reply regarding where folks are communicating with their lawyers within earshot, if you will, of facility personnel and that there could be some concerns on the confidentiality front.

But I hear what the state is saying, in that there has been some mode of relief -- certainly, much more than what has

been indicated in the first set of pleadings when it came in through the door. And that some of these delays are a natural byproduct of a facility being stood up very quickly and continuously attempting to improve access. I do note that at least in some of the email traffic, there was a commitment from Alligator Alcatraz to respect the right to counsel, which I was happy to see.

Ms. Cho, I want to give you a chance -- we're not really going into the --

MR. MEROS: Your Honor?

THE COURT: Oh, yes, Mr. Meros. You wanted to follow up on that point. Sure.

MR. MEROS: Yeah, sorry.

THE COURT: Yeah.

MR. MEROS: The only -- the one point I wanted to make was that the issue with the anecdotal examples is that the one you raised about Ms. Weiser -- so I think our declarations directly contradict this point because we mentioned that this -- this -- was in the motion for preliminary injunction, but it's clear that after looking back at the documents, the stated delay of weeks and weeks actually did not occur. Because while she may have sent emails, the emails were either sent to ICE or to other emails. They were not sent to the facility.

So what actually happened was that the first contact

with Ms. Weiser to the facility was on July 23rd. But in that email, there was no actual request for a meeting. So the facility certainly cannot be faulted for not providing a meeting that was not requested. The first request for a meeting to the facility was on August 4th. The facility responded the next day, which is consistent with our declaration, that we've said that the policy of the facility is to respond and to try to provide the relief within a day. On August 5th, we responded and offered a meeting that same day, and on August 6th. Ms. Weiser declined and chose the August 15th date. So while her client was then deported on the 11th, that certainly cannot be blamed on the facility.

Same with Mr. Borrego. I don't have that at hand, but that's a similar situation where the representations by the plaintiffs were not correct in that the seeming delay of days and days or weeks and weeks was simply not correct.

So while we're not arguing the mootness, we are certainly arguing that the relief that they are seeking, to the extent it is required, we are absolutely providing it. And cherry-picking anecdotal examples of one person had a meeting, and it looked like there were people were walking behind them. Or one person had a meeting, and it looked like there was chain link. Well, there is chain link around the facility. But now, you know, they are always occurring in these rooms. And while someone might be seen in the back -- you know, these anecdotal

examples are not enough certainly, you know, to overcome the plaintiffs' burden to show that there is a clear denial of prisoners' rights.

THE COURT: So to try to state your position in an alternative way, you believe that from a preliminary injunctive relief standard and success of likelihood on the merits and the extraordinary relief being requested that the evidence in this record does not support a success of likelihood on the merits as to the First Amendment claims so that any sort of relief can be afforded on the First Amendment counts because, at minimum, there is a genuine dispute here as to whether these anecdotes are accurate and whether or not there have been these purported breakdowns in confidentiality, legal mail, and the like.

Your point is, you have supplemented the record with enough to rebut, or at least call into question, the denials of First Amendment protections so that preliminary injunctive relief at this stage would not be warranted. Is that fair to say?

MR. MEROS: Yes, sir. And I'll add real briefly -- I know I've taken a lot of your time. But we're happy to add supplemental declarations to show the progress of the facility since we last provided our declaration, you know, and we would certainly have other arguments on the First Amendment and the (indiscernible), but that accurately captures --

THE COURT: And by the way, obviously, I'm doing this

because it's very important for the Court to first determine, really, where we're at in the sense that there have been a lot of changes on the ground. I know there are other arguments with venue, which will be what we finish up with today. But it's important that I get a sense, as I did with the Fifth Amendment claim, as to what's still viable under the First Amendment claim.

So, Ms. Cho, let me ask you on this point, we, I think, have pinned down a position that they are not arguing, the state defendants are not arguing mootness. This is still a live case for controversy under Article 3. It's not a concern on that front, as it was on the Fifth Amendment given that the relief requested has been satisfied by filing and by representation here in court.

But as I stated just a moment ago, there is a back-and-forth, if you will, regarding confidentiality, regarding the scope of access. And I want to hear where you're at on this because, obviously, state defendants believe that there wouldn't be enough here to justify the entry of preliminary injunctive relief, assuming the Court can reach that question after handling venue.

What's your sense on that?

MS. CHO: Your Honor, as you have stated, we believe that there is a very clear case in controversy at issue here and that there continues to be a case in controversy despite

the defendant's representations of improvements to attorney access at the facility.

On the issue of confidentiality and videoconferences, for example, we ask that the Court credit the declarations and the statements of detainees themselves and the attorneys who have spoken directly with detainees themselves in the setting that is provided by the defendants. The videoconferences take place in a cage that is constructed out of chain-link fence. The defendants themselves have referred to drapery. None of that is conducive to a confidential setting for communication.

The attorney declarants have seen other people walk in and out of the frame during these conversations with counsel. That is clearly not a confidential setting. And they have asked detainees directly themselves if they feel that these calls are confidential and if they feel at liberty to share information with the attorney. And the detainees themselves have said no. All of this indicates that the videoconferences are taking place in a setting that is not confidential, that does not allow for attorney-client privilege to take place.

THE COURT: Go ahead, Ms. Cho. Go ahead.

MS. CHO: With respect to the delays with respect to the scheduling in-person and videoconference calls, the defendants take issue with Ms. Weiser's declaration, for example, saying that the emails that she purports to have sent were never received by the defendants.

However, I think what this, perhaps, points to is a larger problem with, one, the lack of clear public information as to what the appropriate email address should be that attorneys are supposed to email to request videoconferences, and that is something that the detainees have said that they aren't doing because they claim that there is no First Amendment right to that. It is very clear that this basic information would -- there's no rational reason for not publicizing this information. Every other correctional facility in the country does this on a routine basis. In addition, it would certainly help to clear up any confusion.

The other point is that it seems that the detainees -- the defendants are trying to pinpoint -- they're trying to place fault on the attorneys for their failure to actually be able to track and receive and respond to accurately these emails from attorneys. It does not inspire confidence that -- when you have sworn declarations from attorneys who state they have repeatedly emailed the facility requesting visits and the facility has no record of that, that does raise some question as to whether or not the defendants have done a good enough job to accurately share what information should be -- where these requests should be made and whether or not they're actually tracking these requests in an orderly, organized manner.

So for that reason, I would also point to -- there are many other examples in the record, beyond Ms. Weiser, beyond

Ms. Blankenship, of course, that show that this delay is a persistent problem and that detainees are being prejudiced as a result of the delays that are now, of course, tantamount to denial.

THE COURT: Let me ask you a legal question, actually. Mr. Meros touched on it briefly. One of the concerns for the Court, in looking at the papers, is making a differentiation, if you will, on the First Amendment legal standard when it pertains to detained plaintiffs as opposed to attorney plaintiffs. You know, on the one hand, you have cases like *Turner* and *Pesci*, which touch more on the penological interests.

And for the attorneys, we have cases like *Button* and *Primus*, and cases of that nature, the Haitian refugee case, and those cases talk about the First Amendment right to inform individuals of their legal rights when counsel does so as an exercise of political speech unaccompanied by expectation of remuneration.

I guess my question to you on this point is: The reply really focuses on the detainee cases. We don't really have a lot built out on the attorney cases. And to the extent the court weighs on the merit-based determination on success of likelihood on the merits, you heard just a moment ago your friend on the other side suggests there's really isn't any case law you can point to for the First Amendment relief. Can you

speak a little bit on that differentiation.

Categorical restrictions or total bans, I think, were easier. We're not there anymore. Now we have an evolution. The restrictions, in your view, continue. But I'm trying to get a sense of your First Amendment theory, which looks like it's now based purely on timeliness and confidentiality.

Can you kind of maybe point to me where would the case law in support of that First Amendment theory come from? And it could be for both, right? It could be different, I would imagine, for detained versus attorney plaintiffs.

MS. CHO: Sure. Well, Your Honor, I believe that you're right that the First Amendment claims for the organizational plaintiffs and for the detained plaintiffs come from different doctrinal standpoints for sure. As you mentioned, the organizational plaintiffs based their First Amendment rights on the *Primus* and *Button* line of cases, which provide that organizational plaintiffs, such as the ones that are present in this case, have the First Amendment right to communicate and solicit clients in exercise of their free speech.

The Haitian refugee and the Cuban American cases, of course, are inapplicable here because in those cases the Court was examining the rights of migrants who had not yet entered the United States. And there was a determination by those courts that those migrants, because they were not yet in the

United States, had no rights by which the organizational plaintiffs could exercise their free speech in that there was no right to enforce, and, thus, there was no basis for the First Amendment right to be expressed.

Here we have a completely different case. We have immigrants who are being held at a domestic facility who clearly have a variety of Constitutional protections that are applicable to them. In fact, the Fifth Amendment right that we just spoke about earlier today. And those organizational plaintiffs have a First Amendment right to be able to communicate with those clients in order to exercise their free speech to advocate on behalf of those whose Constitutional rights have been violated. For that reason, we would say that the organizational plaintiffs maintain their First Amendment right to communication here.

With respect to the -- with respect to the detained plaintiffs, of course, that is based on the *Al-Amin* case and a healthy line of case law that states that people who are in detention have the right to communicate with counsel, and that is protected under First Amendment.

Of course, there are some disagreements between the parties as to whether or not the *Turner* and the *Pesci* case apply, given that these are people who are in immigration detention. They are civil detainees. They are not being charged with any crime. They are not serving a sentence for

any crime. They are there in order to have -- in order for the government to hold them while their immigration cases are being adjudicated. Therefore, it's a very different standard by which the Court should be judging the First Amendment restrictions. One might even say a more relaxed standard than one would in a prison or jail context.

When you look at whether or not the restrictions that the detention facility has imposed on both the bidirectional communication between attorneys and clients and detained clients, and that would -- under that, the same violations would occur because it is both a restriction on the speech and the ability for detainees to be able to speak with their attorneys in a confidential manner, as well as for attorneys to be able to speak to clients in a confidential manner.

And that is where the Fifth Amendment -- First Amendment violation is taking place. It is, one, restriction to access in the first place, because the detainees and attorneys cannot actually meet with one another due to the delays and the denials in access. And they're not able to do so in a confidential manner, which, of course, is a bedrock principal of attorney-client communicate. They are not able to exchange documents. Attorneys cannot get basic signatures on documents that are required to be filed with any court, for example. These are clear violations of that First Amendment right to speech on behalf of both the detained clients and the

attorneys themselves.

THE COURT: And let me ask you this: I mean, again, we're traveling under a preliminary injunction relief standard. We're here on a motion for preliminary injunctive relief. We know it's extraordinary. We know our elements we need. We need to see that success -- likelihood of success on the merits. And one of the other issues that we talked about -- in the briefings mentioned it -- deals with the related, but not set for argument today, motion for class certification.

I say that because, in taking a preliminary peek at that motion, it seemed to have been framed over a total ban. Meaning, it was a lot easier, when it comes to Rule 23 issues like commonality, to find that kind of unifying force or action under the First Amendment that apply to all of the detainees.

Now we're being told that in some cases, some detainees are having communication. Others, they are not. In some instances, they've had video calls. In other instances, they lack confidentiality. It just becomes a little bit more challenging because the facts on the ground have changed. We went through something that was, presumably, identical for all plaintiffs to something that could be a little different depending on who we're talking to, as we've seen just with the anecdotal evidence today.

Should there be a concern for the Court, and where do you sit now on the viability of the class certification in that

the First Amendment restrictions that you argue are still in play have differed, they're differed, they're changed? Does that change anything information you? I mean, I would imagine the class definition would have to change, right?

MS. CHO: No, Your Honor. The class definition does not change.

THE COURT: Tell me why. Tell me why.

MS. CHO: The class definition does not change because all detainees at the facility are subject to the First Amendment violations with respect to their ability to communicate with counsel. And commonality -- the Rule 23 does not require that all plaintiffs in a class have identical factual patterns. It is really the test -- the test really is to look at whether or not there is a common legal question that must be decided, and that is, of course, whether or not there is a First Amendment violation that is taking place at the detention facility.

THE COURT: Okay. That's fair. And let me ask you this, as well. This goes, I think, to some of our venue issues in just a moment. But what is the federal or DHS defendants' role on the First Amendment claims? Because, you know, that's why I really went to Mr. Meros on that, because it appears, from the preliminary injunction motion at Docket Entry 29 and the reply brief at 67, that you don't really differentiate between the federal or DHS defendants and the state defendants

on the First Amendment claims.

So I don't know if your theory is one of imputing actions from the state to the feds under the 287 agreements, almost like a vicarious liability theory, or is your position today, no, Judge, really, it's on-the-ground concerns from the state defendants, how they run the facility, that drives the First Amendment claim and not really anything from the federal defendants, which, arguably, were more the focus under EOIR of the Fifth Amendment claim. What do you -- do you differentiate? What do you think about that?

MS. CHO: Yeah. Well, that's a very good question, Your Honor. And I would actually point you to the Gadea declaration. This is ECF 49-2. I would have you look at pages 25, 31, and 32 of that declaration. And these are exhibits that the defendants have provided with respect to the 287(g) agreements. And, of course, both defendants, the federal and state defendants, claim that the 287(g) agreements are what provides the Florida -- what provides the Florida defendants with authority to detain people at Alligator Alcatraz in the first place. And this, of course, is an agreement that Florida has entered into with the United States.

And when you look at the 287(g) agreement that the Florida defendants have signed with the United States, you'll see that there are four important points to consider here. The first is that the Miami field office director is identified as

the point of contact for the operation of the 287(g) agreement that provides Florida -- the defendant's claim that provided Florida with the authority to detain people at Alligator Alcatraz.

The second is that both defendants -- the federal defendants and the Florida defendants, as well as the 287(g) agreement, states and provides that the ICE Miami field office director is responsible for oversight of the detention facility.

The third is that the 287(g) agreement provides that detention shall be operated in accordance with ICE standards. And, of course, these ICE standards include detention standards providing for attorney access at the detention facility.

And fourth, the 287(g) agreement provides that if there is another policy that is implemented at the detention facility, for example, with respect to attorney access, that the ICE Miami field office director shall be responsible for resolving any conflict that arises between the federal ICE detention centers, with respect here to attorney access and whatever is being implemented at the facility, in particular.

So because of that role that the federal defendants have in terms of oversight and enforcement of the ICE detention standards, there is a clear role that the federal defendants play with respect to attorney access provisions at the facility.

THE COURT: Okay. And that's something that I will be talking about in a moment because I think that that -- I surmise that that may be what we're going to hear from you in a little bit, on venue, which is an overarching concern.

Let me just, if I could, move to -- assuming, again, that we are in the First Amendment world still and not dealing with a mootness concern, which the state defendants have agreed with me on that, even though there is certainly a dispute as to what's happening on the ground and whether, in the view of the defense team, it satisfies the standard for preliminary injunctive relief. And we've heard a little back-and-forth on that.

There's kind of a question to step back on, that the federal defendants -- and presumably, the state defendants agree with this -- have attempted to make on 1252(g). Because certainly, let's assume for a moment that we are able to entertain the First Amendment because we have venue. Then the next step is, well, do we have a jurisdictional bar or hurdle under the First Amendment. I, quite frankly, do not believe that 1252 plays any real impediment or creates any sort of barrier.

And I'll tell you why: I mean, again, the federal defendants can correct me here if I'm wrong, but I think we know that 1252(g) lists just three discrete actions when it comes to the jurisdictional concerns, actions to commence their

proceedings, adjudicate cases, or execute removal orders. And the Supreme Court has said it pretty clearly that we need to stay with a narrow reading. It doesn't cover all claims that arise from deportation proceedings. And I know that on the federal defendants' reading, 1252(g) bars detained plaintiffs' claims. So even if I could consider First Amendment, there's this separate and distinct jurisdictional bar to doing so in the view of the federal defendants.

But I guess my concern with that is, you have to look at the core of the claims. So 1252(g) requires a specific nexus between the claim and one of those covered actions, right? We can't just read "arise from" as swallowing all the narrow categories. And the Supreme Court has said it, in cases like *Jennings*, that 1252(g) doesn't sweep in any claim that can -- technically said to arise from those listed actions. You have to connect it back to the three specific actions.

And so you have to look what the action being challenged is. We can't just read it in a vacuum. And the action, as we just heard from plaintiffs' counsel being challenged, is not related -- quite frankly, I don't think it's related remotely to any acts or decision by any defendants, federal or state, to commence proceedings, adjudicate cases, or execute removal. To me, none of those categories really come into play.

So I guess my question -- because this is one of the

jurisdictional arguments advanced by primarily the federal defendants, is how would I read 1252(g) to stand in the way of considering a potential First Amendment claim. I mean, I heard from Mr. Meros that it would fall based upon success of likelihood on the merits not being met regarding what's happening on the ground. I heard the view in opposition from Ms. Cho.

Now, this is just a separate and distinct argument that I can't even look at all, and I don't see a connection between what's being challenged and the specific categories that have been enumerated by the statute.

Are we still maintaining 1252(g) as a bar, Ms. Rodriguez, on this First Amendment claim?

MS. RODRIGUEZ: Yes, Your Honor.

THE COURT: Tell me how.

MS. RODRIGUEZ: The reason is, if you look at the core of the request, as far as First Amendment -- and we look at the case law and cases from this district, as well. If I may?

THE COURT: Sure.

MS. RODRIGUEZ: We have to look at the context of the situation. This is a new type of facility. And we agree that it's -- you know, it's a new situation. The facility was up for a couple of weeks before the lawsuit was brought. Courts in this district have found that there's no requirement, a Constitutional requirement, for a perfect environment for

detainees to meet with their attorneys.

THE COURT: Yeah. But what does that have to do with your argument? I mean, I'm not talking about perfect and --

MS. RODRIGUEZ: Right.

THE COURT: -- a stand-up facility. I'm talking about you're arguing that this is one of the three discrete actions jurisdictionally barred from review under 1252(g), and I'm saying, where are we commencing a proceeding in the immigration context, adjudicating a case, or executing a removal order. The First Amendment claims don't talk about any of those things.

MS. RODRIGUEZ: Right.

THE COURT: All they talk about is access to their attorneys, confidential communications, legal materials. Those aren't things that arise from discrete actions in the statute, right?

MS. RODRIGUEZ: Well, at the core, I think that the plaintiffs are challenging the decision of the Attorney General of DHS to use the Alligator Alcatraz facility as a detention facility.

THE COURT: Okay. So your argument is you believe that the First Amendment arguments are really, you know -- or the claims are really positioned as First Amendment, but in truth, at their ground level core, they are challenging removal orders and the like. That's your theory.

MS. RODRIGUEZ: That's correct, Your Honor.

THE COURT: Okay.

MS. RODRIGUEZ: And, you know, further evidence of that is, you know, as the state has explained, they have been working continuously, even before the lawsuit was brought, to ensure that detainees had access to attorneys. They've ensured spaces where detainees can speak confidently with attorneys with headphones. The more that they try to provide for these situations, it's just not enough.

Even with the situation with the immigration court. We gave the plaintiffs -- the federal defendants gave the plaintiffs exactly what though were requesting in their relief, but they wanted more. Now they want, you know, some type of consent decree or stipulation from the defendants to say that's never going to change, we're never going to move the immigration court from Alligator Alcatraz to another court. And it just seems that at the core, no matter what the creative, you know, approaches to the pleading are, no matter how they frame their claims, it's really about the decision of the Attorney General of DHS, of the executive branch, to send detainees to Alligator Alcatraz.

THE COURT: Okay.

MS. RODRIGUEZ: And also, if you look at the filings in this case, Your Honor, they're replete with, I'd say, inflammatory allegations of quotes from the president of the

United States that has nothing to do with the First Amendment claim, quotes from the secretary of DHS that has nothing to do with the First Amendment claim. And at their core, it's really an attempt to fragment, to prolong, to block the decision of the executive.

THE COURT: All right. I hear you on that. So I guess, Ms. Cho, I -- perhaps, I get a better sense now of what the argument is. I think that no one could really argue that this has anything to do with arising out of and all the different languages of 1252(g). I think the best argument they're attempting to advance today on the federal side is this is almost a trojan horse. The First Amendment argument is all window dressing, that at its core, this is really attempting to challenge kind of the underlying immigration determinations or detention determinations being made. That is the argument in advance.

I will just say, and I'll turn it back to you on that front, that at least from my review of the complaint and knowing what case law has made very clear, we are allowed to look at and where we are stopped short, because it's a decision or action by the Attorney General, that this particular claim, under the First Amendment, the live claim that remains, doesn't appear to derive from or arise out of any of the three discrete actions in 1252(g).

And again, if it did -- and I think if we were to allow

the federal government's theory, that the Court can look beyond the allegations in a pleading such as this, to try to divine the true intent, if you will, of a lawsuit like this and have it be, one, focused on immigration determinations, well, then that would, essentially, deviate from the narrow reading of 1252(g) that we have been told directly we need to do, and it would impose, really, almost a general jurisdictional limitation, right. Anything could arguably be connected to an immigration decision in this context. We know that that's what the case law says we can't do.

What's your take on this whole -- I see where they're coming from, but I don't know that on this record anything I've seen connects it to the discreet actions that are prohibited jurisdictionally.

MS. CHO: That's right, Your Honor. We would agree with that analysis. As you know, the 1252(g) applies only to the decision to commence proceedings, adjudicate cases, or execute removal orders. Here, the plaintiffs are challenging, at least with respect to Count 1, with respect to the First Amendment claim, regards access to counsel at the detention facility.

As you have noted, the Supreme Court in *Arab-American* [sic] has said that 1252(g) is not a general jurisdictional limitation. That is exactly what the defendants are trying to, it appears, imply that because the case arises out of detention

and the Attorney General's decision or the DHS' decision to place people in a detention facility.

Again, 1252(g) does not apply to all claims that arise from deportation proceedings, and that is what the Supreme Court has clearly said. And there are many other courts, of course, that have come to the same conclusion with respect to claims that are -- nearly identical claims that are being brought by the plaintiffs in this case. I'd point the Court, again, to the *Diaz* case, for example, where the district court stated that access to counsel claims are ancillary to 1252(g).

And although we're not speaking about the Fifth Amendment claim, the *Madu* and *Ibarra-Perez* cases also state that 1252(g) does not apply to access to bond hearings in the first instance. And for those reasons I think it is clear that 1252(g) is not a jurisdictional bar to the plaintiffs' claims here.

THE COURT: Yeah. And at its core, I mean, at no point are you contesting the detention of individuals at Alligator Alcatraz, shutting down Alligator Alcatraz, conditions of confinement at Alligator Alcatraz. None of that is at play here. In fact, we now have a case, given the concessions from the federal defendants on the Fifth Amendment -- and again, I know that there is a concern about a stipulation -- we have good case law that a representation on the record in this front will take care of voluntary cessation concerns.

But we are just left, really, with a First Amendment complaint. And that First Amendment complaint has been broken down into a more granular level because it's no longer, as Mr. Meros noted, really the total ban concern as much as it is some of the new developments or prolonged delays, I guess, would be the better way to talk about it that we see still according to plaintiffs combined with confidentiality and legal documents.

So I say that to say that the 1252(g) argument really, if it's applied to its logical conclusion here, would just transform it into a general jurisdictional limitation. And I don't have anything in this complaint, whether it be the original or the supplement under 15(d), that suggests that this has to deal with detention determinations or commencement of proceedings or execution of removal or the adjudication of cases. I mean, that's not really a function of the lawsuit.

So I don't necessarily believe that a 1252(g) argument carries the day here on jurisdiction. I think where we're at now is 1252(g) does not stop the Court from looking at the First Amendment. And the question then becomes, to the extent I have venue, can the First Amendment arguments carry the day for a substantial success of likelihood on the merits, which, again, that's really what's been disputed on the ground.

Now, I've inferred or mentioned it multiple times, but I think we've gone through the Fifth Amendment. We've gone

through the First Amendment. We've dealt with the mootness on the Fifth, the merits on the First, 1252. I've heard from everyone on each one of their silos, if you will. So we're going to go on and handle venue.

So as the Court said last week, venue continues to be a very significant concern. And I understand that the plaintiffs would have the Court sidestep venue and look to merit-based determinations right now. I will just say as an aside, the cases that have been presented to me in support of that proposition, I think, were procedurally distinct inasmuch as some of them were temporary restraining order considerations, and we are not there right now. We're with a much more fulsome record.

So the Court is not really inclined to sidestep venue, nor do I think it really helps anybody. Because if the Court were to grant preliminary injunctive relief without venue, I would fully expect an appeal, and it would be returned to the Court if I failed to analyze venue properly.

So true that it's not a jurisdictional prerequisite, but the Court feels very strongly -- and I think this is expressed in case law consistently from my circuit -- that it is a statutory requirement that we have to take a hard look at it.

So we've talked a little bit about this, but I think the first issue is dealing with the federal defendants. So

1391(e)(1) sets forth four different ways in which we can have the federal defendants brought into this suit. And you know, there's been arguments raised that they're not satisfied. But I think it's important we go through them together. You know, you may bring this action against the federal defendants in quote: Any judicial district in which the defendant in an action resides, that's (A). (B): A substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated. Or (C): The plaintiff resides if no real property is involved in the action.

So we have all of these different subsections that you can rely on.

And, you know, looking at these venue choices, you know, I struggle to see why we wouldn't have venue on the federal defendants under 1391(e)(1), because there's different ways to get there.

So the first argument is that no federal defendant resides in this district. But I've looked at this record, and we've included the ICE ERO Miami field director, Garrett Ripa, who is here in this district. And, you know, as far as I can tell, Ripa remains a defendant in this action. He resides in this district. That's at the reply at 11, footnote number 3. And then cites to supplement at paragraph 69.

And so I guess I'll go to the plaintiffs first,

Ms. Cho, but I believe on the first argument would be that we have a party that is here. He resides here. He's a federal official in this district. Would that not be at least, on that first prong, a basis under 1391(e)(1)(A) to have the federal defendants in this district?

MS. CHO: Yes, Your Honor. We believe that is true.

THE COURT: Okay. So let me hear, I guess, from the defense, Ms. Rodriguez, on this -- and there's multiple ways the federal defendants, in my view, could be looped in here. But the first one is just the simple fact that the Defendant Ripa remains in or resides in this district.

What would be the argument that that, in and of itself, isn't enough?

MS. RODRIGUEZ: Your Honor, looking at the complaint, it's very difficult to see what the claim is against Garrett Ripa. To state a Constitutional claim, a Constitutional violation, that's a very high bar. The only allegation that I saw, really, that deals with Ripa is an allegation that he is the legal custodian of the detainees at Alligator Alcatraz. I don't see any allegations that would point to a Constitutional violation by Garrett Ripa.

THE COURT: But you would agree with me, you haven't bothered to come to this Court today with an argument as to standing. You have no motion dismissing him for standing. You have a 12(b)(3), but there's no argument that he's an

improperly-named defendant. I mean, we're here with well-established record. If you felt that way, I would have expected, similar to what the county did, we would have a motion to dismiss for lack of standing. So just to be clear, we sit here today with him as a viable defendant. He's named. I don't think there's anything here saying that he should be dismissed in front of the Court, right?

MS. RODRIGUEZ: Well, Your Honor, at this stage -- this is not a stage where there's obligation for defendants to move to dismiss. We were asked to brief whether there was substantial likelihood of success on the merits.

THE COURT: Yeah. But wouldn't that necessarily entail that you would not have success of likelihood on the merits if you had a party that had no standing to be named? That's not even addressed in your papers, right?

MS. RODRIGUEZ: It's not, Your Honor. It's not.

THE COURT: Okay. All right. Just want to make sure. It's okay. I just want to make clear because I've been watching the filings, I never saw a standing argument.

Now, I'll tell you this: Even if, for whatever reason, the Court were to accept some sort of standing argument, how do I then even get past the next prong? Because 1391(e)(1)(B), no one's doubting that most of the alleged incidents arise out of incidents at Alligator Alcatraz. No one is debating that Alligator Alcatraz is in the Middle District of Florida. But

plaintiffs have also noted -- and in their affidavits and it seems clear that the ICE ERO Miami field office oversees detention facility operations and is responsible for ensuring compliance with ICE detention standards, including attorney-client access. That's at page 12 of the reply.

So having to take these allegations as true -- that's the venue standard until they've been rebutted -- I guess my question would be: How do I not find that the purported failure of federal defendants in Miami to ensure state defendants' compliance with attorney-client standards could be -- for venue purposes, let's be clear -- a close nexus between the federal defendants' actions and the failure to ensure confidential attorney-client communications at Alligator Alcatraz.

What do I do about Subsection (B)? Even if for, some reason, I would accept there's a standing problem with Ripa, it looks like (B) provides an alternative way in for federal defendants to have venue.

What do I do with that?

MS. RODRIGUEZ: To begin with, Your Honor, you know, as far as the Constitutional violation, it's very difficult to see what the allegation is against Garrett Ripa. With the 287(g) issue, there's been no APA claim that's been raised. There's been no contractual claim that's been raised. And if they were raised, it's been no APA claim. The proper defendants there

would be in Washington, D.C. All of the 287(g) agreements were signed by officials in Washington, D.C. Garrett Ripa is not a signatory to any of those 287(g) agreements.

THE COURT: Okay. So let me -- your argument, then, is that the 287 agreements -- I'm looking at them. My understanding is that the 287 agreements between state and federal officials show that, quote: "The Miami field office director is responsible for providing authorization to state personnel at Alligator Alcatraz under the agreements and for reviewing complaints regarding law enforcement activities authorized by the agreements at Alligator Alcatraz."

And I'm reading from the reply's position, having looked at the declaration of Juan Lopez Vega at ECF number 50-1, paragraph 5.

So you're going to tell me that with that in the record, that still does not connect decision-making sufficient to establish venue for the federal defendants coming out of this district?

MS. RODRIGUEZ: That's our position, Your Honor.

THE COURT: I got you. All right. That's okay.

MR. MEROS: As well -- as far as any supervisory authority, the ICE detention standards are standards. They do not provide and they could not create Constitutional rights. They do not create Constitutional obligations.

THE COURT: I would agree with you there. As I stated

last week, this isn't a 287 breach or an APA-procedural type claim. This is Constitutional in dimension, and we don't establish Constitutional safeguards by way of the 287 language.

MS. RODRIGUEZ: Correct.

THE COURT: So I'm not disagreeing with you that that's not what the case is about.

MS. RODRIGUEZ: Correct, Your Honor.

THE COURT: Yeah.

MS. RODRIGUEZ: And any supervision of immigration enforcement activity, of ICE detention standard, compliance is occurring in the Middle District of Florida. That's where the facility is. Alligator Alcatraz detainees are in Collier County. They're not in Miami-Dade County. So the activities that are being supervised pursuant to the 287(g) agreements, which are immigration enforcement activities, that supervision is happening in the Middle District of Florida.

THE COURT: Well, I'm going to get to that in a minute because I'm not disputing it. I'm going to hear from Mr. Meros on that, and that goes back to the state defendants because without venue over both -- and obviously, the state and the federal defendants have been lumped together in every count but Count 5, which is no longer a live count. So we're going to get to this problem.

My concern is from the federal defendant's perspective, I now have argument Ripa is a resident of Southern District of

Florida, and that he is a proper official named in this action. And there's no suggestion he's an improper party. So I would have 1391(e)(1)(A). If I don't have that, then I have 1391(e)(1)(B) because there is an allegation -- a prima facie showing, if you will -- that the ICE ERO Miami field office through Ripa oversees detention facility operations and compliance. Again, this is only for venue purposes. I would have the federal defendants venued here properly under that.

But let me give you another one. Because any of the four work. 1391(e)(1)(C) only requires plaintiffs to live in this district. And I know that you've attempted, I think, to argue, well, Your Honor this deals with real property in that it deals with Alligator Alcatraz. My only problem with that is, I mean, that operates at such a high legal of generality.

I mean, if it was just simply any properties involved, it would almost subsume the location of the plaintiffs. I mean, the mere fact that this action peripherally involves the property of Alligator Alcatraz, because it concerns First Amendment violations at Alligator Alcatraz, doesn't connect that you wouldn't have a venue for the federal defendants under 1391(e)(1)(C).

So I want to be clear on (e)(1)(C) -- and it's three and not four because you have (A) (B) and (C) -- that under (C) there is no dispute. I think that the plaintiffs do live in this district.

Is the federal defendant's argument simply that (C) is not a mechanism for venue for the federal defendants because of the property? And again, I'm reading from it where it says: "Or (C) the plaintiff resides if no real property is involved in the action. You would say, it tangentially involves Alligator Alcatraz. As such, (C) is not another basis to bring the federal defendants into the Southern District;" is that right?

MS. RODRIGUEZ: Yes, Your Honor. And it not only involves the location of the property, but it involves who is exercising control of the property.

THE COURT: Okay.

MS. RODRIGUEZ: It involves who is exercising the activities at the property. So it's not just that the facility itself is located in the Middle District of Florida. It has to do with control over the property.

THE COURT: Okay. Let me ask, Ms. Cho, on your side, we're really just focusing on venue as it pertains to the federal defendants. So I've gone through it. And again, we're talking, so that we all are on the same page, Counts 1 and 3, because those are the federal defendant counts. Count 5 no longer being viable, 1 and 3 are the ones that travel under 1391(e).

And I guess at this point I have my three choices for venue under the statute. I've pointed out that I think an

argument could be made under any of the three. The first one being Ripa, where he's at. The second one is kind of that ICE ERO oversight. And then the third being where plaintiffs live, which is here in the district.

Can you speak as to those? I think all three are viable, and certainly, you can rely on any of them to make sure the federal defendants are in the right place, which is down here. What's your sense on that?

MS. CHO: Yes, Your Honor. We would agree with the Court's analysis as to those three points entirely. Again, under subpoint (A), Defendant Ripa is properly venued in this district.

With regards to the substantial portion of activities that give rise to the claim, again, as you pointed out, the 287(g) agreement provides that the ICE field office director in Miami has responsibility for oversight of the facility.

And (C), there are a number of plaintiffs, including C.M., Borrego Fernandez, J.M.C., E.R., F.B., A.S., and N.B., Florida Keys Immigration, and S.O.S., all of which are residents of this district. And for those reasons, we believe that venue is appropriate with respect to the federal defendants in this case.

THE COURT: And I guess -- just to be clear, Subsection (B), 1391(e)(1)(B), lets us have either transactional venue being proper or a substantial part of the property involved in

the action is situated. But I guess it's -- really, what I'm focusing on is that transactional venue being another ground or one of the three, I think, grounds that you can rely on to try to keep the federal defendants here; is that right?

MS. CHO: Correct, Your Honor.

THE COURT: Okay. All right. So let me move to where I think we started at the conference last week. And this is the part that I think is a little more challenging. This deals with the state defendants. Okay? When we come to the state defendants, we know that they are part and parcel of Counts 1 and 3, so they're lumped in with the federal defendants. And then they have a standalone in 2 and 4 because they come in under the 1983 counts. And I think all of us agree that we're traveling under 1391(b)(2).

Now obviously, I think you guys have pled this thoroughly. We're now outside of the 1391(e)(1) world. Mr. Meros, I think, mentioned this early, early on in one of our status calls, that is obviously designed for the federal defendants. But we know that the statute makes very clear that when we're dealing with the state defendants, we have to look at venue for them under 1391(b)(2).

So we have to find or figure out where is venue proper for the state defendants in the standalone counts, 2 and 4, and is there any proper for them in the counts where they're joined with federal defendants who come in under 1391(e)(1).

And so the big concern I have here was the question that I ended with on Thursday, and it's really directed to the plaintiffs. And I'll redirect it again. And I'll use my exact wording because I want to make clear where my concern is. And it deals with, kind of, the actions, right? So I had asked the plaintiffs' team to point me to any action, act, or omission occurring in the Southern District of Florida by the state defendants.

Can you tell me, Ms. Cho, what are you pointing me to for purposes of having the state defendants properly venued here?

MS. CHO: Yes, Your Honor. The state defendants have hailed themselves of venue here in the Southern District of Florida pursuant to the 287(g) agreement that they represent provides them with authority to hold people at Alligator Alcatraz. And I would point you to the case of *Harvard v. Inch*, which, of course, is a case that the defendants themselves have cited. And *Harvard v. Inch* is particularly applicable here because it is also a case that dealt with conditions of confinement in a carceral setting. In *Harvard v. Inch*, the plaintiffs there were challenging the practice of solitary confinement, and the Court in *Harvard* found that there were actually two appropriate venues to hear that case.

The first appropriate venue was, of course, the place in which the plaintiffs themselves had been incarcerated and

suffered the solitary confinement. The second venue in which the Court found was proper for venue purposes was the venue in which the policies that regulated -- that regulated solitary confinements were set. And indeed, that is the venue in which the case was ultimately heard.

Now, I point you again to the 287(g) agreement, which the Florida defendants have entered into and which the Florida defendants claim provide them with the authority to detain people at Alligator Alcatraz. And again, I point you to the Gadea declaration at 49-2, at pages 25, 31, and 32, because this is where it is instructive.

Again, the defendants -- the Florida defendants have signed this agreement and entered into this agreement with the federal government, and they -- 287(g) agreement specifies that the Miami field office director is the point of contact for the 287(g) agreement, that the Miami field office director has oversight of the detention facility, that the detention facility must be operated in accordance with ICE standards, and any deviation from those standards and introduction of any other alternative set of standards regulating the detention facility shall -- that conflict shall be resolved by the Miami field office director. And that is where the policies that set the attorney access are emanating from the act or omission that is substantial in the Southern District of Florida.

THE COURT: I guess that's -- I knew that's what you

were going to say. And I've been struggling with this because I don't see this in the sense that I don't -- I don't see any of these state defendants in these 287 agreements, and I've been looking at this record. I don't see any direction from feds to state. If I had a record that would support that, essentially, the state defendants are being puppeted by individuals at ICE ERO in Miami or I saw direction from the federal to the state facilities in a way that, essentially, made the federal government the operator of Alligator Alcatraz on the ground through direction, I would completely understand where you're coming from.

The problem is, I haven't seen a record that supports that direction, and I don't see anything in the 287 agreements that would suggest that that kind of day-to-day direction is being given. If anything, it seems almost arms' length. My recollection of the Vega declaration was very high level. I mean, general information, general ICE guidelines have been provided by way of the agreements to the state defendants.

But when it comes to running Alligator Alcatraz, it appears that the state defendants on the ground are doing their thing without necessarily the input, on a day-to-day level, from the federal government. That's where I'm trying to understand. And this has been a theme, as you know, from the beginning of the case, of who exactly is running the facility. And it just seems to me today, with this record, that the state

defendants are running the facility, not the federal defendants telling them how to run it. Isn't that what the 287 seem to show? I don't see that direction of them as parties -- the state defendants, I mean.

MS. CHO: Your Honor, the Vega declaration as well as the 287(g) agreement state that the ICE Miami field office director has oversight over the detention facility and that ICE detention standards must be in operation. 28 U.S.C. 1391(b)(2) provides that a substantial portion of the acts -- and this is the key word -- or omissions giving rise to the claim must have taken place in the district.

And here is where the key omission has taken place, the lack of oversight and the lack of adherence to those ICE detention standards, as we have stated throughout the pleadings and in the preliminary injunction motion, the standards by which ICE requires attorney access, if those standards had been adhered to and if proper oversight had been conducted, we would not be here in court today with respect to the First Amendment claims.

THE COURT: Let me tell you, though, this is -- and I get you're extrapolating and putting forth quite a big inferential leave has been my concern. Because this case was never about a 287 breach. This case has never been about that. It's about the First Amendment. So you're having the Court take a big step where you're saying that the -- let's really

break down what you're asking me to do.

You want me to find that, for purposes of venue, the omission by the federal defendants emanating from the Southern District of Florida to enforce 287(g) shows state defendants violated the First Amendment in the Southern District of Florida. I mean, that is -- which, again, I say it out loud because you can see where the disconnect begins to manifest itself, is how would I possibly say that an omission on oversight under 287(g) is somehow what creates the omission, again, by the state defendants in the Southern District of Florida?

Because the omission that you're mentioning is very much from the federal defendants' side as alleged. I still don't see how anything that the state defendants in the Middle District of Florida, right, are doing that emanates or flows back to the Southern District of Florida. All of the First Amendment bars or problems are happening on the ground, whether it's when people show up and they don't have access, or they can't get any confidentiality on a meeting.

Whatever it may be, all of it seems to be happening by the state defendants at or near the facility, not by way of instruction through federal defendants in my district. You see why I'm concerned there, how there's a breakdown.

MS. CHO: I appreciate that concern, Your Honor, and that is why, again, I would point the Court to look at the

*Harvard v. Inch* case.

THE COURT: Okay.

MS. CHO: And that is why -- because, again, the Court in *Harvard v. Inch* found that venue was proper in the district where the solitary confinement abuses were taking place. Right, and here the equivalent would be the attorney access issues. But the *Harvard* Court also found that venue was proper in the venue in which the policies were set.

And here there's a clear contractual agreement between the federal defendants and the Florida defendants by which the Florida defendants have benefited. They have hailed themselves of this district with respect to enforcement of the policies that are being set in the Southern District of Florida. And that is transactional venue at its core.

THE COURT: Do you think you guys have presented facts showing that the state defendants have failed to act in accordance with the agreements?

MS. CHO: Yes, Your Honor.

THE COURT: I think you maybe are saying it in a First Amendment context only. But there's nothing in the pleadings that I've seen -- I mean, correct me if I'm wrong -- that there is -- other than this First Amendment theory, that they are not following the 287 agreements, is there?

MS. CHO: Well, the case is not about, as you said, about the broader import of the 287(g) agreements.

THE COURT: Right.

MS. CHO: This case is about the application of the standards that are required and outlined in the 287(g) agreements.

THE COURT: But you would agree with me, then, that the way in which you're positioning this -- and I am going to obviously, as soon as I step off the bench, read my colleague's *Harvard v. Inch* decision. Again, I don't have a copy of it in front of me, but this is a district court case from the Northern District of Florida; am I right on that?

MS. CHO: Correct, Your Honor.

THE COURT: Okay. So one of the things that I'm concerned about here is the theory, again, comes down to whether the state defendants' failure to act in accordance with the 287 intergovernmental agreements creates a Constitutional First Amendment issue.

And I think where I'm struggling with it is, you know, we don't need the existence of intergovernmental agreement or detention standard to establish a First Amendment violation. Of course, that's why this nexus issue troubles me, because it really -- just having a legally enforceable agreement between the state and federal officials, that can't, at least in my view, support venue on its own. That would just -- there would have to be a connection.

And that's what I've been looking for coming into court

today, is trying to get a sense of where is the connection between the federal defendants flowing or emanating from the Southern District of Florida and what's happening on the ground. And I think it's important because if you read the supplement -- I have a copy of it here in front of me -- everything that is going on from the state defendants when it comes to First Amendment violations seem to occur at Alligator Alcatraz.

So paragraph 4, defendants -- this is from the supplement -- defendants in this case have blocked detainees held at the facility from access to legal counsel. No protocols exist at this facility for providing standard means of confidential attorney-client communication.

Paragraph 88 says: That there's been restrictions to immigrant detainees' access to counsel at Alligator Alcatraz. The reply at page 5 says: Defendants continue to impose significant barriers to attorney access at the facility, that the lack of attorney-client communication is taking place at Alligator Alcatraz. Even the reply says, at page 6 and 7: All outgoing phone calls by detainees to their attorneys are monitored and recorded. Page 7 says: Legal conferences do not take place in an enclosed space. Instead, the detainees are held in a cage, with officers in auditory proximity.

All of these things point me -- when you look at a case like *Jenkins Brick*, which is kind of the Eleventh Circuit case

for venue, they all look to the place where the wrong has been committed. That seems to be the focus. So I guess the important thing for me is to go back and look. But there's going to have to be some sort of connection established in this record that would allow the Court to extrapolate from federal 287(g) oversight of the state defendants' operations at Alligator Alcatraz, a First Amendment violation that generates from that. And I think that -- just so I'm clear, that is the venue hook, if you will, for the state defendants down here. Am I right on that?

MS. CHO: Your Honor, I would clarify that slightly.

THE COURT: Okay. Clarify, yeah.

MS. CHO: So just a few initial thoughts: First is that venue can be properly found not only in the district in which -- the test for venue essentially is not where the most events took place.

THE COURT: Correct.

MS. CHO: It is where a substantial portion of the acts and omissions take place. And so the Court can properly find a venue even in the district where, perhaps, the plaintiffs were not actually detained.

THE COURT: But you would agree with me, though -- and the Eleventh Circuit has made this pretty clear, right -- that it's not a minimum context-type analysis. And we focus, under the case law, on the defendants, meaning, the -- where are

those omissions taking place. You're saying that it's omissions by the federal government, imputed to the state, from the Southern District of Florida, 287 relationship, as opposed to omissions that substantiate First Amendment violations by the state defendants at the facility.

MS. CHO: Your Honor, what we are arguing is that the state defendants have hailed themselves of this district through the signing of the 287(g) agreement. That posits and specifically specifies that the policy's coming from the ICE field office director and set the policies for attorney access at Alligator Alcatraz is the basis for venue.

THE COURT: Shouldn't I be a little worried that that sounds exactly like personal jurisdiction, which has been disclaimed by this district? I get very worried when you tell me I've hailed myself into this district. That's a purposeful availment language that I have not seen in a single case speaking of venue.

I'm very concerned because that seems to be what *Jenkins Brick* warned us about, that, you know, where we should reasonably expect -- let's put it another way. If you really want to go the personal jurisdiction route, it's almost as if saying, well, I should expect to be sued in the Southern District of Florida because I've purposely availed or hailed myself in this district by signing off on a 287 with ICE ERO that is operating out of Miami. I mean, that seems a lot like

purposeful availment, right?

MS. CHO: I understand the concern with that. Again, I would again point you to the *Harvard* --

THE COURT: No, I know. I know.

MS. CHO: The other thing to remember is that this is a transactional venue.

THE COURT: Yes.

MS. CHO: And again, this is an agreement in which the federal defendants and the Florida defendants have entered into in which the Florida defendants have benefited from with respect to they claim their authority to detain people at Alligator Alcatraz. That is the transactional benefit that they have claimed. And the performance of the agreement, again, they have specified that it takes place in this venue with respect to the ICE field office director in the Southern District of Florida.

THE COURT: Okay. Let me hear from Mr. Meros and the state defendants. I think you can tell my concern here that this -- I had a suspicion this was the theory, and now I have my hands on it, and I really understand. You know, we just had this exchange a minute ago with Ms. Rodriguez, and she pointed it out too. This isn't a 287 lawsuit. This is not about breaching a 287 agreement.

It could have been maybe brought that way. Maybe it could have been brought a lot of different ways. It could have

been brought as a condition of confinement. That's splashed through the papers. It's not an issue here. It could have been brought in a different Fifth Amendment theory, which is no longer viable, at least in this case. But it's a First Amendment claim.

And so I have looked through this record. I required the discovery for this explicit purpose, to try to figure out if I had venue here under 1391. And the argument is, this type of hail themselves purposeful availment theory that requires the Court, in my view, to find omissions very clearly expressed in the federal oversight of the state defendant's administration of Alligator Alcatraz, and it appears to me that there's a disconnect there.

I think you can understand why I'm concerned about these logical leaps, that because there's a 287 agreement and because they maintain it's been breached, there is a flow of action from that into a First Amendment violation by state defendants on the ground. I mean, that -- it's -- it seems to be at least a bridge too far. I'm trying to understand it, but I -- and again, I haven't seen case law from at least my circuit that would support that venue theory. And I want to see how my colleague in the Northern District was able to reach that conclusion in the *Inch* case.

But here I think there's a breakdown between federal and state defendants in that no actions or omissions for

transactional venue by the state defendants have taken place in the Southern District of Florida. All of the First Amendment claims have manifested in the Middle District at the facility. So if that's what I know -- and if I'm not persuaded by *Harvard v. Inch* and its logic, then we have a breakdown in that the state defendants are not properly venued here.

So where are you on this point for the state defendants?

MR. MEROS: Well, Your Honor, I couldn't say it better than the court. I will only add to reinforce that, you know, as the Court found the *Jenkins Brick* case is, you know, the authority, and that makes clear that the relevant actions are those, you know, by the defendants not by, you know -- not by the federal defendants but by the state defendants.

And I still have not heard a single action by the state defendants in the Southern District of Florida. They are claiming actions or omissions by federal defendants, and as the Court mentioned, trying to impute that on the state defendants. But I would even push back on that in that there has been no direction whatsoever by the federal defendants from D.C. or from the Southern District.

And to the extent there's supervision, that is not directing. There's been no -- there's been no orders. There's only been to the extent, if anything, there's been advice or anything like that, but there's no direction. Because as the

state defendants have made clear, this is a state of Florida facility. It's not a federal facility. They are in ICE custody. They -- it is a state defendant -- or a state facility, and there has still not been a single mention in the record of any action by any of the state defendants in the Southern District of Florida.

THE COURT: Let me go one step further. Let's assume, for the sake of argument, this 287 theory, right? Can you tell me which 287(g) agreements in this record were signed by Governor DeSantis or the Florida Department of Emergency Management or Guthrie? Because as far as I can tell, there is not a single 287 agreement that a state defendant named in this action has even signed.

I mean, if that's the flow, right, we have to at least see that the 287(g) agreements are signed off on by the state defendants. If there is, you know, no 287(g) with the Florida department of emergency management or any other state defendants, then this theory would also, I think, run into a problem. And again, maybe I missed it, but I don't think I saw one signed in this record.

MR. MEROS: Yes, sir.

THE COURT: Not a single state defendant has signed one of these 287s, right?

MR. MEROS: Well, no, Your Honor. Nor the Governor DeSantis nor Executive Director Guthrie. They were all the

individual directors or the secretaries or commissioners of the agencies that were signing. And that signing all occurred, you know, which is where the policy was directed, which is in Tallahassee, which is what the *Harvard v. Inch* case said, was that the Northern District wasn't appropriate venue because the policy was set there.

So there could be proper venue in the Northern District because that's where the government and Executive Director Guthrie are actually directing policy but none of that has been coming from the Southern District, neither from the state defendants nor from the federal defendants. So there's simply no action by the state defendants in the Southern District.

THE COURT: So to your point, you would maybe concede that maybe an argument could be fleshed out that direction is coming from state defendants from the Northern District, but there is nothing tying them to the Southern District, absent a theory that they are being directed, which you have, on behalf of the state defendants, represented is not the case.

But there's a theory that the federal defendants, at a very high level, are responsible for oversight in the state government relationship -- state-federal relationship. Excuse me, here. And so they're responsible for oversight, and the omissions or the failure, really, to provide oversight in the view of the plaintiffs, is what has led down the path of a First Amendment violation.

But your point has been, number one, none of these relationships or directions are to the level of day-to-day, let's say, administration of Alligator Alcatraz. There's no federal official who's telling the state on the ground what to do, so that there could even be an omission, right?

MR. MEROS: Yes, sir. Exactly. And I want to clarify that, you know, while the *Harvard v. Inch* case might apply here to the Florida Northern District, to the extent that there's some policy, I would argue that Northern District, you know, would not be proper because a substantial amount of the policy and substantial amount of decisions on the day-to-day is occurring at the facility, which, you know, as this Court has made clear, is in the Middle District. We're not conceding the Northern District is the proper venue. But just, you know, that was the situation in *Harvard v. Inch*, and is not the case --

THE COURT: Right. Sorry, yeah. And I don't mean to be -- because I have not thought at any point that the Northern District necessarily is a viable venue for this case, either. I think we have all maintained from the beginning, it should be Middle District, and there's been an argument in the Southern District and plaintiffs have maintained Southern District.

And we just spoke earlier that the federal defendants, in my view, are appropriately in the Southern District, I think, on this record. I don't know that anything here has

dissuaded me of that point given the ICE ERO office down here and the individual who's a resident here as a particular defendant.

So I think my concern, really, is just on the state defendants' side. But I want to confirm that, again, Mr. Meros, that the 287s, they're not -- just so that we're clear, they're not signed by any of the state defendants in this case, right?

MR. MEROS: I can confirm that, Your Honor --

THE COURT: Just confirm that. That's my understanding. I mean, look, I only bring it up because I think if they're not signed by any of the state defendants, that is, in my view at least, a problem for the 287 argument. It may not be fatal.

I mean, I think the argument continues to be a much more, high-level overview by the federal government over the state defendants and how they're doing business at Alligator Alcatraz. And so I think that continues to be the tether or the connection between the two parties, the two sets of defendants that would, in the view of the plaintiffs, in their words, hail themselves to the Southern District of Florida.

But I just don't remember seeing any 287s signed by state defendants.

MR. MEROS: Yes, Your Honor. I'll look through and confirm, but I have not found it through the first five or so,

the first six or seven.

THE COURT: Yeah. Let me ask again -- and maybe just to get a finer point on it, maybe, Ms. Cho, I'm reading it too technically. And you would say to me, Judge, they didn't sign it, but it's of no moment because the fact remains that there is a 287 in place and a 287 requires oversight. Any omissions that flow by state defendants are imputed to the federal defendants, the federal defendants sit in the Southern District of Florida. The state defendants should reasonably expect to be sued in the Southern District of Florida. And the fact that you don't have direct control or oversight is not disqualifying.

Am I getting that right?

MS. CHO: Certainly, that is one argument that could be made, Your Honor.

THE COURT: Okay.

MS. CHO: But I do want to point out the larger concern that we're raising --

THE COURT: Yeah.

MS. CHO: -- with the fact that the Florida department of emergency management, who the defendants claim are running the facility, does not appear to have a signed 287(g). That, perhaps, is not an issue for this case, but raises broader questions of authority of Florida to be holding people at Alligator Alcatraz.

But for purposes of this case, the defendants have, in their response to the interrogatories, stated that the state defendants -- the state agencies that are performing detention duties at this facility, include the following agencies with whom these 287(g) agreements may have been signed.

And I want to note, of course, that the Florida defendants that have been pled in are not pled in in their individual capacity but in their official capacity as the state. And so, for example, although Governor DeSantis is named in the complaint, he, of course, stands in as an executive for all of these agencies.

THE COURT: Right. So meaning that signatories is not, in your view, as much of a concern.

MS. CHO: Exactly, Your Honor. I would actually look to the specific language of the 287 agreements. It is not actually where, you know, who puts the signature on the page. But really, in the transactional venue argument, it is performance that is actually very key here. And the 287(g) agreement itself, of course, specifies that it is the Miami ICE field office director that is the key point of contact for the implementation of 287(g) agreement.

That Miami field office director is responsible for oversight of the detention facility and is responsible for managing any conflicts with respect to the standards that are applicable at the detention facility. And of course, this is

the basis upon which Florida claims that it has detention authority over people at Alligator Alcatraz.

THE COURT: You know, from the very beginning, when we had our first hearing and you elected to move to 15(d) to supplement, I foresaw that we probably would end up here today, which is this 287(g) agreement being, kind of, the linchpin of your theory. I guess I just express concern, as I have multiple times during the litigation.

And I don't know why it was framed this way. I don't know what exactly the theory was behind focusing on these particular claims. But we don't have a 287 breach case. We don't have an argument that this is a facility operating outside the bounds of federal oversight under 287. I mean, it's a -- that's a different case. I just -- I want to express that because I don't have allegations that connect, kind of, the 287(g) state actors to the First Amendment claims.

I know how you want to get me there, and that's why this hearing is important, so I can understand your theory of making that step, taking that extra step. But I just think about all these arguments about performance -- you know, performance as if it was the contractual obligation of 287.

It's challenging for me because I see that case, but it's not this case. I see that case. I see a case under 287. I see a theory. The problem is I don't know that I see a theory under a state action bringing it -- or housing it here

in the Southern District of Florida when it comes to purported First Amendment denial of access or delay or lack of confidentiality.

Now, I have to go back and look because, certainly, I haven't had the benefit of studying the logic from my colleague up north, but I'll take a quick look at that as soon as I step off the bench. I have a better sense, though, as I sit here today, of how you want the Court to get to a venue position for the state defendants in order to allow it to remain in the Southern District of Florida.

I will tell you that I think there's a bit of a challenge there, and I want to expeditiously rule on this. And I'm going to go back and look at that case. But that, to me, is the hardest sell, if you will, for the Court, that these state defendants are committing a First Amendment violation anywhere but near the facility or at the facility in the Middle District of Florida, which no one disputes, because this record is devoid, at least the record that I've reviewed coming into court today, devoid of enough oversight, if you will, or 287 violations, in the view of the plaintiff, to allow omissions or purported omissions by the federal defendants to be imputed to the state defendants for purposes of supplying venue for First Amendment violations that only they have committed according to the complaint on the ground. So that's where the rubber hits the road.

So let's ask the question that we discussed yesterday -- or Thursday, rather. If, for whatever reason, the Court finds that I don't have jurisdiction -- venue isn't proper, rather, not jurisdiction. Let me not make that mistake because, of course, venue and jurisdiction are very different issues.

But let's assume that I don't have proper venue here for the state defendants. They are stuck or commingled with the federal defendants in Count 1 and Count 3. They're on their own in 2 and 4, but we have to look at each count independently. It puts me in a position where I'd have to look at the possibility of a 1404 transfer to the Middle District because the state defendants would take the federal defendants with them, for lack of a better way to phrase it, and the case would have to be litigated there.

We all consented at the last hearing, and the federal defendants did as well. But I do want to confirm that if the Court finds that it does not have venue here for the state defendants, that everyone under 1404 would consent to transfer, on Counts 1 through 4, to the Middle District.

Is that still the position of the plaintiffs?

MS. CHO: Yes, Your Honor.

THE COURT: Okay. Is that still the position of the state defendants?

MR. MEROS: Yes, Your Honor.

THE COURT: Is that still the position of the federal defendants?

MS. RODRIGUEZ: Yes, Your Honor.

THE COURT: Okay. All right. Because obviously the most important thing that we can do today at least is get through a couple of very preliminary issues, right? The Court doesn't feel there's a 1252 problem, so jurisdiction is not going to bar me from reviewing anything as far as I can tell.

And I certainly do not believe that there's a mootness issue for the First Amendment either, and the state has commendably conceded that.

The Fifth Amendment, we cleaned up because the relief request has been provided and it's moot. And we've gotten it's a concession.

So really what we're down to here is Counts 1 through 4 are viable. Either the Court gets to the merits of Counts 1 through 4 on the First Amendment claims and decides preliminary injunction on that basis, or the Court cannot reach the preliminary injunction issue because of a lack of venue on the state defendants only because the Court would then, I think, be persuaded that the federal defendants were properly brought here. The problem is the federal defendants are commingled with the state. So if the state has to go, the federal defendants must follow.

And at least the case moves forward, but it wouldn't

allow me to get to the merits of the First Amendment claim for preliminary injunctive relief, and I need to find out, looking at this *Inch* case that has been provided, if I can wrap my mind around the theory, without record evidence of a 287 agreement that really is supporting a breach, if you will, and letting the First Amendment flow from that. That's really what we're down to.

So I need to answer that question for myself based upon everyone's arguments today, and hopefully let you know. If I can get to the merits, I will. If I have to transfer, I will. But at least some of the preliminary issues, no matter what, can be addressed by the Court on justiciability, which is important as first principles go.

Okay. So we're coming up on just about two hours. I think I've covered all of my concerns because the Fifth Amendment really -- I had other issues about class relief and all of that. But I don't necessarily think that that's in play anymore. I think that we've taken care of it. It really comes down to the First Amendment, and I understand where the First Amendment, merit wise, remains.

Is there anything else that I've missed or anything else that you-all would want to address that maybe we haven't fleshed out today?

I'll start with the plaintiffs. Ms. Cho, anything else you wanted me -- anything else you want to put a finer point

on?

MS. CHO: Yes. Your Honor, we want to just emphasize that what is happening in Alligator Alcatraz is unprecedented and is not normal. The government has been in such a rush to build and detain people at this facility, that it has run roughshod over Constitutional rights at the facility. And we have not talked very much about the irreparable harm that has been suffered by the plaintiffs today.

THE COURT: Let's talk about that. Because I think --

MS. CHO: Yes.

THE COURT: You mentioned, for example, I mean, not to take or interrupt you, rather, or steal your thunder on this, but you mentioned for example, that one individual was in Guatemala I believe it was, right? So that some folks have been deported without being able to timely see their lawyers, and obviously, I don't think anyone could dispute irreparable harm would manifest in those situations, right?

MS. CHO: That's correct, Your Honor. I mean, the irreparable harm here is extraordinary. As you noted, there is a case of one person, at least, who has been erroneously deported from the United States while he is currently in immigration proceedings and without a final order of removal. And this individual had his bond hearing canceled as a result of his detention at Alligator Alcatraz.

Other detention -- other detainees have suffered

significant and irreparable harm. Officers have been going around the facility, going from cage to cage, pressuring detainees to sign voluntary removal orders without the opportunity to speak to counsel. And I point you to the record in the case of at least one person, an intellectually disabled man, who was told that he was signing a piece of paper to receive a blanket when, in fact, it was a voluntary departure order, and he was removed soon after.

This is why access to counsel is so paramount and such an important right to make sure it is not violated at this facility. These violations, beyond just the First Amendment violation that constitutes irreparable harm in and of itself, has resulted in grave harm to the plaintiffs.

And for those reasons, because of the degree of harm that is significant and irreparable here at the detention facility, we request that the Court issue an order for preliminary injunction.

THE COURT: And let me ask you, actually, now that you mention that, if the Court is in a position to reach the merits on the preliminary injunctive relief issue -- and I know the state defendants believe this record does not support extraordinary relief if I get to a merits-based determination. What would that look like?

If I let you borrow this robe and you had to draft an order that specifically requires Alligator Alcatraz to do

certain things or provide certain safeguards or guarantees -- because you can imagine, we talked about this back in the first iteration of the complaint. The recipe for relief was massive. I mean, you had a request that the Court would even get to providing Haitian/Creole interpreters. I mean, and that's why I had said back then, it almost put the Court in charge of Alligator Alcatraz, which I was not going to do.

But here now, we have a much more narrow claim, right? Things have really been fine-tuned to confidentiality, access to legal materials, and timeliness. How would the Court even fashion such a remedy?

Because, for example, you've said that this is unprecedented, that this facility is run outside the norm. It's not up to ICE detention standards.

I mean, would the argument be, well, Judge, we'd ask that you require that Alligator Alcatraz follow promulgated ICE detention policies and procedures? Is that the Constitutional floor? Tell me how you would even draft that.

MS. CHO: Your Honor, that is certainly an option that the Court could take. There are many policies that the defendants themselves have offered to the Court as examples of policies regarding visitation and attorney access at the facility. They themselves in the Saunders declaration, Exhibit Number 10, provide a draft visitation policy. It followed what actually we would argue passed Constitutional muster with

respect to attorney access.

The problem is, of course, none of this is actually being followed. We would also agree that were the facility to follow the ICE detention standards with respect to attorney access, that this similarly -- the degree of harm that we're seeing at the facility would not be taking place. But because of the extraordinary nature of the violations that are taking place, we have asked for very modest relief in comparison to the violations that are taking place.

And you can look at the proposed preliminary injunction order that the plaintiffs have offered --

THE COURT: Well, that one is the whole kitchen sink. That's the draft that has -- short of me stepping into the facility and running it myself, that one is the most expansive. Now you've moved away from that, I think, because that's when you had a total ban. And quite frankly, that was an easier call, right? A total ban is a total ban. If they're not getting attorneys, we have a problem.

As Mr. Meros has pointed out, they're not seeing them fast enough, in your view, but they're getting access. And it sounds like maybe not all the calls are monitored. That's a little bit in dispute. I mean, one thing is to give the laundry list. Another one is to say, Judge, the narrow relief would be that they have confidentiality guarantees, that they have accessibility guarantees with legal documents, and again,

the biggest challenge being timeliness, you know?

You know, what am I going to put in an order, with all deliberate speed? I mean, what is that going to do, right? I mean, you would have to have some metric. It's not necessarily it can't be done, but I think you can understand my concerns with crafting a scope of relief that would work if, on the ground, we're getting all of these delays. That's what I'm worried about.

MS. CHO: Your Honor, and I would point you to the fact that the multiple courts around the country, with respect to ICE detention and attorney access have issued orders that look very similar to the proposed order that the plaintiffs have provided. And it is not out of the question. This is not, I think -- you know, to address the concern with becoming the warden of the facility, this is actually a very generalized relief that is requested.

We pointed you to the *Banco Mercado* order for example. You can look at the *SPLC* order in the District of Colombia, the *Torres* order out of the Central District of California. These are all orders that very specifically state that the attorney access, for example in-person visitation, shall be timely, shall be confidential. And these are considerations that are put into the order because of the fact that these violations do take place. And to guard against the continued repetition of such violations.

So we do think that specificity is actually the Court's -- a tool that the Court can wield very carefully here in terms of providing that in-person visitation is confidential and that it is timely. The defendants themselves have said they're making all best efforts to respond within 24 hours, then require them to respond within 24 hours.

In-person access, again, any other detention facility in the state of Florida does not require a preexisting appointment. Attorneys can go to the facility with their bar card, their ID, and pass through security and be able to wait to visit their clients. There's no such form that you have to fill out with attaching documents for the facility to review in advance and wait for days, maybe even weeks, to schedule an appointment to see your client in person. That simply does not exist.

With respect to the videoconferences, the same would be for timeliness. If they say that they're going to be providing and responding to requests within 24 hours, make them do that. And make sure that these videoconferences are actually confidential.

With respect to the outgoing calls, it's the same.

The document exchange, the same.

These are not dramatic interventions by the Court by any imagination, but are required because the defendants have shown that without such guidance that these problems will

continue to persist and the harms that are suffered as a result are so grave.

THE COURT: Thank you for that.

Let me hear from the state side. As we conclude here this morning, as I think everyone has heard, the Court has to satisfy itself that venue has been met for the state defendants. I'm certainly prepared to reach a merit-based determination, if I can get there. This helps, I think, quite a bit to understand where the plaintiffs are at in terms of the scope of relief they would request if the Court, ultimately, reaches the First Amendment issue.

Where are we at on the state defendants' side, Mr. Meros? Obviously, I know your position continues to be, one, as to venue, that it should be the Middle District of Florida. And two, that from a preliminary injunctive standpoint, there is just not a success of likelihood on the merits.

I don't think anyone can really dispute irreparable harm. But we know that you need all the elements met to be able to procure the relief that plaintiffs are seeking. And so your view would be that on this record there is not a sufficient indicator of a likelihood of success on First Amendment claims, but again, stepping back, that the Court may not reach it due to a venue problem. Tell me if I'm right. And then anything else that you would want me to focus on on

this front.

MR. MEROS: Yes, Your Honor. You're correct. You know, venue first and then certainly, the likelihood of success on the merits. But, you know, there was a lot brought up by the plaintiffs. And I'm a little hesitant to try to address it all because we are -- and the Court has shown that there is serious venue problem. And frankly, if the Court does not have venue, or if venue is not appropriate here, then the plaintiffs -- you know, a lot arguments, you know, we haven't had the chance to respond to.

But real quick. I mean, first, you know, I think -- I think there's a large problem with the scope of relief that the Court would fashion. I mean, certainly the Court would have to find a First Amendment violation first.

THE COURT: Right.

MR. MEROS: And again, going back to the arguments, that the state defendants didn't have a chance to respond to, there's, again, still not a single case that plaintiffs have cited for a First Amendment violation on behalf of detainees to have what they're asking for, nor is there any First Amendment case law on the organizational plaintiffs, you know, the Haitian case, you know, the Cuban relief case, all those cases are, you know, not accurately represented by the plaintiffs.

You know, so there are a number of issues with that. I think even larger -- what they are exactly asking this Court to

do is they're actually -- as the Supreme Court said, it is not (indiscernible) in *Turner* and other cases. As the Court mentioned in the first hearing, plaintiffs would have Your Honor, you know, go to Alligator Alcatraz and become the warden. Because those orders that were granted by the other court that they're seeking are general and fine. Those actually set out certain requirements, you know. You have to have a certain number of meetings this day. You know, you have to have a certain number of -- you have to respond within a certain amount of time. That would absolutely make this Court become the warden of Alligator Alcatraz. And as the Supreme Court has said in *Turner*, the running of detention facilities or of prisons is directly an executive and a legislative function, not of this Court.

So plaintiffs would not just have, you know, the Court follow some ICE guidelines, follow some other things, which, we certainly submit we are already following, but they would have this Court get into the details and be very specific about what's required. And that's simply going beyond what this court can do.

I think even stepping back a little bit further, there is also the larger issue of class certification. We're, obviously, not getting into all of the class certification issues here. But even just at a large level of analysis, you know, the Court has to go through -- you know, to get to any

kind of certification on any kind of class, whether it's provisional or not, the Court has to go through the Rule 23 factors, has to conduct that rigorous analysis, and it has to be in the record. You know, pleading is not enough. As the Supreme Court has been made clear, the burden is proof not pleading.

THE COURT: Well, you would agree with me, though -- not to interrupt, I'm sorry -- but as I stated earlier in my paper order, really only look to the Rule 23 motion for class certifications for purposes of determining a success of likelihood on the merits as to this case. So you're not wrong that -- I mean, again, I would not be writing any orders going through the Rule 23 factors because the Court would have no occasion to certify anything at this point.

It would really just be whether or not there's even a chance that certification is viable because that does relate back. And the Supreme Court has told us in recent case law that we should be looking at that preliminarily to determine whether or not it even carries the day. I've pointed out -- and we've heard both sides on this, that on the plaintiffs' side they believe there's enough in there that class certification would be a possibility as to the First Amendment claims.

To your point, and in your papers you've noted it, it's not so easy. There might be commonality problems. And if I

ultimately agree with you on a merits-based determination, that would cut against any sort of success of likelihood on the merits if it's not viable that a class could be certified. Of course, the Court could also find that as to named plaintiffs only preliminary injunctive relief could be granted and allow the class cert issues to be briefed in normal course, which I've already set that briefing deadline.

So again, I hear you loud and clear, but I don't know that the Court would necessarily go that deep into the class cert. But I certainly have to look at it because I think there are issues in that certification motion that play into the determination for preliminary injunctive relief. So I would agree with you on that.

MR. MEROS: Yes, sir.

THE COURT: Go ahead. Go ahead. You were saying.

MR. MEROS: Yes, sir. But even -- I mean, there's even a more fundamental threshold issue that even to get to the class to even have any kind of relief whatsoever for class, there would be a standing issue, you know, for all these plaintiffs. You know, the Supreme Court has made clear that, you know, to do any kind of certification whatsoever, it has to be clear on the pleadings that there's standing for not only members of the individual plaintiffs but also for the class themselves.

And trying to certify a class or trying to provide

relief on a provisional status or otherwise for all future -- all current and future members of -- or not members -- detainees of Alligator Alcatraz certainly cannot show that there's standing for all those detainees.

And the Court would have to go through some of the Rule 23 analysis to do, you know, any kind of likelihood of success. It would have to actually be able to --

THE COURT: Right.

MR. MEROS: -- to have seen that the proof -- again, not from the pleading, but there's actual proof that it would meet all those levels. And as this Court noticed, the original complaint in the motion is in the -- in the certification motion is more styled as a complete ban, whereas here, you know, there are so many individualized circumstances that there are clear commonality and other issues.

THE COURT: Thank you. I would agree with that.

Sorry, go ahead.

MR. ZACHERL: Your Honor, Frank Zachrel. I'm actually only here on the class certification issues, and I'm chomping at the bit to just make the point on typicality.

Rule 23(a) has four requirements. There's been a little bit of discussion on commonality. There's been no discussion on typicality. The question the Court ultimately has to ask itself is: If we try the claims of the named plaintiffs, based on generalized proof, are we going to be

trying and adjudicating the claims of all the absent class members, all of these detainees?

The answer to that question is, manifestly, no. It is impossible now that it is no longer a complete ban case. If we try the question for one of these plaintiffs of whether they got a delay in meeting with their attorney, does that resolve the question of whether John Smith, absent class member, delayed? Absolutely not. And that is not something that can be remedied. And when we're talking about the likelihood of success on the merits on the issue of class certification, there has been no showing that we could ever overcome that particular aspect of this case.

Obviously, the standing issues, the class cannot have people in it that do not have standing, and the Court has to actually take up the issue of standing of the named plaintiffs first before we can even get to the certification analysis.

But ultimately, Your Honor, the problem here is typicality and the issue of how to try the case. There's been no workable trial plan put forth by the plaintiffs to accommodate these problems. And so we believe that this is one of the fundamental problems with the injunctive relief component because there can't be a likelihood of success on the merits on the issue of class certification.

THE COURT: Wouldn't you agree -- actually, I, quite frankly, think it's probably even less so -- I mean, although I

think there's some arguments to be made under the more traditional 23(a) kind of factors that you've pointed out, that you believe typicality, under 23(a)(3), is the bigger impediment, I mentioned commonality under (2).

But I think, quite frankly, it's even broader than that. It would be under 23(b)(3), meaning that under 23(b)(3), we have to also have a predominance analysis. That's really where it breaks down.

You know, the barriers for commonality and typicality aren't the hardest to satisfy in the world. I'm not saying you don't have a good argument. But the bigger fundamental question is: Do common issues predominate under 23(b)(3). And I will tell you that's where I think we start to get into a lot of problems because we're now dealing with plaintiffs that are not necessarily similarly situated. We have organizational or attorney plaintiffs. We have detained plaintiffs. Different detained plaintiffs are at different places in the sense of their case and their nature of the meetings with their lawyers and what they have and not been able to do.

So it just becomes a little unwieldy. And the question then becomes is a class mechanism, when you lack predominance, the best way to go about doing this. And that I can agree with you can be discussed at a preliminary injunction motion here like today and in an order that comes from this hearing because if there's a predominance problem, then that goes to the heart

of likelihood of success on the merits of the operative complaint that asks for class relief. But I think it's even more about 23(b)(3) than it would be about typicality and commonality.

MR. ZACHERL: And, Judge, I think you're absolutely right on all those points with the caveat that when I read the complaint, I didn't see a (b)(3) class.

THE COURT: Yeah.

MR. ZACHERL: I only saw a (b)(2).

THE COURT: Yeah.

MR. ZACHERL: This is a nonfinal order. It's a case management. Class action is -- class certification is a case management issue at the end of the day, right? So it is appropriate to look at (b)(3). But even under the (b)(2) analysis and the indivisibility requirement and the cohesiveness requirement, there's a lot of U.S. Supreme Court case law that is very specific on this point, the *Wal-Mart v. Duke* case is very specific in saying that the Court has to be able to resolve the problem on a (b)(2) class, which is what they're asking for, in one stroke.

THE COURT: And you're right. In fact -- my apologies. Because it really is -- looking at the complaint here, it's only under a (b)(2) because it's injunctive relief, right, but it doesn't change the fact that under (b)(2) it must apply generally to the class, right? So it still -- it goes back a

little more on the typicality and commonality but that general application, in your view, begins to break down when you have all of these plaintiffs dealing with different or distinct First Amendment problems, right?

MR. ZACHERL: Well, in our view, Judge, you don't need to go any further in the analysis of likelihood of success on the merits than looking at the likelihood of success on the issue of class certification. If you put that on the side, I think the Court is correct that you could issue some sort of injunction on these individual claims based on, perhaps, a more fulsome record than we have here.

But certainly on the issue of class certification, there's been nothing put into this record that would permit the Court to undergo that rigorous analysis. You know, the *Valley Drug* case, I think it's called, from the Eleventh Circuit, the Rule 23 requirements are not just requirements, they are -- they are safeguards.

THE COURT: Right. And let me be clear: Also, I don't want any of the plaintiffs to be concerned. We haven't, nor are we going to, rule on the motion for class cert. In fact, I know plaintiffs wanted us to try to brief that all today, and I declined to do so. I still think looking at it is valuable when we look at the preliminary injunction analysis. But I don't want anybody on the plaintiffs' side to believe that we're getting all the way into Rule 23.

And I think that at bottom, we still have to look at the nature of the First Amendment claims just as much as we need to look at Rule 23 as a mechanism. So I -- you know, I'll look at it. But I hear you, that it's a concern, certainly, that I have to address in the preliminary injunction analysis for sure. I hear you on that.

MR. ZACHERL: Thank you, Your Honor.

THE COURT: Did you want to add something, Mr. Meros?

MR. MEROS: Yes, Your Honor. Thank you.

The last thing I wanted to mention is that, you know, not only is there not grounds for First Amendment violation, but the claims that are being made here, you know, are really for past relief. To the extent there's any -- you know, there's any claim of future relief, you know, an injunction, of course, is not appropriate for past relief. It's only appropriate, you know, when there is a real, immediate threat of future relief.

But the government actors are entitled to a presumption, you know, that any wrongful conduct that may or may not have occurred will not occur again. And as we've shown in this record, we have a -- we actively have a policy that we are following, that despite the plaintiffs' claims, we are following the ICE guidelines. And while one of the exhibits may be labeled a draft, it is the actual policy that the facility is implementing.

So to the extent that in order to get it -- an injunction of any kind, much less a mandatory preliminary injunction, they would have to show there's a real or immediate threat of future harm. We simply suggest that there's clearly not that showing here because we're continuing to provide that kind of relief. And to the extent, you know, that there are anecdotal examples of things that may or may not have occurred, that certainly does not show a real and immediate threat of future harm.

THE COURT: No, and I appreciate that.

And I think, Ms. Cho, as you've pointed out, your position is pretty clear that this is perspective concerns and relief in that some of the delays are ongoing. You've pointed out, as you just did a moment ago, the irreparable harm that flows from some of those delays.

And so I hear you loud and clear on this, Mr. Meros. I think, certainly, this issue of government actors ceasing certain behavior is relevant, actually, for voluntary cessation purposes when it comes to the Fifth Amendment, because that is why I can make an argument here that, with the representations that I've gotten from the federal defendants and the disclosure on Saturday, the bond issue is no more. We know that these individuals can be heard at Krome. In fact, my recollection is that some of them were transferred during the pendency of this litigation to Krome, where they have then been able to pursue

bond determination remedies.

So I hear you that there's no question that there is a rebuttable presumption. The case law says it, *Troiano* and others, the rebuttable presumption, the objectionable behavior will not reoccur is afforded to a government actor. I'll look at that. By the same token, of course, I've heard from the plaintiffs' team that we continue to have some concerns here on the delay in getting access to counsel, right?

Let me just also, then, finally hear from the federal defendants. Anything else, Ms. Rodriguez, on the federal defendant front in terms of issues we may not have touched on or any other finer points you wish to make on the subjects we have covered?

MS. RODRIGUEZ: Your Honor, on the scope of the injunction --

THE COURT: Sure.

MS. RODRIGUEZ: -- it's our position that the plaintiffs cannot make a substantial showing of likelihood of success on the merits. They cannot meet the other requirements for preliminary injunction. And the request -- the relief that they requested would not extend to the federal government. They've requested relief that deals with day-to-day activities and the actual operations that are happening at Alligator Alcatraz. Those are within the province and within the power of the state. The state agrees with that. There's no issue

with that.

And so any junction that would be issued -- and I don't think that there is a basis for an injunction here, Your Honor -- would necessarily not cover the federal defendants. There's no basis for that.

THE COURT: Yeah. That's -- goes more, also, to some of our earlier arguments that -- and again, I would imagine this is directly relevant to the venue argument that has been made, right? And that is there is no day-to-day oversight by the federal defendants. So inasmuch as any First Amendment arguments are being advanced, it is not a function of the federal defendants that allege First Amendment violations are happening on the ground. There is not direction or lack thereof, as you heard from the plaintiffs' side, the omission under 287, and that relationship by the federal defendants giving rise to the First Amendment claim.

So the argument would be that even if there was grounds for preliminary injunctive relief, that certainly it should not be encompassing the federal defendants, who, in your view, I think, Ms. Rodriguez, have not taken an active role in running the facility. So therefore, they have not played any part in any First Amendment violations because, again, simply, as we've seen in this record, having people directed to Krome or directed to call, as some of the state defendants have done, where there's been a question about bond issues and immigration

court, simply being directed to reach out to Krome doesn't somehow transform the claim to one of a First Amendment nature committed by the federal defendants.

The only involvement really has been EOIR on the Fifth Amendment, which is no longer a live issue. So your point is, there really is nothing for the federal defendants to be enjoined from dealing with First Amendment issues because they didn't participate in those issues in the first place because they're not on the ground in Alligator Alcatraz; is that right?

MS. RODRIGUEZ: That's correct, Your Honor.

THE COURT: Okay. Yes, Mr. Meros.

MR. MEROS: One last thing, I don't want to take too much time. Last thing, I know the plaintiffs mentioned before, you know, the *Turner* test, you know, the reasonability aspect.

THE COURT: Right.

MR. MEROS: We would just suggest, you know, that *Turner* and *Pesci* absolutely apply. So to the extent the Court gets into any of the reasonableness, we -- we argue that certainly, those tests apply in this context in that given -- you know, given no declarations, given the record we've demonstrated what we are applying.

It is -- it is certainly clear to state defendants, you know, that the regulations we are applying are certainly reasonable because there is -- you know, there is ample case law that for reasons of safety and security and discipline of

the facility, you know, having some restriction on First Amendment rights is certainly reasonable, and we'd certainly argue that we -- you know, that there certainly are other alternative -- there are certainly other reasonable alternatives that could be applied. You know, and these kind of regulations, you know, are certainly not, as the case law would find overreactions to the situations. I didn't want to get into that too much, but I wanted to at least flag that for the Court.

THE COURT: No. I appreciate that because I think any First Amendment claim requires a look at *Turner*. And I know Ms. Cho has mentioned some of those cases, as well, in both the attorney plaintiff and the detained plaintiff point of view.

Ms. Cho, I want to give you an opportunity here before we conclude. I don't want you to be too concerned about arguing the merits of the class cert issue. We got a little bit into that, and I've made very clear that we're only doing a preliminary peak on it. But is there anything else you wanted to add on that point or any other points before we conclude?

MS. CHO: Yes, Your Honor. Thank you. With respect to the class certification motion, just to clarify that the plaintiffs are not requesting class certification under 23(b)(3).

THE COURT: Just (b)(2), right?

MS. CHO: We are asking for a 23(b)(2) class. And, of

course, 23(b)(2) class are -- this case has appeared in that -- a 23(b)(2) class in that it is a civil rights action asking for injunctive relief to resolve violation -- the Constitutional violation. We have properly pled this, and the defendants have not responded to this.

And with respect to the arguments regarding typicality and the (b)(3) argument, which, of course, is not an argument that the plaintiffs have raised here, this has not been briefed before the Court.

THE COURT: Right.

MS. CHO: And the Court would need to give the plaintiffs a proper opportunity to reply to that.

THE COURT: Sure. Yeah, no. And I don't think I would be getting into that issue at all. I think the important thing is, to your point, as a (b)(2), simply taking a look and making sure that there's not a problem with, kind of, that general commonality is the most the Court will look to just to see that it's a viable mechanism for the First Amendment class. That's really what it is.

And I know, as you do, that there could always be a determination on subclasses. The Court will be at liberty to redefine classes, if I felt I needed to for the confidentiality, et cetera. So there's flexibility built into the joints of a (b)(2) class that you've requested.

MS. CHO: Thank you, Your Honor. And I would, of

course, again, point you to the *Florida Immigration Coalition* case that talks about the fact that the critical inquiry in a (b)(2) class is whether the class members have suffered a common injury, not identical injuries.

THE COURT: Right.

MS. CHO: That could be addressed by classified injunctive or declaratory relief, and that, of course, is the case here today.

THE COURT: Right. Your view has been that it is common enough under (b)(2) and that we don't need to get caught up with the nature or the, maybe, granular level of a First Amendment violation, whether it be legal documents, confidentiality, or delay. At its core, those are all flowing from denial of access to counsel-type claims, right?

MS. CHO: That's right, Your Honor.

THE COURT: Yeah.

MS. CHO: The other thing is that we are slightly confused by the state's position that it has been shifting throughout the case and, indeed, throughout today's hearing with respect to its position regarding voluntary cessation. We believe that the state defendants have stated they're not stating a voluntary cessation claim. And --

THE COURT: My understanding is the only voluntary cessation analysis that I would even feel is warranted would be under the Fifth Amendment because that's the only one where

it's viable. I have to go through that. My understanding of the case law in preparation for today is in these types of situations, you have a right to raise voluntary cessation because there could be a concern that the ball shifts about where the facility will be in the future in terms of bond determination, who's going to have jurisdiction. That's why I pressed Ms. Rodriguez. I now have an answer on record and a filing. So I think I'm in a better position to be less concerned, if you will.

And I guess my problem is to the plaintiffs on that front is, even if the Court does not find that I need to go through a voluntary cessation analysis or that voluntary cessation is not applicable because we have guarantees, it doesn't mean that there couldn't be a request for relief at some point if the government decides to shift the ball again, right, and decide to pick a new spot, or worse, remove from the website where you go get your bond determinations. I think you'd have every right in the world to come back and seek relief in that case.

MS. CHO: Thank you, Your Honor.

THE COURT: Yeah.

MS. CHO: That third issue that I just wanted to cover --

THE COURT: Yeah.

MS. CHO: -- really briefly is this issue of *Turner* and

the applicability of the reasonability standard.

The defendants have just stated for the first time that the draft policy that, I think, was attached at the Saunders declaration, Exhibit Number 10, is in operation at the facility even though it is marked with draft. That has never been a fact that has been made clear to the plaintiffs or to the Court. And I want to just underscore the implications of the defendants' representation right there.

If you look carefully at the Saunders declaration, Exhibit Number 10, which is this draft policy that the defendants are purportedly now implementing with respect to attorney access at the facility, the facts on the ground show that that policy is being clearly violated at every turn. There are -- that policy actually provides that visitation shall be happening in person, without a requirement for an appointment. It requires that visitation policies are openly posted to the public and are provided to detainees. These are all things that the defendants have claimed that they don't have to do, and currently, they do not dispute that that is not taking place.

In addition, the importance of that admission that the defendants' counsel has just made is particularly important for the Court's analysis under *Turner*. The *Turner* analysis states that whether or not the Court agrees with the fact that this should apply at the civil immigration detention facility, the

*Turner* analysis requires that if there are reasonable alternatives to what is taking place at the facility now, that it is, in fact, a violation of the Constitution, it is a violation of the First Amendment because there is no reasonable explanation or justification for the violations to be taking place.

And if the defendants are positing that the draft policy that is at Exhibit Number 10 is, indeed, the policy that is in place and that they can adhere to that policy, then there is even less explanation as to why that is not a reasonable alternative in the face of the violations that are taking place currently.

THE COURT: Yeah. I guess -- look, I agree with you that there is another undercurrent here, almost a different claim that's been formulating or lurking in the background, and that has been something that I have been looking at it and watching it develop by way of the interrogatories and the production of documents.

You know, it's not what I have before me here on the First Amendment. Again, I want to be clear: We don't have this type of 287 or ICE standard arguments that Alligator Alcatraz is operating outside the bounds of its authority or without authority, or outside the scope of a 287. That has been a -- again, it's been in the outskirts of all of the papers.

It's not really framed, but it's not something that we should overlook. I mean, I certainly don't know if it will play a part for purposes of the hearing today and any future ruling, but it has been a concern of the Court, you know, from the very, very beginning, that certainly there could be a disconnect between what is required by 287 and the ICE standards and what is being done under the guise of this federal authority ceded to the state in how it's running Alligator Alcatraz. That's been there, and that continues to be a concern for the Court.

As I stated, I don't know that it will be one that manifests itself in this case. That might be a different case. But certainly, I would imagine that if it comes out of this litigation and has been clarified, then plaintiffs may wish to seek relief on a separate and independent ground than what we see here. I will focus and train my eye on the First Amendment, and I will, of course, be cognizant of the (b)(2) concern, but I'm not going to get too caught up in that.

I do want to confirm, though, to your question: Maybe it would be good, Ms. Cho, that we get that explicitly confirmed on the record today when it comes to that Exhibit Number 10, I believe, right?

Is that correct, Mr. Meros? That's the draft one. Is that operational? I don't know the answer to that.

MR. MEROS: Well, Your Honor, I would -- I would need

to confirm that with my client. I mean, that has been my understanding. That is why we attached it as an exhibit.

THE COURT: Your understanding is that is the operational plan, that it's operative?

MR. MEROS: Well, Your Honor, again, I don't want to make a representation to this Court and have to take it back. So if the Court would like me to make a representation, I can confirm that with the client. But, you know, I don't -- again --

THE COURT: Yeah. I would say this: I don't know that I need it for the record, but, certainly, you mentioned it just now in your argument, and Ms. Cho correctly picked up on it. If you want to clarify that, then I would ask that you perhaps, you know, submit something with the Court just to make clear whether it is or is not operative. It could be very similar to what we received from the federal government on the issue of the bond determination. But that might help. I don't know that it is necessarily relevant for my ruling, but it would be a material development that I think would benefit all of us to understand what's happening on the ground. So if you could, please confirm that for me, that would be helpful.

MR. MEROS: Yes, Your Honor.

THE COURT: And I would ask, if you can, file something by the end of today on that, if you could. All right?

MR. MEROS: Okay.

THE COURT: All right. So by 5:00 p.m., let's get just a state notice of whether or not Exhibit Number 10 is truly the operational plan. Let's get that because I think that'll help us get a better sense of what's happening on the ground.

Does that make sense, Ms. Cho?

MS. CHO: Yes, Your Honor.

THE COURT: All right. So I'll look for that, Mr. Meros. But I think that everything else has been properly framed for the Court.

So I will get to work right away because, again, I'm very sensitive to the fact that if I feel hamstrung by the venue statute, that I don't waste any time because we've essentially teed up everything in this case, and it is prepared, absent a venue problem, for a ruling on preliminary injunctive relief on the First Amendment.

And so my hope is that if, ultimately, I feel constrained by venue for the state defendants -- and now that everyone has consented that if I do so, under 1404, it should go to the Middle District -- then I've done everything I can, absent ignore statutory command, which I will not do, to position this for a sister court in the Middle District. Because everything has been briefed. The motion is teed up. The Court can put out an order that clarifies everything I can in terms of mootness, jurisdiction, and the like.

And then hopefully, if it can't be me, if I can't get

through 13- -- and I'm going to look at the *Inch* case, but if I can't get through the 1390 analysis, then I will attempt to leave as much as I can in terms of breakdown on everything else we've talked about today so that it advances the ball. I don't want this to be delayed any further. We've tried to move expeditiously. But I know that plaintiffs need a ruling on the injunctive relief portion of this as soon as possible.

So with that, is there anything else before we conclude so that I can go back to chambers and begin reviewing and writing? And I meant to say 1391 -- excuse me -- would be the bar, not 1390.

Anything else on behalf of the plaintiffs?

MS. CHO: No, Your Honor. Thank you very much.

THE COURT: Thank you. Anything else on behalf of the state defendants?

MR. MEROS: No, Your Honor. Thank you.

THE COURT: Anything else on behalf of the federal defendants?

MS. RODRIGUEZ: No, Your Honor. Thank you.

THE COURT: Thank you all very much for your submissions. The Court will issue a ruling as soon as possible. So thank you, everyone. We are in recess.

THE COURTROOM DEPUTY: All rise.

(Court recessed at 12:31 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

DATE: August 26, 2025

/s/Ilona Lupowitz
ILONA LUPOWITZ, RMR, CRR
Official Court Reporter
United States District Court
Southern District of Florida
400 North Miami Avenue
Room 11-2
Miami, Florida 33128
(305) 523-5737

## /

**/s/Ilona** [1] - 112:8

## 1

**1** [10] - 1:10, 22:13, 43:19, 54:20, 54:22, 56:10, 78:9, 78:20, 79:15, 79:16
**10** [6] - 83:24, 106:4, 106:10, 107:8, 108:22, 110:2
**10:00** [1] - 1:7
**10th** [1] - 16:22
**11** [2] - 22:7, 47:23
**11-2** [2] - 2:23, 112:11
**11th** [2] - 18:3, 24:12
**12** [1] - 50:5
**12(b)(3** [1] - 48:25
**1252** [3] - 37:20, 46:2, 79:7
**1252(g** [16] - 37:24, 38:5, 38:10, 38:14, 39:2, 39:12, 40:7, 43:6, 43:16, 43:23, 44:3, 44:13, 44:15, 45:9, 45:17, 45:19
**1252(g)** [4] - 37:15, 42:10, 42:24, 44:10
**12:31** [2] - 1:7, 111:24
**13** [1] - 111:1
**1390** [2] - 111:2, 111:11
**1391** [2] - 68:8, 111:10
**1391(b)(2** [1] - 60:8
**1391(b)(2)** [2] - 56:14, 56:21
**1391(e)** [1] - 54:23
**1391(e)(1** [3] - 47:1, 47:16, 56:16
**1391(e)(1)** [1] - 56:25
**1391(e)(1)(A** [1] - 48:4
**1391(e)(1)(A)** [1] - 53:3
**1391(e)(1)(B** [3] - 49:22, 53:4, 55:24
**1391(e)(1)(C** [1] - 53:10
**1391(e)(1)(C)** [1] - 53:21
**1404** [3] - 78:12, 78:19, 110:18
**15** [1] - 22:5
**15(d** [2] - 45:13, 76:4
**15(d)** [1] - 20:25
**150** [1] - 5:18
**152** [1] - 5:22
**15th** [4] - 1:19, 16:21, 17:23, 24:11
**16** [1] - 5:3
**18** [1] - 1:6
**1983** [1] - 56:13
**1st** [1] - 18:4

## 2

**2** [3] - 56:12, 56:23, 78:10
**2)** [1] - 94:4
**200** [1] - 2:14
**20005** [1] - 1:20
**2025** [7] - 1:6, 5:3, 22:5, 22:7, 22:12, 22:13, 112:8
**215** [1] - 2:11
**2200** [1] - 2:6
**23** [9] - 33:12, 34:11, 90:2, 90:9, 90:13, 92:6, 96:16, 96:25, 97:3
**23(a** [2] - 92:21, 94:2
**23(a)(3** [1] - 94:3
**23(b)(2** [3] - 102:25, 103:1, 103:2
**23(b)(3** [3] - 94:6, 95:3
**23(b)(3)** [2] - 94:12, 102:23
**23rd** [2] - 17:19, 24:1
**24** [3] - 86:5, 86:6, 86:18
**25** [2] - 35:14, 58:10
**25-3181** [1] - 3:3
**25-CV-23182-RAR** [1] - 1:2
**26** [1] - 112:8
**28** [2] - 5:17, 60:8
**287** [32] - 35:3, 51:5, 51:6, 52:1, 52:3, 59:3, 59:13, 60:2, 60:23, 62:23, 63:15, 66:3, 66:24, 67:22, 67:23, 68:15, 70:8, 70:12, 73:13, 74:6, 75:15, 76:11, 76:13, 76:21, 76:23, 77:19, 80:4, 100:15, 107:21, 107:23, 108:6
**287(g** [31] - 35:16, 35:17, 35:22, 36:1, 36:6, 36:10, 36:14, 50:22, 51:1, 51:3, 52:14, 55:15, 57:14, 58:6, 58:14, 58:16, 60:6, 61:4, 61:9, 62:25, 63:3, 65:6, 66:8, 70:9, 70:15, 70:16, 75:5, 75:18, 75:21, 76:6, 76:16
**287(g)** [1] - 74:22
**287s** [3] - 70:23, 73:6, 73:22
**29** [1] - 34:23

## 3

**3** [6] - 26:11, 47:23, 54:20, 54:22, 56:11, 78:9
**300** [1] - 2:17
**305** [2] - 2:24, 112:12
**309** [1] - 2:9
**31** [2] - 35:14, 58:10
**32** [2] - 35:14, 58:10
**32301** [1] - 2:12
**33128** [2] - 2:24, 112:11
**33131** [1] - 2:15
**33134** [1] - 2:3
**33152** [1] - 2:6
**33166** [1] - 2:9
**36th** [1] - 2:9

## 4

**4** [8] - 22:12, 56:12, 56:23, 64:9, 78:10, 78:20, 79:15, 79:17
**400** [3] - 2:3, 2:23, 112:10
**4100** [1] - 2:14
**425** [1] - 1:23
**4343** [1] - 2:3
**49-2** [2] - 35:13, 58:10
**4th** [3] - 2:17, 17:20, 24:5

## 5

**5** [7] - 5:13, 5:15, 9:24, 51:14, 52:22, 54:21, 64:16
**50-1** [1] - 51:14
**523-5737** [2] - 2:24, 112:12
**5:00** [1] - 110:1
**5th** [3] - 17:22, 24:9

## 6

**6** [1] - 64:19
**6355** [1] - 2:9
**67** [3] - 6:2, 13:11, 34:24
**69** [1] - 47:24
**6th** [2] - 17:22, 24:10

## 7

**7** [3] - 9:21, 64:19, 64:21
**700** [1] - 1:23
**72nd** [1] - 2:6
**7th** [1] - 1:19

## 8

**804** [1] - 2:11
**83** [1] - 5:2
**88** [1] - 64:14

## 9

**915** [1] - 1:19
**94104** [1] - 1:24
**99** [1] - 2:17

## A

**A)** [1] - 47:7
**a.m** [1] - 1:7
**A.S** [1] - 55:18
**ability** [8] - 13:22, 15:11, 15:19, 19:8, 19:18, 19:22, 32:12, 34:10
**able** [19] - 11:21, 15:12, 17:16, 22:13, 28:15, 31:10, 32:12, 32:14, 32:19, 32:21, 37:16, 68:22, 81:15, 86:10, 87:20, 92:7, 94:19, 95:19, 98:25
**above-entitled** [1] - 112:5
**absent** [5] - 71:16, 93:1, 93:7, 110:14, 110:20
**absolutely** [11] - 10:6, 11:23, 18:18, 18:19, 19:7, 19:8, 24:19, 89:10, 93:8, 95:5, 101:17
**abuses** [1] - 62:5
**accept** [2] - 49:21, 50:16
**access** [48] - 13:13, 13:24, 14:12, 15:11, 16:9, 16:17, 16:23, 16:24, 17:3, 17:6, 20:11, 23:4, 26:17, 27:2, 32:17, 32:19, 36:13, 36:16, 36:19, 36:24, 40:13, 41:6, 43:20, 44:10, 44:13, 50:5, 58:23, 60:16, 61:18, 62:6, 64:11, 64:15, 64:17, 66:10, 77:2, 82:9, 83:9, 83:22, 84:1, 84:5, 84:20, 85:11, 85:21, 86:7, 99:8, 104:14, 106:12
**accessibility** [1] - 84:25
**accommodate** [1] - 93:20
**accordance** [4] - 36:11, 58:18, 62:17, 63:14
**according** [2] - 45:7, 77:23
**accurate** [2] - 25:12, 112:4
**accurately** [4] - 25:24, 28:15, 28:21, 88:23
**ACLU** [1] - 3:25
**act** [4] - 57:6, 58:23, 62:16, 63:14
**action** [22] - 33:13, 38:17, 38:19, 42:21, 47:5, 47:7, 47:9, 47:11, 47:22, 53:1, 53:17, 54:5, 56:1, 57:6, 68:17, 69:15, 70:5, 70:13, 71:12, 76:25, 95:12, 103:2
**actions** [16] - 8:19, 35:3, 37:24, 37:25, 38:11, 38:15, 38:16, 40:6, 40:15, 42:24, 43:13, 50:12, 57:5, 68:25, 69:12, 69:17
**active** [1] - 100:20
**actively** [1] - 97:21
**activities** [6] - 51:10, 52:13, 52:15, 54:14, 55:13, 99:22
**activity** [1] - 52:10
**actor** [1] - 99:5
**actors** [3] - 76:16, 97:18, 98:17
**acts** [3] - 38:21, 60:9, 65:18
**actual** [4] - 24:2, 92:10, 97:24, 99:23
**add** [5] - 25:19, 25:20, 69:10, 97:8, 102:19
**addition** [3] - 14:20, 28:11, 106:21

**additional** [1] - 18:15
**address** [7] - 4:13, 5:16, 28:3, 80:22, 85:14, 88:5, 97:5
**addressed** [4] - 21:23, 49:15, 80:12, 104:6
**adhere** [1] - 107:9
**adhered** [1] - 60:17
**adherence** [1] - 60:13
**adjudicate** [3] - 38:1, 38:22, 43:17
**adjudicated** [1] - 32:3
**adjudicating** [2] - 40:9, 93:1
**adjudication** [1] - 45:15
**administration** [2] - 68:12, 72:3
**administrative** [2] - 5:8, 8:7
**admission** [1] - 106:21
**admit** [1] - 15:1
**advance** [4] - 15:4, 42:11, 42:16, 86:13
**advanced** [2] - 39:1, 100:11
**advances** [1] - 111:4
**advice** [1] - 69:24
**ADVOCACY** [2] - 2:5, 2:8
**advocate** [1] - 31:12
**affidavits** [2] - 4:17, 50:1
**afforded** [2] - 25:10, 99:5
**agencies** [4] - 71:2, 75:3, 75:4, 75:11
**ago** [4] - 26:15, 29:23, 67:21, 98:14
**agree** [18] - 16:6, 37:15, 39:21, 43:15, 48:22, 51:25, 55:9, 56:13, 63:5, 65:22, 84:3, 90:7, 91:1, 91:13, 92:16, 93:24, 94:22, 107:13
**agreed** [1] - 37:7
**agreement** [27] - 35:21, 35:22, 36:1, 36:7, 36:10, 36:14, 55:15, 57:14, 58:6, 58:13, 58:14, 58:16, 60:6, 62:9, 63:18, 63:21, 66:8, 67:8, 67:13, 67:23, 68:15, 70:12, 75:19, 75:21, 76:6, 80:4
**agreements** [22] - 35:3, 35:16, 35:17, 51:1, 51:3, 51:5, 51:6, 51:9, 51:11, 52:14, 59:3, 59:13, 59:18, 62:17, 62:23, 62:25, 63:4, 63:15, 70:9, 70:15, 75:5, 75:15
**agrees** [2] - 99:25, 106:24
**ahead** [10] - 3:10, 3:17, 4:3, 6:21, 9:16, 27:20, 91:15, 92:17
**Al** [1] - 31:17
**al** [4] - 1:5, 1:9, 3:3, 3:4
**Al-Amin** [1] - 31:17
**Alcatraz** [70] - 5:8, 5:10, 5:21, 5:25, 6:7, 7:1, 7:10, 7:13, 7:17, 8:8, 9:4, 10:14, 10:25, 11:3, 11:12, 12:6, 14:11, 15:20, 16:5, 19:22, 21:23, 22:6, 22:13, 23:6, 35:20, 36:4, 40:19, 41:16, 41:21, 44:19, 44:20, 48:19, 49:24, 49:25, 50:14, 51:9, 51:11, 52:12, 53:13, 53:18, 53:19, 54:6, 57:16, 58:9, 59:9, 59:19, 64:8, 64:15, 64:19, 65:7, 66:11, 67:12, 68:12, 72:3, 73:18, 74:25, 76:2, 81:3, 81:24, 82:25, 83:7, 83:16, 89:4, 89:11, 92:3, 99:24, 101:9, 107:22, 108:9
**allegation** [4] - 48:17, 48:18, 50:22, 53:4
**allegations** [5] - 41:25, 43:2, 48:20, 50:6, 76:15
**allege** [1] - 100:12
**alleged** [2] - 49:23, 61:13
**allegedly** [1] - 10:7
**Alligator** [70] - 5:8, 5:10, 5:21, 5:25, 6:6, 6:25, 7:10, 7:13, 7:17, 8:8, 9:4, 10:14, 10:25, 11:2, 11:12, 12:5, 14:11, 15:20, 16:5, 19:22, 21:23, 22:6, 22:13, 23:6, 35:19, 36:3, 40:19, 41:16, 41:21, 44:18, 44:19, 44:20, 48:19, 49:24, 49:25, 50:13, 51:9, 51:11, 52:12, 53:13, 53:18, 53:19, 54:6, 57:15, 58:9, 59:9, 59:19, 64:7, 64:15, 64:19, 65:7, 66:11, 67:12, 68:12, 72:3, 73:17, 74:25, 76:2, 81:3, 81:24, 82:25, 83:7, 83:16, 89:4, 89:11, 92:3, 99:23, 101:9, 107:21, 108:9
**allocate** [1] - 10:13
**allocating** [1] - 11:12
**allocation** [1] - 10:24
**allow** [8] - 14:18, 27:19, 42:25, 65:5, 77:9, 77:20, 80:1, 91:5
**allowed** [5] - 17:10, 19:9, 19:10, 19:12, 42:19
**Almanza** [2] - 22:3, 22:4
**almost** [9] - 20:12, 35:4, 42:12, 43:7, 53:16, 59:15, 66:21, 83:6, 107:14
**alternative** [5] - 25:5, 50:17, 58:20, 102:4, 107:11
**alternatives** [2] - 102:5, 107:2
**Amendment** [131] - 4:20, 5:13, 5:18, 5:23, 6:1, 6:7, 12:16, 12:21, 12:23, 12:24, 13:9, 14:3, 14:6, 15:11, 15:17, 15:24, 16:3, 16:6, 20:11, 25:9, 25:10, 25:16, 25:23, 26:6, 26:7, 26:12, 28:7, 29:8, 29:15, 29:25, 30:5, 30:8, 30:12, 30:16, 30:18, 31:4, 31:8, 31:10, 31:14, 31:20, 32:4, 32:15, 32:16, 32:24, 33:14, 34:1, 34:10, 34:16, 34:21, 35:1, 35:7, 35:9, 37:6, 37:17, 37:19, 38:6, 39:3, 39:13, 39:17, 40:10, 40:22, 40:23, 42:1, 42:3, 42:12, 42:22, 43:20, 44:12, 44:22, 45:1, 45:2, 45:20, 45:21, 45:25, 46:1, 53:19, 60:18, 60:24, 61:5, 61:17, 62:20, 62:22, 63:16, 63:19, 64:7, 65:7, 66:4, 68:3, 68:5, 68:17, 69:2, 71:25, 76:16, 77:2, 77:15, 77:23, 79:10, 79:12, 79:17, 80:1, 80:6, 80:16, 80:19, 80:20, 82:11, 87:11, 87:23, 88:14, 88:19, 88:20, 90:22, 96:4, 97:2, 97:11, 98:19, 100:10, 100:12, 100:16, 100:22, 101:2, 101:5, 101:7, 102:2, 102:11, 103:18, 104:12, 104:25, 107:4, 107:20, 108:17, 110:15
**American** [2] - 30:21, 43:22
**AMERICAN** [2] - 1:18, 1:22
**AMERICANS** [2] - 2:5, 2:8
**Amin** [1] - 31:17
**amount** [3] - 72:10, 72:11, 89:10
**ample** [1] - 101:24
**Amy** [1] - 3:24
**AMY** [1] - 2:2
**analysis** [19] - 43:16, 55:10, 65:24, 89:24, 90:3, 92:6, 93:16, 94:7, 95:15, 96:6, 96:14, 96:23, 97:5, 104:24, 105:12, 106:23, 107:1, 111:2
**analyze** [1] - 46:18
**ancillary** [1] - 44:10
**anecdotal** [7] - 17:12, 18:8, 23:16, 24:20, 24:25, 33:23, 98:7
**anecdotes** [1] - 25:11
**Anna** [2] - 17:15, 22:2
**answer** [5] - 11:25, 80:8, 93:3, 105:7, 108:24
**anticipate** [1] - 4:18
**APA** [3] - 50:23, 50:25, 52:1
**APA-procedural** [1] - 52:1
**apologies** [1] - 95:21
**appeal** [1] - 46:17
**appear** [2] - 42:23, 74:22
**APPEARANCES** [1] - 1:15
**appearances** [2] - 3:10, 3:16
**Appearances** [1] - 2:1
**appeared** [1] - 103:1
**applicability** [1] - 106:1
**applicable** [4] - 31:8, 57:19, 75:25, 105:13
**application** [2] - 63:2, 96:2
**applied** [2] - 45:10, 102:5
**applies** [1] - 43:16
**apply** [9] - 31:23, 33:14, 44:3, 44:13, 72:7, 95:24, 101:17, 101:19, 106:25
**applying** [2] - 101:21, 101:23
**appointment** [4] - 15:7, 86:9, 86:14, 106:16
**appreciate** [4] - 11:18, 61:24, 98:10, 102:10
**approaches** [1] - 41:18
**appropriate** [9] - 28:3, 55:21, 57:23, 57:24, 71:5, 88:8, 95:14, 97:15, 97:16
**appropriately** [1] - 72:24
**approval** [1] - 15:5
**approved** [2] - 19:14, 19:24
**Arab** [1] - 43:22
**Arab-American** [1] - 43:22
**areas** [1] - 18:22
**arguably** [2] - 35:8, 43:8
**argue** [7] - 34:1, 42:8, 53:12, 72:9, 83:25, 101:18, 102:3
**argued** [4] - 13:12, 16:25, 17:2, 18:1
**arguing** [8] - 21:6, 24:17, 24:18, 26:9, 26:10, 40:6, 66:6, 102:16
**argument** [46] - 5:16, 15:24, 15:25, 16:14, 16:15, 21:3, 21:17, 22:16, 33:9, 39:8, 40:3, 40:21, 42:8, 42:10, 42:12, 42:15, 45:9, 45:17, 47:18, 48:1, 48:12, 48:23, 48:25, 49:19, 49:21, 51:4, 52:25, 54:1, 55:1, 68:8, 70:8, 71:14, 72:21, 73:13, 73:15, 74:14, 75:17, 76:12, 83:15, 94:11, 98:20, 100:8, 100:17, 103:7, 109:12
**arguments** [19] - 13:2, 16:11, 18:8, 22:19, 25:23, 26:3, 39:1, 40:22, 45:21, 47:3, 76:20, 80:9, 88:9, 88:16, 94:1, 100:7, 100:11, 103:6, 107:21

**arise** [8] - 15:16, 38:4, 38:12, 38:15, 40:15, 42:23, 44:3, 49:23
**arises** [2] - 36:18, 43:25
**arising** [1] - 42:9
**arms'** [1] - 59:15
**Article** [1] - 26:11
**aside** [1] - 46:8
**aspect** [2] - 93:12, 101:14
**assign** [1] - 8:17
**assisting** [1] - 4:11
**assume** [3] - 37:16, 70:7, 78:7
**assuming** [2] - 26:20, 37:5
**attached** [2] - 106:3, 109:2
**attaching** [1] - 86:12
**attack** [1] - 4:23
**attempt** [2] - 42:4, 111:2
**attempted** [3] - 15:3, 37:15, 53:11
**attempting** [3] - 23:4, 42:11, 42:13
**attorney** [37] - 13:13, 13:24, 14:12, 14:18, 22:2, 22:8, 27:1, 27:11, 27:16, 27:19, 29:9, 29:21, 30:10, 32:21, 36:13, 36:16, 36:19, 36:24, 50:5, 50:10, 50:13, 58:23, 60:16, 62:6, 64:13, 64:17, 64:18, 66:10, 83:22, 84:1, 84:4, 85:11, 85:20, 93:6, 94:16, 102:13, 106:12
**Attorney** [4] - 40:18, 41:20, 42:21, 44:1
**ATTORNEY** [1] - 2:16
**attorney-access** [1] - 13:24
**attorney-client** [8] - 14:18, 27:19, 32:21, 50:5, 50:10, 50:13, 64:13, 64:18
**attorneys** [26] - 13:19, 15:3, 15:5, 15:12, 15:18, 19:9, 19:19, 27:5, 28:4, 28:14, 28:16, 28:17, 29:13, 32:9, 32:13, 32:18, 32:22, 33:1, 40:1, 40:14, 41:6, 41:7, 64:20, 84:18, 86:9
**audio** [1] - 3:5
**auditory** [1] - 64:23
**August** [14] - 1:6, 5:3, 17:20, 17:23, 18:4, 22:5, 22:7, 22:12, 22:13, 24:5, 24:9, 24:10, 24:11, 112:8
**authority** [12] - 35:19, 36:3, 51:22, 57:15, 58:8, 67:11, 69:12, 74:24, 76:2, 107:22, 107:23, 108:8
**authorization** [1] - 51:8
**authorized** [1] - 51:11
**availed** [1] - 66:23
**availment** [3] - 66:16, 67:1, 68:9
**Avenue** [3] - 2:6, 2:23, 112:10
**aware** [1] - 9:24

## B

**b)(2** [10] - 95:14, 95:19, 95:23, 95:24, 102:24, 103:15, 103:24, 104:3, 104:10, 108:17
**b)(2)** [1] - 95:9
**b)(3** [2] - 95:7, 103:7
**b)(3)** [1] - 95:14
**back-and-forth** [2] - 26:16, 37:11
**background** [1] - 107:15
**ball** [3] - 105:4, 105:15, 111:4
**ban** [9] - 14:8, 20:22, 33:11, 45:4, 84:16, 84:17, 92:13, 93:4
**Banco** [1] - 85:17
**bans** [1] - 30:2
**bar** [9] - 7:5, 37:18, 38:7, 39:12, 44:15, 48:17, 79:8, 86:9, 111:11
**barred** [1] - 40:7
**barrier** [1] - 37:21
**barriers** [3] - 13:13, 64:17, 94:9
**bars** [2] - 38:5, 61:17
**based** [14] - 18:8, 21:9, 29:22, 30:6, 30:15, 31:17, 39:4, 46:7, 80:8, 82:22, 87:7, 91:1, 92:25, 96:10
**basic** [5] - 13:23, 15:8, 15:10, 28:7, 32:22
**basis** [9] - 28:10, 31:3, 48:4, 54:6, 66:11, 76:1, 79:18, 100:3, 100:5
**become** [2] - 89:4, 89:11
**becomes** [4] - 33:18, 45:20, 94:20, 94:21
**becoming** [1] - 85:14
**bedrock** [1] - 32:20
**BEFORE** [1] - 1:13
**began** [2] - 7:11, 10:20
**begin** [2] - 50:20, 111:9
**beginning** [5] - 9:23, 59:24, 72:20, 76:3, 108:5
**begins** [2] - 61:7, 96:2
**begun** [1] - 14:13
**behalf** [20] - 1:4, 3:10, 3:13, 3:15, 3:19, 3:21, 3:23, 4:3, 4:5, 4:9, 8:10, 11:10, 17:25, 31:12, 32:25, 71:17, 88:19, 111:12, 111:14, 111:17
**behavior** [4] - 7:5, 10:7, 98:18, 99:4
**behind** [2] - 24:21, 76:10
**below** [1] - 5:9
**bench** [2] - 63:7, 77:7
**benefit** [3] - 67:12, 77:5, 109:19
**benefited** [2] - 62:11, 67:10
**best** [4] - 4:25, 42:10, 86:5, 94:22
**better** [8] - 6:11, 42:7, 45:6, 69:9, 77:7, 78:14, 105:8, 110:4
**between** [15] - 13:7, 31:21, 32:9, 34:25, 36:18, 38:11, 39:9, 50:12, 51:6, 62:9, 63:21, 64:2, 68:24, 73:19, 108:6
**beyond** [6] - 20:10, 28:25, 43:1, 82:11, 89:19
**bidirectional** [1] - 32:8
**big** [3] - 57:1, 60:21, 60:25
**bigger** [2] - 94:3, 94:11
**biggest** [2] - 17:14, 85:1
**bind** [1] - 7:25
**Biscayne** [1] - 2:14
**bit** [14] - 12:6, 12:10, 12:23, 30:1, 33:18, 37:4, 46:24, 77:11, 84:22, 87:9, 89:21, 92:20, 92:22, 102:17
**blamed** [1] - 24:12
**Blankenship** [1] - 29:1
**blanket** [1] - 82:7
**block** [1] - 42:4
**blocked** [1] - 64:10
**body** [1] - 11:12
**bond** [11] - 5:11, 10:13, 11:15, 44:13, 81:23, 98:22, 99:1, 100:25, 105:5, 105:17, 109:17
**booths** [2] - 18:22
**Borrego** [4] - 22:10, 22:12, 24:13, 55:18
**BORREGO** [1] - 1:4
**borrow** [1] - 82:24
**bothered** [1] - 48:23
**bottom** [1] - 97:1
**Boulevard** [1] - 2:14
**bounds** [2] - 76:13, 107:22
**Bowen** [1] - 4:7
**BOWEN** [2] - 2:11, 2:13
**branch** [1] - 41:20
**breach** [4] - 52:1, 60:23, 76:11, 80:5
**breached** [1] - 68:16
**breaching** [1] - 67:23
**break** [2] - 61:1, 96:2
**breakdown** [5] - 20:21, 61:23, 68:24, 69:5, 111:3
**breakdowns** [1] - 25:13
**breaks** [1] - 94:8
**Brick** [3] - 64:25, 66:19, 69:11
**bridge** [1] - 68:19
**brief** [3] - 34:24, 49:10, 96:21
**briefed** [3] - 91:6, 103:8, 110:22
**briefing** [1] - 91:7
**briefings** [1] - 33:8
**briefly** [3] - 25:19, 29:6, 105:25
**bring** [5] - 15:6, 19:9, 47:5, 54:6, 73:11
**bringing** [2] - 19:17, 76:25
**broader** [3] - 62:25, 74:23, 94:5
**broken** [1] - 45:2
**brought** [10] - 39:23, 41:5, 44:8, 47:2, 67:24, 67:25, 68:1, 68:3, 79:21, 88:4
**buckets** [1] - 14:6
**build** [2] - 18:24, 81:5
**building** [1] - 17:3
**built** [2] - 29:21, 103:23
**burden** [2] - 25:2, 90:5
**business** [1] - 73:17
**Button** [2] - 29:13, 30:16
**BY** [1] - 2:19
**byproduct** [1] - 23:3

## C

**C.M** [4] - 1:4, 3:3, 18:4, 55:18
**cage** [4] - 27:8, 64:23, 82:2
**California** [3] - 1:23, 1:24, 85:19
**canceled** [1] - 81:23
**cannot** [9] - 24:3, 24:12, 32:18, 32:22, 79:18, 92:3, 93:13, 99:18, 99:19
**capacity** [2] - 75:8
**captures** [1] - 25:24
**carceral** [1] - 57:20
**card** [1] - 86:10
**care** [4] - 9:25, 12:20, 44:25, 80:18
**carefully** [2] - 86:2, 106:9
**carries** [2] - 45:18, 90:19
**carry** [1] - 45:21
**case** [100] - 4:25, 7:6, 10:6, 19:15, 20:10, 20:17, 22:18, 26:11, 26:24, 26:25, 29:14, 29:24, 30:7, 30:18, 31:5, 31:17, 31:18, 31:22, 39:18, 40:9, 41:24, 42:19, 43:10, 43:25, 44:8, 44:9, 44:21, 44:24, 46:21, 52:6, 55:22, 57:16, 57:17, 57:19, 57:23, 58:5, 59:24, 60:22, 60:23,

62:1, 62:24, 63:2, 63:9, 64:10, 64:24, 64:25, 65:25, 66:16, 68:4, 68:20, 68:23, 69:11, 71:4, 71:18, 72:7, 72:16, 72:19, 73:8, 74:23, 75:1, 76:11, 76:14, 76:22, 76:23, 77:13, 78:14, 79:25, 80:3, 81:20, 82:5, 88:18, 88:21, 88:22, 90:11, 90:17, 93:4, 93:12, 93:18, 94:18, 95:11, 95:12, 95:17, 95:18, 96:15, 99:3, 101:24, 102:6, 103:1, 104:2, 104:8, 104:19, 105:2, 105:19, 108:12, 110:13, 111:1
**CASE** [1] - 1:2
**Case** [1] - 3:2
**cases** [26] - 7:4, 11:7, 13:16, 14:15, 29:10, 29:13, 29:14, 29:15, 29:20, 29:21, 30:16, 30:21, 30:22, 32:2, 33:15, 38:1, 38:13, 38:22, 39:18, 43:17, 44:12, 45:16, 46:9, 88:22, 89:2, 102:12
**categorical** [1] - 30:2
**categories** [3] - 38:13, 38:23, 39:10
**caught** [2] - 104:10, 108:18
**caveat** [1] - 95:6
**cavernous** [1] - 6:16
**ceasing** [1] - 98:17
**ceded** [1] - 108:8
**Center** [3] - 5:7, 9:5, 9:6
**centers** [1] - 36:19
**Central** [1] - 85:19
**cert** [4] - 91:6, 91:10, 96:20, 102:16
**certain** [9] - 4:19, 4:20, 83:1, 89:7, 89:8, 89:9, 89:10, 98:18
**certainly** [41] - 4:23, 21:11, 22:1, 22:19, 22:25, 24:3, 24:12, 24:18, 25:1, 25:23, 28:11, 37:8, 37:16, 55:6, 74:14, 77:4, 79:9, 83:19, 87:7, 88:3, 88:13, 89:17, 91:10, 92:3, 96:12, 97:4, 98:8, 98:17, 100:18, 101:19, 101:22, 101:23, 102:2, 102:3, 102:4, 102:6, 108:2, 108:5, 108:13, 109:11
**certification** [19] - 33:9, 33:25, 89:22, 89:23, 90:1, 90:16, 90:22, 91:11, 91:21, 92:12, 92:19, 93:10, 93:16, 93:23, 95:12, 96:8, 96:12, 102:21, 102:22
**certifications** [1] - 90:10
**certified** [1] - 91:3
**certify** [3] - 90:14, 91:25, 112:3
**cessation** [11] - 7:3, 7:4, 12:2, 44:25, 98:18, 104:20, 104:22, 104:24, 105:3, 105:12, 105:13
**Cessation** [2] - 10:1, 12:8
**cetera** [1] - 103:23
**chain** [3] - 24:22, 24:23, 27:8
**chain-link** [1] - 27:8
**challenge** [3] - 42:14, 77:12, 85:1
**challenged** [3] - 38:18, 38:20, 39:10
**challenging** [7] - 33:19, 40:18, 40:24, 43:18, 56:8, 57:21, 76:22
**chambers** [1] - 111:9
**chance** [5] - 22:7, 23:8, 88:10, 88:17, 90:16
**change** [11] - 7:7, 7:23, 8:6, 10:3, 12:10, 34:3, 34:4, 34:6, 34:8, 41:15, 95:24
**changed** [8] - 7:8, 7:14, 7:20, 12:13, 16:7, 21:6, 33:19, 34:2
**changes** [1] - 26:3
**changing** [2] - 17:8, 17:10
**characterized** [1] - 20:22
**charge** [2] - 3:17, 83:6
**charged** [1] - 31:25
**Chavez** [1] - 3:22
**CHAVEZ** [2] - 2:7, 3:22
**checked** [1] - 18:5
**cherry** [1] - 24:20
**cherry-picking** [1] - 24:20
**CHO** [54] - 1:17, 3:12, 6:10, 6:22, 11:18, 12:18, 14:10, 26:23, 27:21, 30:11, 34:5, 34:8, 35:11, 43:15, 48:6, 55:9, 56:5, 57:12, 60:5, 61:24, 62:3, 62:18, 62:24, 63:2, 63:11, 65:11, 65:13, 65:18, 66:6, 67:2, 67:5, 67:8, 74:14, 74:17, 74:20, 75:14, 78:22, 81:2, 81:10, 81:18, 83:19, 85:9, 102:20, 102:25, 103:11, 103:25, 104:6, 104:15, 104:17, 105:20, 105:22, 105:25, 110:6, 111:13
**Cho** [24] - 3:12, 3:16, 6:3, 6:21, 8:2, 9:25, 11:6, 13:2, 23:8, 26:8, 27:20, 39:7, 42:7, 48:1, 54:17, 57:9, 74:3, 80:24, 98:11, 102:12, 102:14, 108:20, 109:12, 110:5
**choices** [2] - 47:14, 54:24
**chomping** [1] - 92:19
**chose** [2] - 17:23, 24:10
**CHRISTINA** [1] - 2:4
**Circuit** [5] - 10:7, 11:7, 64:25, 65:23, 96:15
**circuit** [2] - 46:21, 68:21
**circumstances** [2] - 10:11, 92:14
**cite** [1] - 17:14
**cited** [4] - 20:10, 20:17, 57:18, 88:19
**cites** [1] - 47:24
**civil** [3] - 31:24, 103:2, 106:25
**CIVIL** [2] - 1:18, 1:22
**claim** [47] - 5:18, 6:2, 7:2, 7:11, 9:13, 9:18, 12:16, 14:6, 16:3, 26:6, 26:7, 28:6, 35:7, 35:9, 35:17, 36:2, 38:11, 38:14, 39:3, 39:13, 42:2, 42:3, 42:21, 42:22, 43:20, 44:12, 47:8, 48:15, 48:16, 50:23, 50:24, 50:25, 52:2, 55:14, 58:8, 60:10, 67:11, 68:5, 74:21, 80:1, 83:8, 97:14, 100:16, 101:2, 102:11, 104:22, 107:15
**claimed** [3] - 17:15, 67:13, 106:18
**claiming** [1] - 69:17
**claims** [35] - 13:9, 16:7, 17:10, 18:15, 25:9, 30:12, 34:21, 35:1, 38:3, 38:6, 38:10, 40:10, 40:23, 41:19, 44:3, 44:7, 44:10, 44:15, 60:19, 69:3, 76:1, 76:11, 76:16, 79:17, 87:23, 90:23, 92:24, 93:1, 96:10, 97:2, 97:12, 97:22, 104:14
**clarification** [1] - 9:15
**clarified** [1] - 108:14
**clarifies** [1] - 110:23
**clarify** [5] - 65:11, 65:12, 72:6, 102:21, 109:13
**class** [45] - 33:9, 33:25, 34:4, 34:5, 34:8, 34:12, 80:16, 89:22, 89:23, 90:1, 90:9, 90:21, 91:3, 91:6, 91:9, 91:18, 91:23, 91:25, 92:19, 93:1, 93:7, 93:10, 93:13, 93:23, 94:21, 95:2, 95:7, 95:12, 95:19, 95:25, 96:8, 96:12, 96:20, 102:16, 102:21, 102:22, 102:25, 103:1, 103:2, 103:18, 103:24, 104:3
**classes** [1] - 103:22
**classified** [1] - 104:6
**cleaned** [1] - 79:12
**clear** [49] - 7:3, 8:5, 10:5, 10:6, 16:14, 16:23, 19:10, 20:20, 21:4, 21:10, 21:17, 23:20, 25:2, 26:24, 28:2, 28:7, 28:11, 32:24, 36:23, 42:19, 44:14, 49:4, 49:18, 50:2, 50:11, 53:22, 55:23, 56:19, 57:4, 62:9, 65:8, 65:23, 69:12, 70:1, 72:13, 73:7, 90:5, 91:8, 91:20, 91:22, 92:15, 96:18, 98:12, 98:16, 101:22, 102:17, 106:6, 107:20, 109:14
**clearly** [9] - 9:20, 18:17, 27:13, 31:7, 38:2, 44:5, 68:10, 98:4, 106:13
**click** [1] - 9:3
**client** [14] - 14:18, 17:17, 18:3, 24:11, 27:19, 32:21, 50:5, 50:10, 50:13, 64:13, 64:18, 86:14, 109:1, 109:8
**clients** [9] - 15:13, 15:19, 30:19, 31:11, 32:9, 32:10, 32:14, 32:25, 86:11
**close** [1] - 50:11
**closer** [1] - 6:18
**Coalition** [1] - 104:1
**cognizant** [1] - 108:17
**cohesiveness** [1] - 95:16
**colleague** [2] - 68:22, 77:5
**colleague's** [1] - 63:7
**Collier** [1] - 52:12
**Colombia** [1] - 85:18
**combined** [1] - 45:7
**comfortable** [1] - 11:16
**coming** [9] - 43:12, 51:17, 59:11, 63:25, 66:9, 71:10, 71:15, 77:18, 80:14
**command** [1] - 110:20
**commence** [3] - 37:25, 38:22, 43:17
**commencement** [1] - 45:14
**commencing** [1] - 40:8
**commendably** [1] - 79:11
**commingled** [2] - 78:8, 79:22
**commissioners** [1] - 71:1
**commitment** [2] - 10:16, 23:5
**committed** [3] - 65:2, 77:23, 101:3
**committing** [1] - 77:15
**common** [4] - 34:14, 94:12, 104:4, 104:10
**commonality** [10] - 33:13, 34:11, 90:25, 92:15, 92:22, 94:4, 94:9, 95:4, 96:1, 103:17
**communicate** [7] - 15:18, 15:19, 30:19, 31:11, 31:19, 32:21, 34:11
**communicating** [1] - 22:21

**communication** [12] - 14:2, 14:24, 18:6, 20:3, 20:19, 20:21, 27:10, 31:15, 32:9, 33:16, 64:13, 64:18
**communications** [3] - 21:24, 40:14, 50:13
**comparison** [1] - 84:8
**complaint** [17] - 5:14, 8:21, 9:9, 16:16, 20:21, 42:18, 45:2, 45:12, 48:14, 75:10, 77:24, 83:3, 92:12, 95:2, 95:7, 95:22
**complaints** [2] - 18:12, 51:10
**complete** [3] - 10:16, 92:13, 93:4
**completely** [3] - 8:19, 31:5, 59:10
**compliance** [4] - 50:4, 50:10, 52:10, 53:7
**component** [1] - 93:22
**concede** [1] - 71:13
**conceded** [1] - 79:11
**conceding** [1] - 72:13
**concern** [28] - 10:1, 12:2, 21:21, 26:11, 33:24, 37:4, 37:7, 38:9, 44:23, 45:4, 46:6, 52:24, 57:1, 57:4, 60:22, 61:24, 67:2, 67:18, 73:4, 74:17, 75:13, 76:7, 85:14, 97:4, 105:4, 108:4, 108:10, 108:18
**concerned** [8] - 10:5, 61:23, 63:13, 66:18, 68:14, 96:19, 102:15, 105:9
**concerns** [18] - 4:19, 4:21, 13:20, 13:21, 20:23, 21:11, 21:23, 22:22, 29:6, 35:5, 37:25, 44:25, 53:18, 80:15, 85:5, 98:12, 99:7
**concession** [1] - 79:14
**concessions** [1] - 44:21
**conclude** [4] - 87:4, 102:15, 102:19, 111:8
**conclusion** [4] - 7:23, 44:6, 45:10, 68:23
**condition** [1] - 68:1
**conditions** [2] - 44:19, 57:20
**conducive** [1] - 27:10
**conduct** [2] - 90:3, 97:19
**conducted** [1] - 60:17
**Conference** [1] - 3:8
**conference** [1] - 56:7
**conferences** [1] - 64:21
**confidence** [2] - 7:7, 28:16
**confidential** [18] - 14:18, 14:21, 14:25, 19:23, 20:4, 27:10, 27:13, 27:15, 27:18, 32:13, 32:14, 32:20, 40:14, 50:13, 64:13, 85:22, 86:3, 86:20
**confidentiality** [25] - 13:19, 13:21, 14:4, 14:23, 18:16, 18:19, 19:7, 20:23, 21:8, 21:11, 21:22, 22:17, 22:23, 25:13, 26:16, 27:3, 30:6, 33:18, 45:7, 61:19, 77:3, 83:9, 84:24, 103:23, 104:13
**confidently** [1] - 41:7
**confinement** [6] - 44:20, 57:20, 57:22, 58:1, 62:5, 68:1
**confinements** [1] - 58:4
**confirm** [13] - 8:9, 10:8, 12:11, 15:13, 73:5, 73:9, 73:10, 73:25, 78:17, 108:19, 109:1, 109:8, 109:21
**confirmation** [1] - 11:17
**confirmed** [1] - 108:21
**conflict** [2] - 36:18, 58:21
**conflicts** [1] - 75:24
**confused** [1] - 104:18
**confusion** [1] - 28:11
**connect** [4] - 38:16, 51:16, 53:19, 76:15
**connected** [1] - 43:8
**connection** [5] - 39:9, 63:24, 64:1, 65:4, 73:19
**connects** [1] - 43:13
**consent** [2] - 41:14, 78:19
**consented** [2] - 78:16, 110:18
**consider** [2] - 35:24, 38:6
**considerations** [2] - 46:11, 85:22
**considering** [1] - 39:3
**consistent** [2] - 10:16, 24:6
**consistently** [1] - 46:21
**constitutes** [1] - 82:12
**Constitution** [1] - 107:3
**Constitutional** [16] - 31:7, 31:12, 39:25, 48:16, 48:20, 50:21, 51:23, 51:24, 52:2, 52:3, 63:15, 81:6, 83:17, 83:25, 103:3
**constrained** [1] - 110:17
**constructed** [1] - 27:8
**contact** [6] - 15:9, 17:18, 23:25, 36:1, 58:15, 75:20
**contacted** [1] - 18:2
**contention** [1] - 5:19
**contesting** [1] - 44:18
**context** [7] - 32:6, 39:20, 40:9, 43:9, 62:20, 65:24, 101:19
**context-type** [1] - 65:24
**continue** [6] - 13:12, 14:2, 30:4, 64:16, 87:1, 99:7
**continued** [3] - 2:1, 18:24, 85:24
**continues** [6] - 26:25, 46:5, 73:15, 73:18, 87:13, 108:9
**continuing** [2] - 15:23, 98:5
**continuously** [2] - 23:4, 41:5
**contraband** [1] - 19:16
**contractual** [3] - 50:24, 62:9, 76:21
**contradict** [2] - 18:17, 23:18
**control** [3] - 54:11, 54:16, 74:11
**controversy** [6] - 13:6, 16:9, 22:18, 26:11, 26:24, 26:25
**conversations** [1] - 27:12
**copy** [2] - 63:8, 64:5
**core** [10] - 38:10, 39:16, 40:17, 40:24, 41:17, 42:3, 42:13, 44:17, 62:14, 104:13
**Corene** [1] - 3:20
**CORENE** [1] - 1:21
**correct** [18] - 14:10, 14:12, 17:13, 24:15, 24:16, 37:23, 41:1, 52:4, 52:7, 56:5, 62:21, 63:11, 65:17, 81:18, 88:2, 96:9, 101:10, 108:23
**correctional** [1] - 28:9
**correctly** [1] - 109:12
**counsel** [20] - 4:10, 13:5, 16:17, 22:10, 22:14, 23:6, 27:12, 29:16, 31:19, 34:11, 38:19, 43:20, 44:10, 64:11, 64:15, 82:4, 82:9, 99:8, 104:14, 106:22
**counsel-type** [1] - 104:14
**Count** [8] - 5:13, 5:15, 9:24, 43:19, 52:22, 54:21, 78:9
**count** [5] - 5:13, 6:7, 52:21, 52:22, 78:10
**country** [2] - 28:10, 85:10
**counts** [5] - 25:10, 54:21, 56:13, 56:23, 56:24
**Counts** [5] - 54:20, 56:10, 78:20, 79:15, 79:16
**county** [1] - 49:3
**County** [2] - 52:13
**couple** [4] - 4:15, 13:10, 39:23, 79:6
**course** [32] - 6:22, 7:17, 7:22, 29:1, 29:3, 30:22, 31:17, 31:21, 32:20, 34:15, 35:16, 35:20, 36:12, 44:6, 57:17, 57:24, 63:20, 75:6, 75:10, 75:19, 75:25, 78:5, 84:2, 91:4, 91:6, 97:15, 99:6, 103:1, 103:7, 104:1, 104:7, 108:17
**COURT** [118] - 1:1, 3:2, 3:14, 4:1, 4:12, 6:12, 8:2, 8:23, 9:16, 9:22, 11:5, 11:23, 12:19, 15:21, 20:18, 21:15, 23:11, 23:14, 25:4, 25:25, 27:20, 29:5, 33:2, 34:7, 34:18, 37:1, 39:15, 39:19, 40:2, 40:5, 40:13, 40:21, 41:2, 41:22, 42:6, 44:17, 48:7, 48:22, 49:12, 49:17, 51:4, 51:20, 51:25, 52:5, 52:8, 52:17, 54:12, 54:17, 55:23, 56:6, 58:25, 60:20, 62:2, 62:15, 62:19, 63:1, 63:5, 63:12, 65:12, 65:17, 65:22, 66:12, 67:4, 67:7, 67:17, 70:7, 70:22, 71:13, 72:17, 73:10, 74:2, 74:16, 74:19, 75:12, 76:3, 78:23, 79:1, 79:4, 81:9, 81:11, 82:18, 84:12, 87:3, 88:15, 90:7, 91:15, 92:8, 92:16, 93:24, 95:8, 95:10, 95:21, 96:18, 97:8, 98:10, 99:16, 100:6, 101:11, 101:15, 102:10, 102:24, 103:10, 103:13, 104:5, 104:9, 104:16, 104:23, 105:21, 105:24, 107:13, 109:3, 109:10, 109:23, 110:1, 110:7, 111:14, 111:17, 111:20
**Court** [119] - 2:21, 2:22, 3:1, 4:14, 5:5, 6:25, 7:24, 8:24, 9:15, 11:21, 12:10, 12:14, 16:20, 17:3, 20:9, 26:1, 26:20, 27:4, 29:7, 30:22, 32:4, 33:24, 38:2, 38:13, 43:1, 43:22, 44:5, 44:8, 45:19, 46:5, 46:7, 46:14, 46:15, 46:18, 46:20, 48:23, 49:7, 49:21, 57:22, 58:2, 60:24, 61:25, 62:3, 62:7, 65:5, 65:19, 68:10, 69:11, 69:18, 72:12, 77:8, 77:14, 78:3, 78:18, 79:6, 79:16, 79:18, 79:20, 80:12, 82:16, 82:19, 83:4, 83:6, 83:10, 83:20, 83:21, 86:2, 86:23, 87:5, 87:10, 87:23, 88:6, 88:7, 88:13, 88:25, 89:1, 89:2, 89:10, 89:12, 89:14, 89:15, 89:18, 89:25, 90:2, 90:5, 90:13, 90:17, 91:4, 91:9, 91:20, 92:5, 92:11, 92:23, 93:14, 95:16, 95:18, 96:9, 96:14, 101:17, 102:9, 103:9, 103:11, 103:17, 103:21, 105:11, 106:7, 106:24, 108:4, 108:10, 109:6, 109:7, 109:14, 110:9, 110:23, 111:21, 111:24,

112:9, 112:9
**court** [33] - 5:7, 5:20, 5:24, 6:5, 6:6, 6:24, 6:25, 7:9, 7:12, 7:19, 7:21, 8:14, 8:16, 8:17, 9:10, 9:20, 10:21, 26:14, 29:22, 32:23, 41:10, 41:16, 44:9, 60:18, 63:9, 63:25, 69:10, 77:19, 89:6, 89:20, 101:1, 110:21
**Court's** [5] - 11:24, 12:1, 55:10, 86:2, 106:23
**court-enforceable** [1] - 6:24
**courtroom** [1] - 3:9
**COURTROOM** [1] - 111:23
**courtrooms** [1] - 6:15
**courts** [5] - 7:15, 30:25, 39:23, 44:5, 85:10
**cover** [4] - 4:22, 38:3, 100:4, 105:23
**covered** [3] - 38:11, 80:15, 99:13
**covering** [1] - 18:23
**crafting** [1] - 85:6
**create** [2] - 51:23, 51:24
**creates** [3] - 37:20, 61:9, 63:15
**creative** [1] - 41:18
**credit** [1] - 27:4
**crime** [2] - 31:25, 32:1
**critical** [1] - 104:2
**CRR** [2] - 2:20, 112:8
**Cuban** [2] - 30:21, 88:22
**cured** [1] - 5:23
**current** [1] - 92:2
**custodian** [1] - 48:19
**custody** [1] - 70:3
**cut** [2] - 9:22, 91:2

## D

**D.C** [3] - 51:1, 51:2, 69:20
**Dade** [1] - 52:13
**DATE** [1] - 112:8
**date** [2] - 17:24, 24:11
**day-to-day** [6] - 59:14, 59:21, 72:2, 72:11, 99:22, 100:9
**days** [3] - 24:15, 24:16, 86:13
**DC** [1] - 1:20
**deadline** [1] - 91:7
**deal** [1] - 45:14
**dealing** [6] - 37:6, 46:25, 56:20, 94:14, 96:3, 101:7
**deals** [7] - 33:8, 48:18, 53:12, 53:13, 56:8, 57:5, 99:22
**dealt** [2] - 46:1, 57:19
**debating** [1] - 49:24
**decide** [1] - 105:16
**decided** [1] - 34:15
**decides** [2] - 79:17, 105:15
**decision** [15] - 10:13, 10:15, 11:11, 11:12, 38:21, 40:18, 41:19, 42:4, 42:20, 43:9, 43:17, 44:1, 51:16, 63:8
**decision-making** [2] - 11:12, 51:16
**decisions** [1] - 72:11
**declarants** [1] - 27:11
**declaration** [12] - 24:7, 25:22, 27:23, 35:13, 35:14, 51:13, 58:10, 59:16, 60:5, 83:23, 106:4, 106:9
**declarations** [7] - 18:17, 18:21, 23:17, 25:21, 27:4, 28:17, 101:20
**declaratory** [2] - 6:1, 104:7
**declined** [3] - 17:23, 24:10, 96:22
**decree** [1] - 41:14
**deep** [1] - 91:9
**defendant** [12] - 20:3, 47:6, 47:18, 47:22, 49:1, 49:5, 54:21, 70:3, 70:12, 70:22, 73:3, 99:11
**Defendant** [2] - 48:10, 55:11
**defendant's** [5] - 27:1, 36:2, 52:24, 54:1, 68:11
**Defendants** [1] - 1:10
**defendants** [209] - 4:3, 4:5, 4:7, 4:9, 5:5, 5:12, 5:19, 6:4, 7:4, 7:8, 7:11, 7:14, 7:20, 7:23, 7:25, 8:4, 8:11, 9:14, 9:18, 9:19, 11:1, 11:9, 13:3, 13:4, 13:12, 14:13, 15:1, 15:22, 16:1, 18:5, 18:13, 18:18, 26:10, 26:18, 27:7, 27:9, 27:23, 27:25, 28:13, 28:20, 34:25, 35:6, 35:8, 35:15, 35:16, 35:17, 35:19, 35:23, 36:5, 36:6, 36:21, 36:23, 37:7, 37:14, 37:23, 38:8, 38:21, 39:2, 41:11, 41:14, 43:24, 44:22, 46:25, 47:2, 47:5, 47:16, 48:5, 48:9, 49:9, 50:9, 50:18, 50:25, 51:17, 52:19, 52:21, 53:8, 53:20, 54:2, 54:7, 54:19, 55:7, 55:22, 56:4, 56:9, 56:10, 56:11, 56:19, 56:20, 56:23, 56:25, 57:8, 57:10, 57:12, 57:17, 58:7, 58:8, 58:12, 59:3, 59:6, 59:18, 59:20, 60:1, 60:4, 61:3, 61:4, 61:10, 61:14, 61:21, 61:22, 62:10, 62:11, 62:16, 64:2, 64:6, 64:9, 64:10, 64:16, 65:9, 65:25, 66:5, 66:7, 67:9, 67:10, 67:18, 68:18, 68:25, 69:1, 69:6, 69:8, 69:13, 69:14, 69:16, 69:17, 69:18, 69:20, 70:1, 70:5, 70:16, 70:18, 71:11, 71:12, 71:15, 71:18, 71:19, 72:23, 73:7, 73:12, 73:17, 73:20, 73:23, 74:7, 74:8, 74:9, 74:21, 75:1, 75:3, 75:7, 77:9, 77:15, 77:21, 77:22, 78:8, 78:9, 78:13, 78:17, 78:19, 78:24, 79:2, 79:20, 79:21, 79:22, 79:24, 82:21, 83:21, 86:4, 86:24, 87:7, 88:17, 98:21, 99:10, 100:4, 100:10, 100:12, 100:15, 100:19, 100:24, 101:3, 101:6, 101:22, 103:4, 104:21, 106:2, 106:11, 106:18, 107:7, 110:17, 111:15, 111:18
**DEFENDANTS** [2] - 2:10, 2:16
**defendants'** [12] - 5:3, 34:20, 38:5, 50:10, 50:12, 61:13, 63:14, 65:6, 73:5, 87:12, 106:8, 106:22
**defense** [2] - 37:10, 48:8
**definition** [3] - 34:4, 34:5, 34:8
**degree** [2] - 82:14, 84:5
**delay** [10] - 14:3, 14:15, 17:24, 23:21, 24:15, 29:1, 77:2, 93:6, 99:8, 104:13
**delayed** [2] - 93:8, 111:5
**delays** [11] - 13:14, 21:25, 22:18, 23:2, 27:21, 29:3, 32:19, 45:5, 85:7, 98:13, 98:15
**deliberate** [1] - 85:3
**demonstrated** [1] - 101:21
**denial** [5] - 14:15, 25:2, 29:4, 77:2, 104:14
**denials** [2] - 25:15, 32:19
**denied** [2] - 17:11, 18:13
**department** [2] - 70:17, 74:20
**Department** [2] - 1:9, 70:10
**departure** [1] - 82:7
**deportation** [2] - 38:4, 44:4
**deported** [3] - 24:11, 81:15, 81:21
**DEPUTY** [1] - 111:23
**derive** [1] - 42:23
**DeSantis** [4] - 2:11, 70:10, 70:25, 75:9
**described** [1] - 20:21
**designated** [4] - 5:6, 9:10, 10:18, 10:19
**designates** [1] - 6:24
**designation** [2] - 9:6, 16:4
**designed** [1] - 56:18
**despite** [2] - 26:25, 97:22
**details** [1] - 89:18
**detain** [5] - 35:19, 36:3, 58:8, 67:11, 81:5
**detained** [12] - 15:20, 29:9, 30:10, 30:13, 31:16, 32:9, 32:25, 38:5, 65:21, 94:16, 94:17, 102:13
**detainee** [2] - 15:15, 29:20
**detainees** [44] - 5:11, 7:12, 7:16, 7:17, 13:4, 13:18, 14:13, 14:20, 14:21, 18:10, 19:11, 19:12, 19:17, 19:21, 19:25, 27:5, 27:6, 27:14, 27:16, 28:5, 28:12, 29:2, 31:24, 32:12, 32:17, 33:14, 33:15, 34:9, 40:1, 41:6, 41:7, 41:21, 48:19, 52:12, 64:10, 64:20, 64:22, 81:25, 82:3, 88:19, 92:3, 92:4, 93:2, 106:17
**detainees'** [3] - 13:16, 15:17, 64:15
**Detention** [2] - 9:5, 9:6
**detention** [48] - 5:9, 7:21, 15:14, 17:4, 31:19, 31:24, 32:8, 34:17, 36:8, 36:11, 36:12, 36:13, 36:15, 36:19, 36:22, 40:19, 42:15, 43:20, 43:25, 44:2, 44:18, 45:14, 50:3, 50:4, 51:22, 52:10, 53:6, 58:17, 58:20, 60:7, 60:8, 60:14, 63:19, 75:3, 75:23, 75:25, 76:1, 81:24, 81:25, 82:15, 83:14, 83:17, 84:4, 85:11, 86:7, 89:12, 106:25
**determination** [14] - 11:2, 11:24, 12:13, 21:9, 29:22, 30:24, 82:22, 87:8, 91:1, 91:12, 99:1, 103:21, 105:6, 109:17
**determinations** [8] - 10:14, 11:15, 42:14, 42:15, 43:4, 45:14, 46:8, 105:17
**determine** [2] - 26:1, 90:18
**determining** [1] - 90:10
**develop** [1] - 107:17
**development** [3] - 5:1, 5:4, 109:19
**developments** [1] - 45:5
**deviate** [1] - 43:5
**deviates** [1] - 11:20
**deviation** [1] - 58:19
**devoid** [2] - 77:18, 77:19
**DHS** [5] - 34:20, 34:25,

40:19, 41:20, 42:2
**DHS'** [1] - 44:1
**Diaz** [1] - 44:9
**differed** [2] - 34:2
**different** [20] - 10:18, 14:8, 30:9, 30:14, 31:5, 32:3, 33:21, 42:10, 47:1, 47:12, 47:16, 67:25, 68:3, 76:14, 78:5, 94:16, 94:17, 96:3, 107:14, 108:12
**differentiate** [2] - 34:24, 35:10
**differentiation** [2] - 29:7, 30:1
**difficult** [3] - 13:23, 48:15, 50:21
**dimension** [1] - 52:2
**direct** [2] - 11:25, 74:11
**directed** [6] - 57:2, 71:3, 71:17, 100:23, 100:24, 101:1
**directing** [2] - 69:23, 71:9
**direction** [10] - 59:4, 59:7, 59:10, 59:13, 59:14, 60:3, 69:20, 69:25, 71:14, 100:13
**directions** [1] - 72:2
**directly** [7] - 8:4, 23:18, 27:6, 27:14, 43:6, 89:13, 100:8
**director** [14] - 35:25, 36:8, 36:17, 47:20, 51:8, 55:15, 58:15, 58:16, 58:22, 60:7, 66:10, 67:15, 75:20, 75:22
**Director** [2] - 70:25, 71:8
**directors** [1] - 71:1
**disabled** [1] - 82:5
**disagree** [1] - 20:20
**disagreeing** [1] - 52:5
**disagreements** [1] - 31:21
**disappeared** [1] - 12:14
**discipline** [1] - 101:25
**disclaimed** [1] - 66:14
**disclosure** [1] - 98:21
**disconnect** [3] - 61:7, 68:13, 108:6
**discovery** [1] - 68:7
**discreet** [1] - 43:13
**discrete** [4] - 37:24, 40:6, 40:15, 42:23
**discretion** [1] - 8:17
**discussed** [3] - 4:18, 78:1, 94:23
**discussion** [2] - 92:22, 92:23
**dismiss** [2] - 49:4, 49:10
**dismissed** [1] - 49:7
**dismissing** [1] - 48:24
**dispute** [7] - 25:11, 37:8, 53:24, 81:16, 84:22, 87:18, 106:19
**disputed** [1] - 45:23
**disputes** [1] - 77:17
**disputing** [1] - 52:18
**disqualifying** [1] - 74:12
**dissuaded** [1] - 73:1
**distance** [1] - 19:6
**distinct** [4] - 38:7, 39:8, 46:10, 96:3
**District** [58] - 2:22, 2:22, 49:25, 52:11, 52:16, 52:25, 54:7, 54:15, 57:7, 57:13, 58:24, 61:4, 61:5, 61:10, 61:15, 61:16, 62:13, 63:10, 64:3, 66:3, 66:23, 67:16, 68:22, 69:2, 69:3, 69:16, 69:21, 70:6, 71:5, 71:7, 71:10, 71:12, 71:15, 71:16, 72:8, 72:9, 72:13, 72:14, 72:19, 72:21, 72:22, 72:24, 73:21, 74:8, 74:10, 77:1, 77:10, 77:17, 78:12, 78:20, 85:18, 85:19, 87:14, 110:19, 110:21, 112:9, 112:10
**district** [27] - 39:18, 39:24, 44:9, 47:6, 47:19, 47:21, 47:23, 48:3, 48:5, 48:11, 51:18, 53:11, 53:25, 55:4, 55:12, 55:20, 60:11, 61:22, 62:4, 62:12, 63:9, 65:14, 65:20, 66:7, 66:14, 66:15, 66:24
**DISTRICT** [3] - 1:1, 1:1, 1:13
**divine** [1] - 43:2
**DIVISION** [1] - 1:2
**Docket** [5] - 5:2, 5:17, 6:2, 13:11, 34:23
**doctrinal** [1] - 30:14
**Doctrine** [2] - 10:1, 12:8
**document** [3] - 14:25, 18:16, 86:22
**documents** [19] - 13:22, 15:3, 15:6, 15:8, 19:9, 19:11, 19:12, 19:19, 19:20, 19:23, 23:20, 32:22, 32:23, 45:8, 84:25, 86:12, 104:12, 107:18
**domestic** [1] - 31:6
**done** [7] - 21:1, 21:7, 28:20, 85:5, 100:24, 108:7, 110:19
**door** [1] - 23:2
**doors** [1] - 19:4
**doubting** [1] - 49:23
**down** [14] - 26:9, 44:19, 45:3, 55:7, 61:1, 63:13, 65:9, 71:24, 73:1, 79:15, 80:7, 80:19, 94:8, 96:2
**draft** [10] - 82:24, 83:18, 83:24, 84:13, 97:24, 106:3, 106:5, 106:10, 107:7, 108:23
**dramatic** [1] - 86:23
**drapery** [1] - 27:9
**drapes** [1] - 18:23
**dressing** [1] - 42:13
**drive** [1] - 14:6
**drives** [1] - 35:6
**Drug** [1] - 96:15
**due** [4] - 9:13, 9:17, 32:18, 87:24
**Duke** [1] - 95:18
**during** [4] - 8:1, 27:12, 76:8, 98:24
**duties** [1] - 75:4
**duty** [1] - 8:17

## E

**e)(1)(C** [1] - 53:22
**E.R** [2] - 1:4, 55:18
**early** [2] - 56:17
**earshot** [1] - 22:21
**easier** [5] - 6:12, 6:18, 30:3, 33:12, 84:16
**easy** [1] - 90:25
**ECF** [2] - 35:13, 51:13
**efforts** [1] - 86:5
**Eileen** [1] - 4:10
**either** [7] - 18:23, 19:10, 23:22, 55:24, 72:19, 79:10, 79:16
**elected** [1] - 76:4
**elements** [2] - 33:5, 87:19
**Eleventh** [5] - 10:6, 11:7, 64:25, 65:23, 96:15
**email** [8] - 15:9, 17:18, 17:19, 17:21, 23:5, 24:2, 28:3, 28:4
**emailed** [2] - 19:19, 28:18
**emails** [5] - 23:22, 23:23, 27:24, 28:16
**emanates** [1] - 61:15
**emanating** [3] - 58:23, 61:3, 64:2
**Emergency** [1] - 70:10
**emergency** [2] - 70:17, 74:21
**emphasize** [1] - 81:2
**enclosed** [1] - 64:22
**encompassing** [1] - 100:19
**end** [3] - 76:5, 95:13, 109:24
**ended** [1] - 57:2
**enforce** [2] - 31:3, 61:4
**enforceable** [2] - 6:24, 63:21
**enforcement** [5] - 36:22, 51:10, 52:10, 52:15, 62:12
**enjoined** [1] - 101:7
**ensure** [3] - 41:6, 50:9, 50:13
**ensured** [1] - 41:6
**ensuring** [1] - 50:3
**entail** [1] - 49:12
**enter** [1] - 6:23
**entered** [5] - 30:23, 35:21, 58:7, 58:13, 67:9
**entertain** [1] - 37:17
**entire** [2] - 4:19, 17:4
**entirely** [2] - 5:19, 55:10
**entitled** [2] - 97:18, 112:5
**entity** [1] - 12:4
**Entry** [5] - 5:2, 5:17, 6:2, 13:11, 34:23
**entry** [1] - 26:19
**enumerated** [1] - 39:11
**environment** [1] - 39:25
**EOIR** [8] - 5:6, 9:14, 9:18, 9:19, 11:1, 11:10, 35:8, 101:4
**equation** [1] - 12:10
**equivalent** [1] - 62:6
**ERO** [7] - 47:20, 50:2, 53:5, 55:3, 59:7, 66:24, 73:1
**erroneously** [1] - 81:20
**essentially** [5] - 43:5, 59:6, 59:8, 65:15, 110:13
**establish** [3] - 51:17, 52:3, 63:19
**established** [2] - 49:2, 65:4
**et** [5] - 1:5, 1:9, 3:3, 3:4, 103:23
**Eunice** [1] - 3:12
**EUNICE** [1] - 1:17
**eve** [1] - 7:19
**events** [2] - 47:8, 65:16
**evidence** [5] - 21:24, 25:7, 33:23, 41:3, 80:4
**evolution** [1] - 30:3
**exact** [1] - 57:3
**exactly** [10] - 9:25, 12:15, 41:12, 43:24, 59:24, 66:13, 72:6, 75:14, 76:10, 88:25
**examining** [1] - 30:23
**example** [15] - 10:17, 17:15, 21:25, 22:2, 27:4, 27:24, 32:24, 36:16, 44:9, 75:9, 81:11, 81:13, 83:12, 85:17, 85:21
**examples** [9] - 17:12, 17:14, 18:9, 23:16, 24:20, 25:1, 28:25, 83:21, 98:7
**exchange** [6] - 14:25, 18:16, 19:8, 32:22, 67:21, 86:22
**exchanging** [1] - 13:22
**excuse** [3] - 20:15, 71:21, 111:10
**execute** [3] - 38:1, 38:23, 43:18
**executing** [1] - 40:9
**execution** [1] - 45:15
**executive** [4] - 41:20, 42:5,

75:11, 89:13
**Executive** [5] - 5:6, 8:16, 8:25, 70:25, 71:8
**exercise** [4] - 29:17, 30:19, 31:2, 31:11
**exercising** [2] - 54:11, 54:13
**exhibit** [1] - 109:2
**Exhibit** [6] - 83:23, 106:4, 106:10, 107:8, 108:21, 110:2
**exhibits** [2] - 35:15, 97:23
**exist** [2] - 64:12, 86:15
**existence** [1] - 63:18
**existing** [1] - 15:2
**expansive** [1] - 84:14
**expect** [5] - 11:19, 46:17, 66:20, 66:22, 74:9
**expectation** [2] - 12:11, 29:17
**expected** [2] - 10:8, 49:3
**expeditiously** [3] - 4:24, 77:12, 111:6
**explained** [1] - 41:4
**explanation** [2] - 107:5, 107:10
**explicit** [1] - 68:7
**explicitly** [1] - 108:20
**express** [2] - 76:7, 76:14
**expressed** [5] - 20:24, 21:12, 31:4, 46:21, 68:10
**extend** [1] - 99:21
**extent** [13] - 10:15, 17:9, 19:23, 24:19, 29:21, 45:20, 69:22, 69:24, 72:8, 97:13, 98:1, 98:6, 101:17
**extra** [1] - 76:19
**extracted** [1] - 11:9
**extraordinary** [5] - 25:7, 33:5, 81:19, 82:22, 84:7
**extrapolate** [1] - 65:5
**extrapolating** [1] - 60:21
**eye** [1] - 108:16

## F

**F.B** [1] - 55:18
**face** [1] - 107:11
**facie** [1] - 53:4
**facilities** [4] - 20:4, 20:6, 59:8, 89:12
**facility** [109] - 5:9, 6:5, 8:7, 10:18, 10:19, 11:14, 14:22, 14:25, 15:2, 15:5, 15:6, 15:14, 16:1, 16:25, 17:4, 17:19, 17:21, 18:2, 18:10, 18:24, 19:10, 19:13, 19:15, 19:18, 19:19, 19:20, 20:3, 22:22, 23:3, 23:24, 24:1, 24:3, 24:5, 24:7, 24:12, 24:23, 25:21, 27:2, 28:10, 28:18, 28:19, 31:6, 32:8, 34:9, 34:17, 35:6, 36:9, 36:13, 36:16, 36:20, 36:25, 39:21, 39:22, 40:5, 40:19, 40:20, 43:21, 44:2, 50:3, 52:12, 53:6, 54:14, 55:16, 58:17, 58:18, 58:21, 59:24, 60:1, 60:7, 61:21, 64:11, 64:12, 64:17, 66:5, 69:3, 70:2, 70:4, 72:12, 74:22, 75:4, 75:23, 75:25, 76:12, 77:16, 81:5, 81:6, 82:2, 82:11, 82:16, 83:13, 83:23, 84:3, 84:6, 84:14, 85:15, 86:7, 86:9, 86:12, 97:25, 100:21, 102:1, 105:5, 106:4, 106:12, 106:25, 107:2
**fact** [23] - 5:22, 5:25, 16:18, 17:18, 31:8, 44:21, 48:10, 53:17, 74:5, 74:10, 74:20, 82:7, 85:9, 85:23, 95:21, 95:24, 96:20, 98:23, 104:2, 106:6, 106:24, 107:3, 110:11
**factors** [3] - 90:3, 90:13, 94:2
**facts** [4] - 14:11, 33:19, 62:15, 106:12
**factual** [1] - 34:13
**failed** [3] - 5:20, 46:18, 62:16
**failure** [5] - 28:14, 50:9, 50:12, 63:14, 71:23
**fair** [2] - 25:17, 34:18
**fall** [1] - 39:4
**falling** [1] - 9:5
**false** [1] - 17:11
**far** [7] - 39:17, 47:21, 50:21, 51:21, 68:19, 70:11, 79:8
**fashion** [3] - 14:17, 83:11, 88:13
**fast** [1] - 84:20
**fatal** [1] - 73:14
**fault** [1] - 28:14
**faulted** [1] - 24:3
**federal** [108] - 4:9, 5:3, 5:5, 5:12, 6:4, 8:4, 8:11, 10:24, 11:9, 13:4, 16:1, 34:20, 34:25, 35:7, 35:17, 36:5, 36:18, 36:21, 36:23, 37:14, 37:22, 38:5, 38:8, 38:22, 39:1, 41:11, 42:11, 43:1, 44:22, 46:25, 47:2, 47:5, 47:16, 47:18, 48:2, 48:4, 48:9, 50:9, 50:12, 50:17, 51:7, 51:17, 52:21, 52:24, 53:8, 53:20, 54:1, 54:2, 54:7, 54:19, 54:21, 55:7, 55:21, 56:4, 56:11, 56:18, 56:25, 58:14, 59:8, 59:9, 59:22, 60:1, 61:3, 61:13, 61:22, 62:10, 63:22, 64:2, 65:5, 66:2, 67:9, 68:11, 68:24, 69:14, 69:17, 69:20, 70:2, 71:11, 71:19, 71:21, 72:4, 72:23, 73:16, 74:7, 74:8, 76:13, 77:21, 78:9, 78:13, 78:16, 79:1, 79:21, 79:22, 79:23, 98:21, 99:9, 99:10, 99:21, 100:4, 100:10, 100:12, 100:15, 100:19, 101:3, 101:6, 108:8, 109:16, 111:17
**FEDERAL** [1] - 2:16
**feds** [2] - 35:3, 59:5
**feedback** [1] - 3:9
**felt** [2] - 49:2, 103:22
**fence** [1] - 27:8
**Fernandez** [1] - 55:18
**FERNANDEZ** [1] - 1:4
**few** [2] - 4:16, 65:13
**field** [16] - 35:25, 36:7, 36:17, 47:20, 50:2, 51:7, 53:5, 55:15, 58:15, 58:16, 58:22, 60:6, 66:10, 67:15, 75:20, 75:22
**Fifth** [25] - 4:20, 5:13, 5:18, 5:23, 6:1, 6:7, 12:16, 12:20, 15:24, 16:3, 26:5, 26:12, 31:8, 32:15, 35:9, 44:11, 44:22, 45:25, 46:2, 68:3, 79:12, 80:15, 98:19, 101:4, 104:25
**figure** [2] - 56:22, 68:7
**file** [2] - 5:11, 109:23
**filed** [3] - 5:2, 16:19, 32:23
**filing** [4] - 7:14, 11:25, 26:13, 105:8
**filings** [3] - 4:17, 41:23, 49:19
**fill** [1] - 86:12
**final** [1] - 81:22
**finally** [1] - 99:9
**fine** [2] - 83:9, 89:6
**fine-tuned** [1] - 83:9
**finer** [3] - 74:3, 80:25, 99:12
**finish** [1] - 26:4
**First** [109] - 4:20, 12:22, 12:24, 13:9, 14:2, 14:6, 15:11, 15:16, 16:6, 20:11, 25:9, 25:10, 25:16, 25:23, 26:6, 28:6, 29:8, 29:15, 29:25, 30:5, 30:8, 30:12, 30:15, 30:18, 31:4, 31:10, 31:14, 31:20, 32:4, 32:15, 32:24, 33:14, 34:1, 34:9, 34:16, 34:21, 35:1, 35:7, 37:6, 37:17, 37:19, 38:6, 39:3, 39:13, 39:17, 40:10, 40:22, 40:23, 42:1, 42:3, 42:12, 42:22, 43:19, 45:1, 45:2, 45:20, 45:21, 46:1, 46:2, 53:18, 60:18, 60:24, 61:5, 61:16, 62:19, 62:22, 63:16, 63:19, 64:7, 65:7, 66:4, 68:4, 68:17, 69:2, 71:25, 76:16, 77:2, 77:15, 77:22, 79:10, 79:17, 80:1, 80:6, 80:19, 82:11, 87:11, 87:22, 88:14, 88:19, 88:20, 90:22, 96:4, 97:2, 97:11, 100:10, 100:12, 100:16, 100:22, 101:2, 101:7, 102:1, 102:11, 103:18, 104:11, 107:4, 107:20, 108:16, 110:15
**first** [35] - 5:16, 6:3, 10:20, 15:12, 18:2, 20:18, 23:1, 23:25, 24:4, 26:1, 32:17, 35:20, 35:25, 44:14, 46:25, 47:18, 47:25, 48:1, 48:4, 48:10, 55:1, 57:24, 65:13, 73:25, 74:1, 76:4, 80:13, 83:2, 88:3, 88:11, 88:14, 89:3, 93:16, 101:8, 106:2
**five** [1] - 73:25
**flag** [1] - 102:8
**Flagler** [1] - 2:3
**fleshed** [2] - 71:14, 80:23
**flexibility** [1] - 103:23
**Floor** [1] - 1:19
**floor** [1] - 83:18
**FLORIDA** [1] - 1:1
**Florida** [68] - 1:4, 2:3, 2:6, 2:9, 2:12, 2:15, 2:17, 2:22, 2:24, 3:25, 9:4, 9:5, 35:18, 35:21, 35:23, 36:2, 36:3, 36:6, 49:25, 52:11, 52:16, 53:1, 54:15, 55:19, 57:7, 57:14, 58:7, 58:12, 58:24, 61:4, 61:6, 61:11, 61:15, 61:16, 62:10, 62:11, 62:13, 63:10, 64:3, 66:3, 66:23, 67:9, 67:10, 67:16, 69:2, 69:16, 70:1, 70:6, 70:10, 70:16, 72:8, 73:21, 74:9, 74:10, 74:20, 74:24, 75:6, 76:1, 77:1, 77:10, 77:17, 86:8, 87:15, 104:1, 112:10, 112:11
**flow** [4] - 68:16, 70:14, 74:7, 80:6
**flowing** [2] - 64:2, 104:13
**flows** [2] - 61:15, 98:15
**focus** [5] - 35:8, 65:2, 65:24, 87:25, 108:16
**focused** [2] - 4:19, 43:4
**focuses** [1] - 29:20
**focusing** [3] - 54:18, 56:2, 76:10
**folks** [3] - 3:5, 22:20, 81:14

**follow** [6] - 23:11, 79:24, 83:16, 84:4, 89:16
**followed** [2] - 83:24, 84:3
**following** [5] - 62:23, 75:4, 89:17, 97:22, 97:23
**footnote** [1] - 47:23
**FOR** [6] - 1:17, 2:2, 2:5, 2:8, 2:10, 2:16
**forbid** [1] - 8:15
**force** [1] - 33:13
**foregoing** [1] - 112:3
**foresaw** [1] - 76:5
**form** [1] - 86:11
**formally** [1] - 12:7
**formulating** [1] - 107:15
**forth** [7] - 6:14, 21:19, 26:16, 37:11, 47:1, 60:21, 93:19
**forward** [1] - 79:25
**FOUNDATION** [2] - 1:18, 1:22
**four** [5] - 35:24, 47:1, 53:10, 53:23, 92:21
**fourth** [1] - 36:14
**fragment** [1] - 42:4
**frame** [2] - 27:12, 41:19
**framed** [5] - 16:2, 33:11, 76:9, 108:1, 110:9
**Frank** [2] - 4:6, 92:18
**FRANK** [1] - 2:13
**frankly** [7] - 16:16, 37:19, 38:20, 84:16, 88:7, 93:25, 94:5
**Fransisco** [1] - 1:24
**free** [3] - 30:19, 31:2, 31:11
**freely** [1] - 15:1
**friend** [1] - 29:24
**front** [13] - 6:17, 12:25, 16:6, 22:23, 26:12, 42:18, 44:24, 49:7, 63:9, 64:5, 88:1, 99:11, 105:11
**fully** [1] - 46:17
**fulsome** [2] - 46:12, 96:11
**function** [3] - 45:16, 89:14, 100:11
**fundamental** [3] - 91:17, 93:21, 94:11
**future** [11] - 8:19, 10:4, 11:22, 92:1, 92:2, 97:14, 97:17, 98:4, 98:9, 105:5, 108:3

## G

**Gadea** [2] - 35:12, 58:10
**gained** [1] - 16:22
**Garrett** [5] - 47:20, 48:15, 48:21, 50:22, 51:2
**general** [8] - 43:7, 43:23, 45:11, 59:17, 89:6, 96:1, 103:16
**General** [3] - 40:18, 41:20, 42:21
**General's** [1] - 44:1
**generality** [1] - 53:14
**generalized** [2] - 85:15, 92:25
**generally** [2] - 12:22, 95:25
**generates** [1] - 65:7
**genuine** [1] - 25:11
**given** [8] - 26:12, 31:23, 44:21, 59:15, 73:1, 101:19, 101:20
**God** [1] - 8:15
**Godshall** [1] - 3:24
**GODSHALL** [2] - 2:2, 3:24
**Gonzalo** [1] - 22:3
**government** [20] - 10:3, 10:9, 10:24, 11:18, 11:20, 32:2, 58:14, 59:9, 59:22, 66:2, 71:8, 71:21, 73:16, 81:4, 97:18, 98:17, 99:5, 99:21, 105:15, 109:16
**government's** [3] - 10:13, 11:11, 43:1
**Governor** [3] - 70:10, 70:24, 75:9
**grant** [1] - 46:16
**granted** [5] - 13:5, 14:17, 18:11, 89:5, 91:5
**granular** [2] - 45:3, 104:11
**grave** [2] - 82:13, 87:2
**ground** [23] - 21:20, 26:3, 33:19, 35:5, 37:9, 39:6, 40:24, 45:23, 56:2, 59:10, 59:20, 61:17, 64:4, 68:18, 72:4, 77:24, 85:7, 100:13, 101:9, 106:12, 108:15, 109:20, 110:4
**grounds** [4] - 12:14, 56:3, 97:11, 100:17
**growing** [1] - 16:24
**guarantee** [1] - 7:22
**guarantees** [4] - 83:1, 84:24, 84:25, 105:13
**guard** [1] - 85:24
**Guatemala** [1] - 81:14
**guess** [18] - 6:3, 21:21, 29:19, 38:9, 38:25, 42:7, 45:5, 47:25, 48:7, 50:7, 54:24, 55:23, 56:1, 58:25, 65:2, 76:7, 105:10, 107:13
**guidance** [1] - 86:25
**guidelines** [3] - 59:17, 89:16, 97:23
**guise** [1] - 108:7
**Guthrie** [3] - 70:11, 70:25, 71:9
**GUTHRIE** [1] - 2:11
**guys** [4] - 4:3, 21:5, 56:15, 62:15

## H

**hail** [2] - 68:9, 73:21
**hailed** [5] - 57:13, 62:11, 66:7, 66:15, 66:23
**Haitian** [3] - 29:14, 30:21, 88:22
**Haitian/Creole** [1] - 83:5
**hamstrung** [1] - 110:11
**hand** [2] - 24:13, 29:10
**handle** [1] - 46:4
**handling** [1] - 26:21
**hands** [1] - 67:20
**happy** [3] - 6:23, 23:7, 25:20
**hard** [1] - 46:22
**hardest** [2] - 77:14, 94:10
**harm** [12] - 81:7, 81:17, 81:19, 82:1, 82:12, 82:13, 82:14, 84:5, 87:19, 98:4, 98:9, 98:14
**harms** [1] - 87:1
**Harvard** [13] - 57:16, 57:18, 57:20, 57:22, 62:1, 62:4, 62:7, 63:8, 67:3, 69:4, 71:4, 72:7, 72:15
**headphones** [1] - 41:8
**healthy** [1] - 31:18
**hear** [16] - 21:17, 22:24, 26:17, 37:3, 42:6, 48:7, 52:18, 57:23, 67:17, 87:4, 91:8, 97:4, 97:6, 98:16, 99:2, 99:9
**heard** [13] - 29:23, 37:11, 38:19, 39:3, 39:6, 46:2, 58:5, 69:15, 87:5, 90:20, 98:23, 99:6, 100:14
**hearing** [13] - 4:19, 7:19, 7:24, 12:3, 19:6, 76:4, 76:18, 78:16, 81:23, 89:3, 94:24, 104:19, 108:3
**HEARING** [1] - 1:12
**hearings** [3] - 7:16, 7:18, 44:13
**heart** [1] - 94:25
**held** [4] - 7:10, 31:6, 64:11, 64:23
**help** [3] - 28:11, 109:17, 110:3
**helpful** [2] - 8:3, 109:21
**helps** [3] - 12:6, 46:15, 87:8
**hereby** [1] - 112:3
**hesitant** [1] - 88:5
**high** [6] - 7:4, 48:17, 53:14, 59:16, 71:20, 73:16
**high-level** [1] - 73:16
**highlight** [1] - 18:7
**hits** [1] - 77:24
**hold** [2] - 32:2, 57:15
**holding** [1] - 74:24
**Homeland** [1] - 1:9
**Honor** [78] - 3:12, 3:18, 3:20, 3:22, 3:24, 4:4, 4:6, 4:8, 6:10, 6:22, 6:23, 8:12, 8:22, 9:8, 9:10, 11:4, 12:18, 14:10, 23:10, 26:23, 30:11, 34:5, 35:12, 39:14, 41:1, 41:24, 43:15, 48:6, 48:14, 49:8, 49:16, 50:20, 51:19, 52:7, 53:12, 54:9, 55:9, 56:5, 57:12, 60:5, 61:24, 62:18, 63:11, 65:11, 66:6, 69:9, 70:24, 73:9, 73:24, 74:15, 75:14, 78:22, 78:25, 79:3, 81:2, 81:18, 83:19, 85:9, 88:2, 89:4, 92:18, 93:17, 97:7, 97:9, 99:14, 100:4, 101:10, 102:20, 103:25, 104:15, 105:20, 108:25, 109:5, 109:22, 110:6, 111:13, 111:16, 111:19
**Honorable** [1] - 2:21
**HONORABLE** [1] - 1:13
**hook** [1] - 65:9
**hope** [1] - 110:16
**hopefully** [2] - 80:9, 110:25
**horse** [1] - 42:12
**hours** [4] - 80:14, 86:5, 86:6, 86:18
**housing** [1] - 76:25
**hurdle** [1] - 37:18
**HYUNHYE** [1] - 1:17

## I

**Ibarra** [1] - 44:12
**Ibarra-Perez** [1] - 44:12
**ICE** [37] - 15:14, 23:23, 36:7, 36:11, 36:12, 36:17, 36:18, 36:22, 47:20, 50:2, 50:4, 51:22, 52:10, 53:5, 55:2, 55:15, 58:18, 59:7, 59:17, 60:6, 60:7, 60:13, 60:16, 66:9, 66:24, 67:15, 70:2, 73:1, 75:19, 83:14, 83:16, 84:4, 85:11, 89:16, 97:23, 107:21, 108:6
**ID** [1] - 86:10
**identical** [4] - 33:20, 34:12, 44:7, 104:4
**identified** [3] - 6:5, 10:21, 35:25
**identifies** [1] - 9:4
**identify** [2] - 5:20, 9:20
**identifying** [1] - 5:24
**ignore** [1] - 110:20
**II** [2] - 1:13, 2:21
**ILONA** [2] - 2:20, 112:8

**imagination** [1] - 86:24
**imagine** [5] - 30:10, 34:3, 83:2, 100:7, 108:13
**immediate** [3] - 97:16, 98:3, 98:8
**immediately** [1] - 17:5
**IMMIGRANT** [2] - 2:5, 2:8
**immigrant** [1] - 64:15
**immigrants** [1] - 31:6
**Immigration** [7] - 5:6, 6:25, 7:21, 8:16, 9:1, 55:19, 104:1
**immigration** [26] - 5:7, 5:20, 5:24, 6:6, 7:9, 7:12, 7:15, 7:19, 8:14, 8:15, 9:20, 10:21, 31:23, 32:2, 40:8, 41:10, 41:16, 42:14, 43:4, 43:9, 52:9, 52:15, 81:22, 100:25, 106:25
**impediment** [2] - 37:20, 94:4
**implementation** [1] - 75:21
**implemented** [2] - 36:15, 36:20
**implementing** [2] - 97:25, 106:11
**implications** [1] - 106:7
**imply** [1] - 43:25
**import** [1] - 62:25
**importance** [1] - 106:21
**important** [12] - 26:1, 26:5, 35:24, 47:4, 64:4, 65:3, 76:18, 79:5, 80:13, 82:10, 103:14, 106:22
**importantly** [2] - 5:10, 20:8
**impose** [3] - 13:12, 43:7, 64:16
**imposed** [1] - 32:8
**impossible** [1] - 93:4
**improper** [1] - 53:2
**improperly** [1] - 49:1
**improperly-named** [1] - 49:1
**improve** [1] - 23:4
**improvements** [1] - 27:1
**impute** [1] - 69:18
**imputed** [3] - 66:2, 74:7, 77:21
**imputing** [1] - 35:2
**in-person** [9] - 13:15, 14:13, 18:20, 18:25, 19:3, 27:22, 85:21, 86:3, 86:7
**inapplicable** [1] - 30:22
**inasmuch** [2] - 46:10, 100:10
**inbox** [1] - 16:23
**incarcerated** [1] - 57:25
**Inch** [13] - 57:17, 57:18, 57:21, 62:1, 62:4, 63:8, 68:23, 69:5, 71:4, 72:7, 72:15, 80:3, 111:1
**incidents** [2] - 49:23, 49:24
**inclined** [1] - 46:14
**include** [2] - 36:12, 75:4
**included** [1] - 47:20
**including** [2] - 50:4, 55:17
**incorrect** [1] - 18:17
**indeed** [4] - 8:9, 58:4, 104:19, 107:8
**independent** [1] - 108:15
**independently** [1] - 78:11
**indicate** [1] - 21:25
**indicated** [1] - 23:1
**indicates** [1] - 27:17
**indicator** [1] - 87:22
**indiscernible** [3] - 16:22, 25:24, 89:2
**individual** [7] - 71:1, 73:2, 75:8, 81:13, 81:23, 91:23, 96:10
**individualized** [1] - 92:14
**individuals** [4] - 29:16, 44:18, 59:7, 98:23
**indivisibility** [1] - 95:15
**inferential** [1] - 60:22
**inferred** [1] - 45:24
**inflammatory** [1] - 41:25
**inform** [1] - 29:15
**information** [11] - 12:5, 13:23, 15:9, 15:10, 27:16, 28:2, 28:8, 28:9, 28:21, 34:3, 59:17
**initial** [1] - 65:13
**injunction** [22] - 4:14, 7:25, 9:13, 16:17, 23:19, 33:3, 34:23, 60:15, 79:18, 79:19, 82:17, 84:10, 94:23, 96:10, 96:23, 97:5, 97:14, 98:2, 98:3, 99:15, 99:20, 100:3
**INJUNCTION** [1] - 1:12
**injunctive** [18] - 25:5, 25:16, 26:20, 33:4, 37:11, 46:16, 80:2, 82:20, 87:15, 91:5, 91:12, 93:21, 95:23, 100:18, 103:3, 104:7, 110:15, 111:7
**injuries** [1] - 104:4
**injury** [1] - 104:4
**input** [1] - 59:21
**inquiry** [1] - 104:2
**inside** [1] - 19:5
**inspected** [2] - 19:13, 19:15
**inspire** [1] - 28:16
**instance** [2] - 7:3, 44:14
**instances** [3] - 13:17, 33:17
**instead** [1] - 64:22
**instruction** [1] - 61:22
**instructions** [1] - 20:13
**instructive** [1] - 58:11
**intellectually** [1] - 82:5
**intend** [2] - 10:25, 11:1
**intends** [1] - 4:15
**intent** [1] - 43:3
**interests** [1] - 29:12
**intergovernmental** [2] - 63:15, 63:18
**interpreters** [1] - 83:5
**interrogatories** [2] - 75:2, 107:17
**interrupt** [2] - 81:12, 90:8
**interventions** [1] - 86:23
**introduction** [1] - 58:19
**involved** [4] - 47:11, 53:15, 54:4, 55:25
**involvement** [1] - 101:4
**involves** [5] - 53:17, 54:5, 54:10, 54:13
**irreparable** [8] - 81:7, 81:16, 81:19, 82:1, 82:12, 82:15, 87:18, 98:14
**ISABEL** [1] - 2:4
**issue** [42] - 7:25, 12:2, 12:21, 20:9, 22:9, 23:16, 26:24, 27:3, 27:23, 46:25, 50:23, 63:16, 63:20, 68:2, 74:23, 79:10, 79:19, 82:16, 82:20, 87:11, 89:22, 91:17, 91:19, 93:10, 93:15, 93:18, 93:23, 95:13, 96:8, 96:9, 96:12, 98:17, 98:22, 99:25, 101:5, 102:16, 103:14, 105:22, 105:25, 109:16, 111:21
**issued** [2] - 85:11, 100:2
**issues** [26] - 4:16, 4:20, 4:25, 15:16, 21:22, 22:18, 33:7, 33:12, 34:19, 62:7, 78:6, 79:6, 80:11, 80:16, 88:24, 89:24, 91:6, 91:11, 92:15, 92:19, 93:13, 94:12, 99:11, 100:25, 101:7, 101:8
**iteration** [1] - 83:3
**itself** [8] - 48:12, 54:15, 61:8, 75:19, 82:12, 87:6, 92:24, 108:12

## J

**J.M.C** [2] - 1:4, 55:18
**jail** [1] - 32:6
**Jenkins** [3] - 64:25, 66:19, 69:11
**Jennings** [1] - 38:14
**job** [1] - 28:20
**John** [1] - 93:7
**JOHN** [1] - 2:10
**joined** [1] - 56:24
**joints** [1] - 103:24
**Juan** [1] - 51:13
**Judge** [6] - 35:5, 74:4, 83:15, 84:23, 95:5, 96:5
**JUDGE** [1] - 1:13
**judges** [1] - 10:21
**judging** [1] - 32:4
**Judicial** [1] - 3:8
**judicial** [2] - 8:25, 47:6
**July** [5] - 16:21, 16:22, 17:19, 18:3, 24:1
**junction** [1] - 100:2
**jurisdiction** [21] - 4:21, 5:20, 5:24, 6:6, 6:25, 7:10, 7:12, 7:16, 10:22, 11:2, 12:4, 16:5, 45:18, 66:13, 66:21, 78:3, 78:4, 78:5, 79:7, 105:6, 110:24
**jurisdictional** [9] - 37:18, 37:25, 38:7, 39:1, 43:7, 43:23, 44:15, 45:11, 46:19
**jurisdictionally** [2] - 40:7, 43:14
**JUSTICE** [2] - 2:5, 2:8
**justiciability** [1] - 80:12
**justification** [1] - 107:5
**justify** [1] - 26:19

## K

**keep** [1] - 56:4
**Kelmet** [1] - 4:10
**KENDRICK** [2] - 1:21, 3:20
**Kendrick** [1] - 3:21
**KEVIN** [1] - 2:11
**key** [6] - 4:15, 4:24, 60:10, 60:12, 75:18, 75:20
**Keys** [1] - 55:19
**kind** [25] - 10:2, 12:24, 14:6, 16:10, 18:23, 30:7, 33:13, 37:13, 42:14, 55:2, 57:5, 59:14, 64:25, 76:6, 76:15, 90:1, 91:18, 91:21, 92:6, 94:2, 98:2, 98:6, 102:5, 103:16
**kitchen** [1] - 84:12
**knowing** [1] - 42:19
**KRISTI** [1] - 1:8
**Krome** [18] - 5:7, 5:11, 6:5, 6:24, 7:21, 8:7, 8:14, 9:6, 10:11, 10:14, 10:24, 11:2, 12:4, 16:1, 98:23, 98:25, 100:23, 101:1
**Kyle** [1] - 3:18
**KYLE** [1] - 1:21

## L

**labeled** [1] - 97:24
**lack** [11] - 28:2, 33:18, 49:4, 60:13, 64:18, 77:2, 78:14, 79:19, 94:21, 100:13
**language** [3] - 52:3, 66:16,

75:15
**languages** [2] - 20:14, 42:10
**large** [2] - 88:12, 89:24
**larger** [4] - 28:2, 74:17, 88:25, 89:22
**LaROCCA** [1] - 2:4
**last** [12] - 4:16, 4:18, 7:8, 14:7, 25:22, 46:5, 52:1, 56:7, 78:16, 97:10, 101:12, 101:13
**latest** [1] - 5:1
**laundry** [1] - 84:23
**law** [19] - 10:6, 29:25, 30:8, 31:18, 39:18, 42:19, 43:10, 44:24, 46:21, 51:10, 65:25, 68:20, 88:21, 90:17, 95:17, 99:3, 101:25, 102:6, 105:2
**lawsuit** [6] - 16:19, 39:23, 41:5, 43:3, 45:16, 67:22
**lawyers** [3] - 22:21, 81:15, 94:18
**leading** [1] - 3:16
**leaps** [1] - 68:15
**least** [19] - 12:1, 23:5, 25:15, 42:18, 43:19, 48:3, 63:22, 68:4, 68:19, 68:20, 70:14, 73:13, 77:18, 79:5, 79:25, 80:11, 81:20, 82:5, 102:8
**leave** [3] - 19:12, 60:22, 111:3
**led** [1] - 71:24
**left** [3] - 7:17, 19:17, 45:1
**legal** [34] - 4:15, 4:19, 13:5, 13:20, 13:22, 13:23, 14:21, 14:24, 15:1, 16:23, 16:24, 20:10, 20:12, 20:23, 21:8, 21:12, 22:10, 22:14, 22:17, 25:13, 29:5, 29:8, 29:16, 34:14, 40:14, 45:7, 48:19, 53:14, 64:11, 64:21, 83:10, 84:25, 104:12
**legally** [1] - 63:21
**legislative** [1] - 89:13
**length** [1] - 59:15
**less** [4] - 93:25, 98:2, 105:8, 107:10
**letting** [1] - 80:5
**level** [10] - 15:16, 40:24, 45:3, 59:16, 59:21, 71:20, 72:2, 73:16, 89:24, 104:11
**levels** [1] - 92:11
**liability** [1] - 35:4
**LIBERTIES** [2] - 1:18, 1:22
**liberty** [2] - 27:15, 103:21
**likelihood** [20] - 25:6, 25:8, 29:23, 33:6, 39:5, 45:22, 49:11, 49:13, 87:16, 87:22, 88:3, 90:11, 91:2, 92:6, 93:9, 93:22, 95:1, 96:6, 96:7, 99:18
**limitation** [3] - 43:8, 43:24, 45:11
**linchpin** [1] - 76:6
**line** [4] - 3:6, 14:23, 30:16, 31:18
**link** [4] - 5:9, 24:23, 27:8
**list** [1] - 84:23
**listed** [1] - 38:15
**listening** [2] - 3:5, 3:7
**lists** [1] - 37:24
**litigated** [1] - 78:15
**litigation** [4] - 8:1, 76:8, 98:25, 108:14
**LITIGATION** [2] - 2:5, 2:8
**live** [9] - 16:9, 22:17, 26:11, 42:22, 52:22, 53:10, 53:24, 55:3, 101:5
**LLP** [2] - 2:11, 2:13
**located** [1] - 54:15
**location** [2] - 53:16, 54:10
**locator** [1] - 15:15
**logic** [2] - 69:5, 77:5
**logical** [2] - 45:10, 68:15
**look** [49] - 5:17, 12:10, 32:7, 34:14, 35:13, 35:22, 38:9, 38:17, 39:9, 39:16, 39:17, 39:20, 41:23, 42:20, 43:1, 46:7, 46:22, 56:20, 61:25, 64:24, 65:1, 65:3, 73:11, 73:24, 75:14, 77:4, 77:6, 77:13, 78:10, 78:11, 82:23, 84:10, 85:11, 85:18, 90:9, 91:10, 95:14, 96:23, 97:1, 97:3, 97:4, 99:5, 102:11, 103:15, 103:17, 106:9, 107:13, 110:7, 111:1
**looked** [5] - 24:21, 24:22, 47:19, 51:13, 68:6
**looking** [15] - 13:8, 23:20, 29:7, 45:19, 47:14, 48:14, 51:5, 59:4, 63:25, 80:2, 90:18, 95:22, 96:7, 96:22, 107:16
**looks** [2] - 30:5, 50:17
**looped** [1] - 48:9
**Lopez** [1] - 51:13
**loud** [4] - 21:17, 61:6, 91:8, 98:16
**lovely** [1] - 6:15
**lumped** [2] - 52:21, 56:11
**LUPOWITZ** [2] - 2:20, 112:8
**Lupowitz** [1] - 112:8
**lurking** [1] - 107:15

**M**

**Madu** [1] - 44:12
**mail** [8] - 13:23, 15:1, 20:13, 20:23, 21:8, 21:12, 22:17, 25:13
**maintain** [6] - 5:12, 13:15, 13:25, 15:23, 31:14, 68:16
**maintained** [2] - 72:20, 72:22
**maintaining** [1] - 39:12
**man** [1] - 82:6
**Management** [1] - 70:11
**management** [4] - 70:17, 74:21, 95:12, 95:13
**managing** [1] - 75:24
**mandatory** [1] - 98:2
**manifest** [2] - 61:7, 81:17
**manifested** [2] - 4:16, 69:3
**manifestly** [1] - 93:3
**manifests** [1] - 108:12
**manner** [4] - 28:23, 32:13, 32:14, 32:20
**marked** [1] - 106:5
**MARLENE** [1] - 2:16
**Marlene** [1] - 4:8
**Mart** [1] - 95:17
**massive** [1] - 83:3
**material** [2] - 5:3, 109:19
**materials** [2] - 40:14, 83:10
**matter** [5] - 3:3, 41:17, 41:18, 80:11, 112:5
**mean** [41] - 9:22, 16:4, 16:14, 33:2, 34:3, 37:22, 39:3, 40:3, 44:17, 45:16, 49:1, 53:14, 53:15, 53:17, 59:17, 60:4, 61:6, 62:21, 66:25, 68:18, 70:14, 72:17, 73:11, 73:15, 76:13, 81:11, 81:18, 83:4, 83:5, 83:15, 84:22, 85:3, 85:4, 88:11, 88:13, 90:12, 91:16, 93:25, 105:14, 108:2, 109:1
**meaning** [4] - 33:12, 65:25, 75:12, 94:6
**means** [2] - 14:24, 64:12
**meant** [1] - 111:10
**mechanism** [4] - 54:2, 94:21, 97:3, 103:18
**meet** [7] - 13:5, 22:4, 22:14, 32:18, 40:1, 92:11, 99:19
**meeting** [17] - 17:16, 17:17, 17:20, 17:21, 17:22, 18:12, 18:14, 22:5, 22:11, 24:2, 24:4, 24:5, 24:9, 24:20, 24:22, 61:19, 93:6
**meetings** [6] - 14:1, 18:20, 19:1, 19:3, 89:8, 94:18
**member** [1] - 93:7
**members** [5] - 91:23, 92:2, 93:2, 104:3
**mention** [3] - 70:4, 82:19, 97:10
**mentioned** [15] - 9:25, 11:6, 23:18, 30:15, 33:8, 45:24, 56:17, 69:18, 81:11, 81:13, 89:3, 94:4, 101:13, 102:12, 109:11
**mentioning** [1] - 61:12
**Mercado** [1] - 85:17
**mere** [1] - 53:17
**merit** [7] - 21:7, 21:9, 22:16, 29:22, 46:7, 80:20, 87:7
**merit-based** [4] - 21:9, 29:22, 46:7, 87:7
**merits** [25] - 25:6, 25:8, 29:23, 33:7, 39:5, 45:22, 46:2, 49:11, 49:13, 79:16, 80:1, 80:10, 82:19, 82:22, 87:17, 88:4, 90:11, 91:1, 91:3, 93:10, 93:23, 95:1, 96:7, 99:19, 102:16
**merits-based** [2] - 82:22, 91:1
**Meros** [18] - 4:4, 15:23, 23:11, 29:6, 34:22, 39:4, 45:4, 52:18, 56:17, 67:17, 73:6, 84:19, 87:13, 97:8, 98:16, 101:11, 108:23, 110:8
**MEROS** [29] - 2:10, 4:4, 16:13, 21:14, 23:10, 23:13, 23:15, 25:19, 51:21, 69:9, 70:21, 70:24, 72:6, 73:9, 73:24, 78:25, 88:2, 88:16, 91:14, 91:16, 92:9, 97:9, 101:12, 101:16, 108:25, 109:5, 109:22, 109:25, 111:16
**met** [3] - 39:5, 87:6, 87:19
**metric** [1] - 85:4
**MIAMI** [1] - 1:2
**Miami** [29] - 1:4, 2:3, 2:6, 2:9, 2:15, 2:17, 2:23, 2:24, 4:7, 35:25, 36:7, 36:17, 47:20, 50:2, 50:9, 51:7, 52:13, 53:5, 55:16, 58:15, 58:16, 58:21, 59:7, 60:6, 66:25, 75:19, 75:22, 112:10, 112:11
**Miami-Dade** [1] - 52:13
**MICHAEL** [1] - 1:4
**microphone** [1] - 6:20
**Middle** [14] - 49:25, 52:11, 52:16, 54:15, 61:14, 69:3, 72:13, 72:21, 77:16, 78:12, 78:20, 87:14, 110:19, 110:21
**might** [7] - 12:9, 24:25, 32:5, 72:7, 90:25, 108:12, 109:17
**migrants** [2] - 30:23, 30:25
**mind** [1] - 80:3
**mindset** [1] - 12:24
**minimum** [2] - 25:10, 65:24
**minute** [2] - 52:17, 67:21
**missed** [2] - 70:19, 80:21

**mistake** [1] - 78:4
**mode** [2] - 20:2, 22:25
**modest** [1] - 84:8
**moment** [7] - 26:15, 29:23, 34:20, 37:2, 37:16, 74:5, 98:14
**Monday** [1] - 6:4
**monitored** [4] - 14:23, 20:7, 64:21, 84:21
**monitoring** [1] - 19:5
**Monroe** [1] - 2:11
**month** [2] - 7:8, 7:11
**moot** [9] - 5:14, 6:8, 7:2, 12:7, 15:25, 16:8, 17:1, 21:5, 79:13
**mooted** [2] - 13:10, 16:12
**mootness** [13] - 12:21, 15:24, 16:8, 16:14, 21:2, 21:3, 21:16, 24:17, 26:10, 37:7, 46:1, 79:9, 110:24
**morning** [15] - 3:2, 3:12, 3:14, 3:18, 3:20, 3:22, 3:24, 4:1, 4:4, 4:6, 4:8, 4:15, 4:22, 87:5
**most** [7] - 4:24, 5:10, 49:23, 65:15, 79:5, 84:14, 103:17
**motion** [23] - 4:14, 7:14, 9:13, 16:16, 20:15, 20:16, 23:19, 33:4, 33:9, 33:11, 34:23, 48:24, 49:4, 60:15, 90:9, 91:11, 92:12, 92:13, 94:23, 96:20, 102:21, 110:22
**move** [6] - 37:5, 41:15, 49:9, 56:6, 76:4, 111:5
**moved** [2] - 14:8, 84:15
**moves** [1] - 79:25
**MR** [37] - 3:18, 3:22, 4:4, 4:6, 16:13, 21:14, 23:10, 23:13, 23:15, 25:19, 51:21, 69:9, 70:21, 70:24, 72:6, 73:9, 73:24, 78:25, 88:2, 88:16, 91:14, 91:16, 92:9, 92:18, 95:5, 95:9, 95:11, 96:5, 97:7, 97:9, 101:12, 101:16, 108:25, 109:5, 109:22, 109:25, 111:16
**MS** [84] - 3:12, 3:20, 3:24, 4:8, 6:10, 6:22, 8:12, 8:24, 9:17, 11:4, 11:18, 12:18, 14:10, 26:23, 27:21, 30:11, 34:5, 34:8, 35:11, 39:14, 39:16, 39:20, 40:4, 40:12, 40:17, 41:1, 41:3, 41:23, 43:15, 48:6, 48:14, 49:8, 49:16, 50:20, 51:19, 52:4, 52:7, 52:9, 54:9, 54:13, 55:9, 56:5, 57:12, 60:5, 61:24, 62:3, 62:18, 62:24, 63:2, 63:11, 65:11, 65:13, 65:18, 66:6, 67:2, 67:5, 67:8, 74:14, 74:17, 74:20, 75:14, 78:22, 79:3, 81:2, 81:10, 81:18, 83:19, 85:9, 99:14, 99:17, 101:10, 102:20, 102:25, 103:11, 103:25, 104:6, 104:15, 104:17, 105:20, 105:22, 105:25, 110:6, 111:13, 111:19
**multiple** [6] - 18:5, 20:13, 45:24, 48:8, 76:8, 85:10
**must** [6] - 34:15, 58:18, 60:8, 60:10, 79:24, 95:24
**muster** [1] - 83:25
**mute** [1] - 3:8

## N

**N.B** [1] - 55:18
**named** [9] - 49:1, 49:5, 49:14, 53:1, 70:12, 75:10, 91:4, 92:24, 93:15
**narrative** [1] - 21:18
**narrow** [6] - 16:3, 38:3, 38:13, 43:5, 83:8, 84:23
**narrowed** [1] - 16:7
**NATIONAL** [1] - 1:19
**natural** [1] - 23:2
**nature** [10] - 16:9, 20:19, 21:19, 22:16, 29:14, 84:7, 94:18, 97:2, 101:2, 104:11
**NE** [1] - 2:17
**near** [2] - 61:21, 77:16
**nearly** [1] - 44:7
**necessarily** [11] - 21:16, 45:17, 49:12, 59:21, 72:19, 80:17, 85:4, 91:9, 94:15, 100:4, 109:18
**need** [18] - 8:23, 19:14, 33:5, 33:6, 38:2, 43:6, 63:18, 80:2, 80:8, 87:19, 96:5, 97:3, 103:11, 104:10, 105:11, 108:25, 109:11, 111:6
**needed** [1] - 103:22
**needs** [1] - 20:9
**never** [9] - 6:16, 7:18, 27:25, 41:15, 49:19, 60:23, 106:5
**new** [4] - 39:21, 39:22, 45:5, 105:16
**next** [8] - 9:2, 9:7, 9:11, 24:6, 37:18, 49:22
**nexus** [3] - 38:11, 50:11, 63:20
**NICHOLAS** [1] - 2:10
**Nick** [1] - 4:4
**NICOLE** [1] - 2:2
**NO** [1] - 1:2
**Noem** [1] - 3:3
**NOEM** [1] - 1:8
**non** [1] - 6:1
**non-declaratory** [1] - 6:1
**none** [6] - 27:9, 38:23, 44:20, 71:9, 72:1, 84:2
**nonfinal** [1] - 95:11
**norm** [1] - 83:13
**normal** [2] - 81:4, 91:6
**North** [4] - 2:23, 5:7, 9:6, 112:10
**north** [1] - 77:6
**Northern** [9] - 63:10, 68:22, 71:5, 71:7, 71:15, 72:8, 72:9, 72:14, 72:18
**note** [2] - 23:4, 75:6
**noted** [6] - 21:22, 43:22, 45:4, 50:1, 81:19, 90:24
**nothing** [7] - 17:4, 42:1, 42:2, 62:20, 71:16, 96:13, 101:6
**notice** [3] - 5:3, 8:25, 110:2
**noticed** [1] - 92:11
**notify** [1] - 5:5
**Number** [6] - 83:24, 106:4, 106:10, 107:8, 108:22, 110:2
**number** [9] - 13:11, 15:9, 47:23, 51:13, 55:17, 72:1, 88:24, 89:8, 89:9
**NW** [3] - 1:19, 2:6, 2:9

## O

**objectionable** [1] - 99:4
**obligation** [2] - 49:9, 76:21
**obligations** [1] - 51:24
**obviously** [14] - 15:24, 20:5, 21:24, 25:25, 26:18, 52:20, 56:15, 56:18, 63:7, 79:4, 81:16, 87:13, 89:23, 93:13
**occasion** [1] - 90:14
**occur** [4] - 23:21, 32:11, 64:7, 97:20
**occurred** [4] - 47:8, 71:2, 97:20, 98:7
**occurring** [8] - 18:22, 19:1, 19:2, 19:3, 24:24, 52:11, 57:7, 72:12
**Ochopee** [1] - 9:5
**OF** [1] - 1:1
**offered** [5] - 17:21, 17:22, 24:9, 83:21, 84:11
**Office** [3] - 5:6, 8:16, 8:25
**OFFICE** [1] - 2:16
**office** [16] - 35:25, 36:7, 36:17, 50:2, 51:7, 53:5, 55:15, 58:15, 58:16, 58:22, 60:6, 66:10, 67:15, 73:1, 75:20, 75:22
**officers** [2] - 64:23, 82:1
**official** [4] - 48:3, 53:1, 72:4, 75:8
**Official** [2] - 2:21, 112:9
**officials** [3] - 51:2, 51:7, 63:22
**old** [2] - 6:17
**omission** [9] - 57:6, 58:23, 60:12, 61:3, 61:8, 61:9, 61:12, 72:5, 100:14
**omissions** [13] - 47:8, 60:10, 65:19, 66:1, 66:2, 66:4, 68:10, 68:25, 69:17, 71:23, 74:6, 77:20, 77:21
**on-the-ground** [1] - 35:5
**once** [1] - 16:22
**one** [55] - 9:3, 9:7, 11:8, 18:12, 23:15, 23:16, 24:20, 24:22, 28:2, 29:6, 29:10, 32:5, 32:6, 32:16, 32:18, 33:7, 35:2, 38:11, 38:25, 40:6, 42:8, 43:4, 46:3, 48:10, 49:24, 53:9, 55:1, 55:2, 56:3, 56:17, 63:12, 70:7, 70:20, 70:22, 72:1, 74:14, 77:17, 81:13, 81:20, 82:5, 84:12, 84:14, 84:22, 84:23, 87:14, 93:5, 93:20, 95:20, 97:23, 101:2, 101:12, 104:25, 108:11, 108:23
**one's** [1] - 49:23
**ones** [2] - 30:17, 54:22
**ongoing** [4] - 14:2, 20:19, 22:1, 98:13
**opening** [1] - 6:3
**openly** [1] - 106:16
**operated** [2] - 36:11, 58:18
**operates** [1] - 53:14
**operating** [3] - 66:25, 76:12, 107:22
**operation** [3] - 36:1, 60:8, 106:4
**operational** [3] - 108:24, 109:4, 110:3
**operations** [4] - 50:3, 53:6, 65:6, 99:23
**operative** [5] - 5:13, 21:12, 95:1, 109:4, 109:15
**operator** [1] - 59:9
**opportunity** [4] - 13:18, 82:4, 102:14, 103:12
**opposed** [3] - 13:3, 29:9, 66:3
**opposition** [1] - 39:6
**option** [1] - 83:19
**order** [23] - 15:10, 31:11, 32:1, 40:9, 46:11, 77:9, 81:22, 82:8, 82:16, 82:25, 84:11, 85:2, 85:12, 85:17, 85:18, 85:19, 85:23, 90:9, 94:24, 95:11, 98:1, 110:23
**Order** [1] - 3:1
**orderly** [1] - 28:23

**orders** [9] - 38:1, 40:24, 43:18, 69:23, 82:3, 85:11, 85:20, 89:5, 90:12
**ordinarily** [1] - 10:2
**organizational** [9] - 15:18, 30:13, 30:15, 30:17, 31:1, 31:9, 31:14, 88:21, 94:15
**organized** [1] - 28:23
**original** [4] - 20:21, 20:24, 45:13, 92:11
**otherwise** [1] - 92:1
**outgoing** [5] - 13:20, 14:21, 14:24, 64:20, 86:21
**outlined** [1] - 63:3
**outside** [6] - 19:6, 56:16, 76:13, 83:13, 107:22, 107:23
**outskirts** [1] - 107:24
**overarching** [2] - 20:9, 37:4
**overcome** [2] - 25:1, 93:11
**overlook** [1] - 108:2
**overreactions** [1] - 102:7
**overrun** [2] - 8:14, 10:11
**oversees** [2] - 50:2, 53:6
**oversight** [22] - 10:14, 11:15, 36:8, 36:22, 55:3, 55:16, 58:17, 60:7, 60:13, 60:17, 61:9, 65:6, 68:11, 71:20, 71:22, 71:23, 74:6, 74:11, 75:23, 76:13, 77:19, 100:9
**overview** [1] - 73:16
**own** [2] - 63:23, 78:10

**P**

**p.m** [3] - 1:7, 110:1, 111:24
**page** [8] - 20:23, 21:11, 50:5, 54:20, 64:16, 64:19, 64:21, 75:16
**Pages** [1] - 1:10
**pages** [2] - 35:14, 58:10
**paper** [2] - 82:6, 90:9
**papers** [6] - 13:8, 29:7, 49:15, 68:2, 90:24, 107:25
**paragraph** [6] - 5:18, 5:22, 47:24, 51:14, 64:9, 64:14
**paramount** [1] - 82:9
**parcel** [1] - 56:10
**part** [7] - 47:7, 47:9, 55:25, 56:8, 56:10, 100:21, 108:3
**participate** [1] - 101:8
**particular** [7] - 13:13, 16:3, 36:20, 42:21, 73:2, 76:11, 93:12
**particularly** [3] - 14:3, 57:18, 106:22
**parties** [5] - 12:15, 13:7, 31:22, 60:3, 73:19
**party** [3] - 48:2, 49:14, 53:2
**pass** [1] - 86:10
**passed** [1] - 83:25
**past** [3] - 49:22, 97:13, 97:15
**path** [1] - 71:24
**patterns** [1] - 34:13
**Paul** [1] - 3:22
**PAUL** [1] - 2:7
**peak** [1] - 102:18
**peek** [1] - 33:10
**pendency** [2] - 8:1, 98:24
**penological** [1] - 29:11
**people** [18] - 7:10, 7:18, 24:21, 27:11, 31:18, 31:23, 35:19, 36:3, 44:2, 57:15, 58:9, 61:18, 67:11, 74:24, 76:2, 81:5, 93:14, 100:23
**Perez** [1] - 44:12
**perfect** [2] - 39:25, 40:3
**performance** [4] - 67:13, 75:18, 76:20, 76:21
**performing** [1] - 75:3
**perhaps** [8] - 4:25, 10:18, 28:1, 42:7, 65:20, 74:23, 96:10, 109:13
**peripherally** [1] - 53:17
**permanent** [1] - 10:15
**permit** [1] - 96:13
**permitted** [1] - 3:7
**persist** [2] - 13:9, 87:1
**persisted** [1] - 13:14
**persistent** [1] - 29:2
**person** [15] - 13:15, 14:13, 18:20, 18:25, 19:3, 24:20, 24:22, 27:22, 81:20, 82:5, 85:21, 86:3, 86:7, 86:14, 106:15
**personal** [2] - 66:13, 66:21
**personnel** [2] - 22:22, 51:9
**perspective** [2] - 52:24, 98:12
**persuaded** [2] - 69:4, 79:21
**pertains** [2] - 29:9, 54:18
**Pesci** [3] - 29:11, 31:22, 101:17
**PETER** [1] - 2:10
**petitions** [2] - 5:11, 8:15
**phone** [5] - 13:20, 15:9, 20:1, 20:6, 64:20
**phonetic** [1] - 4:10
**phrase** [1] - 78:14
**pick** [1] - 105:16
**picked** [1] - 109:12
**picking** [1] - 24:20
**piece** [1] - 82:6
**pinned** [1] - 26:9
**pinpoint** [1] - 28:13
**place** [36] - 10:20, 14:19, 15:12, 27:8, 27:18, 27:19, 28:14, 32:16, 32:17, 34:16, 35:20, 44:2, 55:7, 57:24, 60:11, 60:12, 62:5, 64:18, 64:22, 65:1, 65:16, 65:19, 66:1, 67:14, 69:1, 74:6, 84:6, 84:8, 84:9, 85:24, 101:8, 106:20, 107:2, 107:6, 107:9, 107:11
**places** [2] - 19:1, 94:17
**plain** [1] - 6:17
**plaintiff** [6] - 22:2, 47:10, 54:4, 77:20, 102:13
**Plaintiff** [3] - 18:4, 22:10
**plaintiffs** [90] - 3:11, 3:13, 3:19, 3:21, 3:23, 3:25, 6:4, 6:23, 7:2, 9:19, 10:4, 13:25, 16:19, 18:1, 18:10, 20:10, 24:15, 29:9, 29:10, 30:10, 30:13, 30:15, 30:17, 31:2, 31:10, 31:14, 31:17, 33:21, 34:12, 40:18, 41:11, 41:12, 43:18, 44:8, 45:7, 46:6, 47:25, 50:1, 53:10, 53:16, 53:24, 55:3, 55:17, 57:3, 57:21, 57:25, 65:20, 71:24, 72:22, 73:20, 78:21, 80:24, 81:8, 82:13, 84:11, 85:12, 87:9, 87:20, 88:5, 88:9, 88:18, 88:21, 88:23, 89:3, 89:15, 91:4, 91:20, 91:23, 92:25, 93:5, 93:15, 93:19, 94:14, 94:16, 94:17, 96:3, 96:19, 96:21, 99:18, 101:13, 102:22, 103:8, 103:12, 105:10, 106:6, 108:14, 111:6, 111:12
**Plaintiffs** [1] - 1:6
**PLAINTIFFS** [2] - 1:17, 2:2
**plaintiffs'** [16] - 5:16, 9:12, 9:13, 15:19, 18:8, 25:2, 38:5, 38:19, 44:15, 57:6, 90:20, 96:24, 97:22, 99:7, 100:14
**Plaintiffs'** [1] - 9:17
**plan** [5] - 4:23, 12:4, 93:19, 109:4, 110:3
**play** [8] - 14:11, 34:2, 36:24, 38:24, 44:20, 80:17, 91:11, 108:3
**played** [1] - 100:21
**plays** [1] - 37:20
**pleading** [5] - 41:18, 43:2, 90:4, 90:6, 92:10
**pleadings** [8] - 16:2, 20:24, 21:12, 21:19, 23:1, 60:14, 62:20, 91:22
**pled** [4] - 56:15, 75:7, 103:4
**podiums** [1] - 6:17
**point** [49] - 11:17, 13:11, 18:7, 21:21, 23:12, 23:15, 23:18, 25:14, 26:8, 28:12, 28:24, 29:19, 29:25, 30:7, 35:12, 36:1, 44:8, 44:17, 48:20, 54:24, 57:6, 57:16, 58:6, 58:9, 58:15, 61:25, 64:24, 67:3, 69:7, 71:13, 72:1, 72:18, 73:1, 74:3, 74:17, 75:20, 80:25, 82:4, 85:9, 90:14, 90:24, 92:20, 95:17, 101:5, 102:13, 102:19, 103:15, 104:1, 105:15
**pointed** [14] - 9:8, 9:10, 13:17, 13:19, 13:21, 54:25, 55:14, 67:21, 84:19, 85:17, 90:19, 94:2, 98:11, 98:13
**pointing** [1] - 57:9
**points** [6] - 28:1, 35:24, 55:10, 95:6, 99:12, 102:19
**policies** [10] - 15:8, 58:3, 58:22, 62:8, 62:12, 66:10, 83:17, 83:20, 83:22, 106:16
**policy** [17] - 24:7, 36:15, 71:3, 71:6, 71:9, 72:9, 72:10, 83:24, 97:21, 97:24, 106:3, 106:10, 106:13, 106:14, 107:8, 107:9
**policy's** [1] - 66:9
**political** [1] - 29:17
**portion** [4] - 55:13, 60:9, 65:18, 111:7
**positing** [1] - 107:7
**position** [25] - 7:9, 8:1, 8:6, 8:10, 10:4, 11:20, 13:6, 25:4, 26:9, 35:4, 51:12, 51:19, 77:8, 78:11, 78:21, 78:23, 79:1, 82:19, 87:13, 98:12, 99:17, 104:18, 104:20, 105:8, 110:21
**positioned** [1] - 40:23
**positioning** [1] - 63:6
**posits** [1] - 66:8
**possibility** [2] - 78:12, 90:22
**possible** [3] - 10:15, 111:7, 111:22
**possibly** [1] - 61:8
**Postal** [1] - 19:21
**posted** [2] - 5:9, 106:17
**posting** [1] - 8:25
**potential** [1] - 39:3
**potentially** [1] - 10:3
**power** [1] - 99:24
**PowerPoint** [1] - 8:22
**practice** [1] - 57:21
**predominance** [3] - 94:7, 94:21, 94:25
**predominate** [1] - 94:12
**preexisting** [2] - 15:6, 86:8
**prejudiced** [1] - 29:2
**prejudices** [1] - 13:15
**preliminarily** [1] - 90:18

**PRELIMINARY** [1] - 1:12
**preliminary** [34] - 4:14, 7:25, 9:12, 16:16, 23:19, 25:5, 25:16, 26:20, 33:3, 33:4, 33:10, 34:23, 37:10, 46:16, 60:15, 79:6, 79:17, 79:19, 80:2, 80:11, 82:17, 82:20, 84:10, 87:15, 91:5, 91:12, 94:23, 96:23, 97:5, 98:2, 99:20, 100:18, 102:18, 110:14
**premised** [1] - 5:18
**preparation** [1] - 105:2
**prepared** [2] - 87:7, 110:14
**prerequisite** [1] - 46:19
**present** [1] - 30:18
**presented** [2] - 46:9, 62:15
**president** [1] - 41:25
**pressed** [1] - 105:7
**pressuring** [1] - 82:2
**presumably** [2] - 33:20, 37:14
**presumption** [3] - 97:19, 99:3, 99:4
**pretty** [4] - 16:2, 38:2, 65:23, 98:12
**prima** [1] - 53:4
**primarily** [1] - 39:1
**Primus** [2] - 29:14, 30:16
**principal** [1] - 32:21
**principles** [1] - 80:13
**PRISON** [1] - 1:19
**prison** [2] - 20:5, 32:6
**prisoners'** [1] - 25:3
**prisons** [2] - 20:5, 89:13
**private** [3] - 18:22, 18:25, 19:4
**privilege** [2] - 14:19, 27:19
**problem** [25] - 10:11, 11:11, 16:8, 28:2, 29:2, 50:16, 52:23, 53:13, 59:12, 70:19, 73:13, 76:24, 79:7, 79:22, 84:2, 84:18, 87:24, 88:7, 88:12, 93:17, 94:25, 95:19, 103:16, 105:10, 110:14
**problems** [7] - 61:17, 86:25, 90:25, 93:20, 93:21, 94:14, 96:4
**procedural** [3] - 9:13, 9:17, 52:1
**procedurally** [1] - 46:10
**procedures** [1] - 83:17
**proceed** [1] - 3:6
**proceeding** [1] - 40:8
**proceedings** [9] - 3:7, 38:1, 38:4, 38:22, 43:17, 44:4, 45:15, 81:22, 112:4
**process** [3] - 9:13, 9:18, 14:13
**Processing** [2] - 5:7, 9:6
**procure** [1] - 87:20
**production** [1] - 107:18
**progress** [1] - 25:21
**prohibited** [1] - 43:13
**PROJECT** [1] - 1:19
**prolong** [1] - 42:4
**prolonged** [1] - 45:5
**promulgated** [1] - 83:16
**prong** [2] - 48:4, 49:22
**proof** [4] - 90:5, 92:9, 92:10, 92:25
**proper** [16] - 17:9, 50:25, 53:1, 55:25, 56:22, 56:24, 58:2, 60:17, 62:4, 62:7, 71:7, 72:10, 72:14, 78:4, 78:7, 103:12
**properly** [10] - 46:18, 53:8, 55:11, 57:10, 65:14, 65:19, 69:6, 79:21, 103:4, 110:8
**properties** [1] - 53:15
**property** [11] - 47:9, 47:11, 53:12, 53:18, 54:3, 54:4, 54:10, 54:11, 54:14, 54:16, 55:25
**proposed** [2] - 84:10, 85:12
**proposition** [1] - 46:10
**protected** [1] - 31:20
**protections** [3] - 15:12, 25:16, 31:7
**protocols** [2] - 13:24, 64:12
**provide** [16] - 14:23, 15:3, 15:4, 19:20, 19:22, 20:11, 24:8, 30:17, 41:8, 51:23, 58:8, 71:23, 83:1, 83:24, 91:25, 98:5
**provided** [22] - 14:14, 14:20, 16:18, 16:19, 16:20, 16:22, 16:24, 17:3, 17:7, 18:18, 18:21, 19:24, 20:1, 25:22, 27:7, 35:15, 36:2, 59:18, 79:13, 80:3, 85:13, 106:17
**provides** [12] - 7:6, 35:18, 36:2, 36:7, 36:10, 36:14, 50:17, 55:15, 57:15, 60:9, 106:14
**providing** [9] - 20:13, 24:3, 24:19, 36:13, 51:8, 64:12, 83:5, 86:3, 86:17
**province** [1] - 99:24
**provision** [1] - 15:8
**provisional** [2] - 90:2, 92:1
**provisions** [1] - 36:24
**proximity** [1] - 64:23
**public** [2] - 28:2, 106:17
**publicized** [1] - 12:5
**publicizing** [1] - 28:9
**publicly** [2] - 5:24, 9:20
**puppeted** [1] - 59:6
**purely** [1] - 30:6
**purported** [4] - 25:12, 50:8, 77:1, 77:21
**purportedly** [1] - 106:11
**purports** [2] - 11:20, 27:24
**purpose** [1] - 68:7
**purposeful** [3] - 66:15, 67:1, 68:9
**purposely** [1] - 66:23
**purposes** [11] - 11:23, 50:11, 53:7, 57:10, 58:2, 61:2, 75:1, 77:22, 90:10, 98:19, 108:3
**pursuant** [2] - 52:14, 57:14
**pursue** [1] - 98:25
**push** [1] - 69:19
**put** [10] - 21:18, 66:20, 80:25, 83:6, 85:2, 85:23, 93:19, 96:8, 96:13, 110:23
**puts** [2] - 75:16, 78:11
**putting** [2] - 6:17, 60:21

## Q

**questions** [1] - 74:24
**quick** [2] - 77:6, 88:11
**quickly** [1] - 23:3
**quite** [8] - 12:6, 37:19, 38:20, 60:21, 84:16, 87:8, 93:24, 94:5
**quote** [4] - 5:19, 5:23, 47:6, 51:7
**quotes** [2] - 41:25, 42:2

## R

**raise** [2] - 28:19, 105:3
**raised** [7] - 16:10, 23:17, 47:3, 50:23, 50:24, 50:25, 103:8
**raises** [2] - 10:3, 74:23
**raising** [1] - 74:18
**rather** [3] - 78:2, 78:4, 81:12
**rational** [1] - 28:8
**RAYMOND** [1] - 2:7
**reach** [7] - 26:20, 68:22, 79:18, 82:19, 87:7, 87:24, 101:1
**reaches** [1] - 87:11
**read** [8] - 5:4, 19:14, 38:12, 38:18, 39:2, 63:7, 64:4, 95:6
**readily** [1] - 5:23
**reading** [6] - 38:3, 38:5, 43:5, 51:12, 54:3, 74:3
**real** [9] - 25:19, 37:20, 47:10, 53:12, 54:4, 88:11, 97:16, 98:3, 98:8
**really** [58] - 10:19, 12:11, 12:20, 21:9, 23:9, 26:2, 29:20, 29:24, 34:13, 34:22, 34:24, 35:5, 35:7, 38:23, 40:22, 40:23, 41:19, 42:3, 42:8, 42:13, 43:7, 45:1, 45:4, 45:9, 45:16, 45:23, 46:14, 46:15, 48:18, 54:18, 56:1, 57:2, 60:25, 63:21, 66:20, 67:20, 71:23, 73:4, 75:17, 79:15, 80:5, 80:6, 80:16, 80:18, 83:9, 87:18, 90:9, 90:15, 94:7, 95:22, 97:12, 101:4, 101:6, 103:19, 105:25, 108:1
**reason** [9] - 7:24, 12:13, 28:8, 28:24, 31:13, 39:16, 49:20, 50:16, 78:2
**reasonability** [2] - 101:14, 106:1
**reasonable** [6] - 101:24, 102:2, 102:4, 107:1, 107:4, 107:10
**reasonableness** [1] - 101:18
**reasonably** [3] - 10:8, 66:20, 74:9
**reasons** [5] - 13:10, 44:14, 55:20, 82:14, 101:25
**rebut** [1] - 25:15
**rebuttable** [2] - 99:3, 99:4
**rebutted** [2] - 21:19, 50:7
**receive** [5] - 13:22, 18:3, 22:3, 28:15, 82:7
**received** [3] - 18:12, 27:25, 109:16
**recent** [1] - 90:17
**recess** [1] - 111:22
**recessed** [1] - 111:24
**recipe** [1] - 83:3
**recognize** [1] - 20:9
**recognized** [1] - 17:3
**recollection** [2] - 59:16, 98:23
**record** [41] - 7:6, 8:5, 10:23, 11:17, 11:19, 21:25, 25:8, 25:14, 28:19, 28:25, 43:12, 44:24, 46:13, 47:19, 49:2, 51:16, 59:4, 59:5, 59:12, 59:25, 65:5, 68:6, 70:5, 70:9, 70:20, 72:25, 77:17, 77:18, 80:4, 82:4, 82:21, 87:21, 90:4, 96:11, 96:13, 97:21, 100:23, 101:20, 105:7, 108:21, 109:11
**recorded** [4] - 14:22, 20:2, 20:6, 64:21
**recur** [2] - 10:8, 12:12
**redefine** [1] - 103:22
**redirect** [1] - 57:3
**reengage** [1] - 12:14
**refer** [1] - 11:25
**referred** [1] - 27:9

**refugee** [2] - 29:14, 30:21
**regard** [1] - 8:6
**regarding** [13] - 4:21, 20:23, 21:11, 22:16, 22:20, 26:16, 26:17, 39:5, 51:10, 83:22, 103:6, 104:20
**regards** [2] - 43:20, 55:13
**regulated** [2] - 58:3
**regulating** [1] - 58:20
**regulations** [2] - 101:23, 102:6
**reinforce** [2] - 11:21, 69:10
**relate** [1] - 90:16
**related** [3] - 33:8, 38:20, 38:21
**relationship** [4] - 66:3, 71:21, 100:15
**relationships** [1] - 72:2
**relaxed** [1] - 32:5
**relevant** [4] - 69:12, 98:18, 100:8, 109:18
**relied** [1] - 11:8
**relief** [64] - 5:15, 6:1, 8:20, 9:9, 9:21, 9:24, 12:16, 16:2, 16:12, 20:15, 21:6, 21:18, 22:25, 24:8, 24:18, 25:6, 25:7, 25:9, 25:17, 26:13, 26:20, 29:25, 33:3, 33:4, 37:11, 41:12, 46:16, 79:12, 80:2, 80:16, 82:20, 82:22, 83:3, 84:8, 84:23, 85:6, 85:16, 87:10, 87:20, 88:12, 88:22, 91:5, 91:12, 91:18, 92:1, 93:21, 95:2, 95:23, 97:13, 97:14, 97:15, 97:17, 98:6, 98:13, 99:20, 99:22, 100:18, 103:3, 104:7, 105:14, 105:19, 108:15, 110:15, 111:7
**rely** [3] - 47:13, 55:6, 56:3
**relying** [1] - 17:12
**remain** [2] - 6:19, 77:9
**remains** [5] - 42:22, 47:22, 48:11, 74:5, 80:20
**remedied** [1] - 93:9
**remedies** [1] - 99:1
**remedy** [1] - 83:11
**remember** [2] - 67:5, 73:22
**remotely** [1] - 38:21
**removal** [8] - 38:1, 38:23, 40:9, 40:24, 43:18, 45:15, 81:22, 82:3
**remove** [1] - 105:16
**removed** [1] - 82:8
**remuneration** [1] - 29:18
**rendered** [1] - 5:13
**renewed** [4] - 4:14, 16:16, 20:15, 20:16
**reoccur** [2] - 7:5, 99:5
**repeat** [1] - 9:16
**repeatedly** [1] - 28:18
**repetition** [1] - 85:24
**replete** [1] - 41:24
**reply** [12] - 9:12, 17:14, 18:2, 20:16, 22:20, 29:19, 34:24, 47:23, 50:5, 64:16, 64:19, 103:12
**reply's** [1] - 51:12
**REPORTED** [1] - 2:19
**reporter** [1] - 9:15
**Reporter** [2] - 2:21, 112:9
**represent** [1] - 57:14
**representation** [8] - 10:23, 11:14, 12:9, 26:14, 44:24, 106:8, 109:6, 109:7
**representations** [5] - 11:8, 12:3, 24:14, 27:1, 98:20
**represented** [2] - 71:18, 88:23
**request** [17] - 7:24, 9:19, 15:10, 17:20, 18:9, 18:13, 22:4, 24:2, 24:4, 28:4, 39:17, 79:13, 82:16, 83:4, 87:10, 99:20, 105:14
**requested** [12] - 5:15, 8:20, 9:9, 12:16, 18:11, 24:4, 25:7, 26:13, 85:16, 99:21, 99:22, 103:24
**requesting** [5] - 9:24, 17:8, 28:18, 41:12, 102:22
**requests** [4] - 13:4, 28:22, 28:23, 86:18
**require** [4] - 34:12, 83:16, 86:6, 86:8
**required** [9] - 14:24, 15:4, 24:19, 32:23, 63:3, 68:6, 86:24, 89:19, 108:6
**requirement** [9] - 20:2, 20:11, 20:17, 39:24, 39:25, 46:22, 95:15, 95:16, 106:15
**requirements** [5] - 89:7, 92:21, 96:16, 99:19
**requires** [10] - 15:7, 38:10, 53:10, 60:16, 68:9, 74:6, 82:25, 102:11, 106:16, 107:1
**resident** [2] - 52:25, 73:2
**residents** [1] - 55:20
**resides** [7] - 47:7, 47:10, 47:19, 47:22, 48:2, 48:11, 54:4
**resolve** [3] - 93:6, 95:19, 103:3
**resolved** [1] - 58:21
**resolving** [1] - 36:18
**respect** [31] - 7:20, 14:12, 14:16, 23:6, 27:21, 31:16, 34:10, 35:15, 36:16, 36:19, 36:24, 43:19, 44:6, 55:21, 60:18, 62:12, 67:11, 67:15, 75:24, 84:1, 84:4, 85:10, 86:16, 86:21, 102:20, 103:6, 104:20, 106:11
**respond** [7] - 24:8, 28:15, 86:5, 86:6, 88:10, 88:17, 89:9
**responded** [4] - 17:22, 24:6, 24:9, 103:5
**responding** [1] - 86:18
**response** [3] - 18:3, 22:4, 75:2
**responsibility** [3] - 5:8, 8:7, 55:16
**responsible** [8] - 36:8, 36:17, 50:3, 51:8, 71:20, 71:22, 75:22, 75:23
**restraining** [1] - 46:11
**restriction** [3] - 32:11, 32:16, 102:1
**restrictions** [6] - 30:2, 30:4, 32:5, 32:7, 34:1, 64:14
**result** [3] - 29:3, 81:23, 87:1
**resulted** [1] - 82:13
**returned** [1] - 46:17
**reversing** [1] - 11:1
**Review** [3] - 5:6, 8:16, 9:1
**review** [5] - 15:4, 15:7, 40:7, 42:18, 86:12
**reviewed** [2] - 19:24, 77:18
**reviewing** [3] - 51:10, 79:8, 111:9
**rights** [11] - 15:17, 25:3, 29:16, 30:16, 30:23, 31:1, 31:13, 51:23, 81:6, 102:2, 103:2
**rigorous** [2] - 90:3, 96:14
**Ripa** [13] - 47:20, 47:22, 48:11, 48:16, 48:18, 48:21, 50:16, 50:22, 51:2, 52:25, 53:6, 55:2, 55:11
**rise** [5] - 47:8, 55:14, 60:10, 100:16, 111:23
**RMR** [2] - 2:20, 112:8
**road** [1] - 77:25
**robe** [1] - 82:24
**Rodolfo** [1] - 2:21
**RODOLFO** [1] - 1:13
**Rodriguez** [9] - 4:9, 8:10, 11:10, 39:13, 48:8, 67:21, 99:10, 100:20, 105:7
**RODRIGUEZ** [30] - 2:16, 4:8, 8:12, 8:24, 9:17, 11:4, 39:14, 39:16, 39:20, 40:4, 40:12, 40:17, 41:1, 41:3, 41:23, 48:14, 49:8, 49:16, 50:20, 51:19, 52:4, 52:7, 52:9, 54:9, 54:13, 79:3, 99:14, 99:17, 101:10, 111:19
**role** [4] - 34:21, 36:21, 36:23, 100:20
**RONALD** [1] - 2:11
**room** [2] - 19:5, 19:6
**Room** [2] - 2:23, 112:11
**rooms** [5] - 18:25, 19:2, 19:4, 19:7, 24:24
**roughshod** [1] - 81:6
**route** [1] - 66:21
**routine** [1] - 28:10
**rubber** [1] - 77:24
**RUIZ** [1] - 1:13
**Ruiz** [1] - 2:21
**rule** [2] - 77:12, 96:20
**Rule** [10] - 33:12, 34:11, 90:2, 90:9, 90:13, 92:6, 92:21, 96:16, 96:25, 97:3
**ruling** [5] - 108:4, 109:18, 110:14, 111:6, 111:21
**run** [5] - 35:6, 60:2, 70:18, 81:5, 83:13
**running** [8] - 59:19, 59:24, 60:1, 74:21, 84:14, 89:12, 100:20, 108:8
**rush** [1] - 81:4

## S

**S.O.S** [1] - 55:19
**safeguards** [4] - 14:4, 52:3, 83:1, 96:17
**safety** [1] - 101:25
**sake** [1] - 70:8
**San** [1] - 1:24
**Sanctuary** [1] - 22:11
**satisfied** [2] - 26:13, 47:3
**satisfies** [1] - 37:10
**satisfy** [2] - 87:6, 94:10
**Saturday** [3] - 5:2, 11:25, 98:22
**Saunders** [3] - 83:23, 106:3, 106:9
**saw** [5] - 48:18, 49:19, 59:7, 70:19, 95:9
**schedule** [1] - 86:13
**scheduled** [3] - 18:11, 22:5, 22:11
**scheduling** [2] - 13:14, 27:22
**scope** [8] - 16:2, 21:6, 26:17, 85:6, 87:10, 88:12, 99:14, 107:23
**second** [3] - 36:5, 55:2, 58:1
**secretaries** [1] - 71:1
**secretary** [1] - 42:2
**Secretary** [1] - 1:8
**security** [2] - 86:10, 101:25
**Security** [1] - 1:9
**see** [32] - 6:2, 8:5, 23:7, 33:6, 35:24, 39:9, 43:11, 45:6, 47:15, 48:15, 48:20, 50:21, 59:2, 59:4, 59:13,

60:3, 61:7, 61:14, 61:22, 68:22, 70:15, 76:22, 76:23, 76:24, 81:15, 86:14, 95:7, 103:17, 108:16
**seeing** [3] - 73:22, 84:6, 84:19
**seek** [3] - 9:21, 105:18, 108:15
**seeking** [4] - 16:4, 24:18, 87:20, 89:6
**seem** [3] - 22:17, 60:2, 64:7
**seeming** [1] - 24:15
**sell** [1] - 77:14
**send** [2] - 17:18, 41:20
**sense** [13] - 12:17, 26:2, 26:5, 26:22, 30:5, 42:7, 55:8, 59:2, 64:1, 77:7, 94:17, 110:4, 110:5
**sensitive** [1] - 110:11
**sent** [4] - 23:22, 23:23, 27:24
**sentence** [1] - 31:25
**separate** [3] - 38:7, 39:8, 108:15
**serious** [1] - 88:7
**Service** [2] - 5:7, 19:22
**serving** [1] - 31:25
**set** [12] - 4:13, 23:1, 33:9, 58:4, 58:20, 58:22, 62:8, 62:13, 66:10, 71:6, 89:7, 91:7
**sets** [2] - 47:1, 73:19
**setting** [5] - 27:6, 27:10, 27:13, 27:18, 57:20
**seven** [1] - 74:1
**shall** [7] - 36:11, 36:17, 58:21, 85:21, 85:22, 106:15
**share** [2] - 27:15, 28:21
**shift** [1] - 105:15
**shifted** [1] - 20:15
**shifting** [1] - 104:18
**shifts** [1] - 105:4
**short** [2] - 42:20, 84:13
**show** [11] - 7:5, 25:2, 25:21, 29:1, 51:7, 60:3, 61:18, 92:3, 98:3, 98:8, 106:12
**showing** [6] - 15:14, 53:5, 62:16, 93:11, 98:5, 99:18
**shown** [3] - 86:25, 88:6, 97:20
**shows** [1] - 61:4
**shutting** [1] - 44:19
**shuttling** [1] - 6:13
**Shutts** [1] - 4:7
**SHUTTS** [2] - 2:11, 2:13
**sic** [1] - 43:23
**side** [14] - 5:17, 15:22, 22:19, 29:24, 42:11, 54:17, 61:13, 73:5, 87:4, 87:12, 90:21, 96:8, 96:24, 100:14
**sides** [2] - 6:18, 90:20
**sidestep** [2] - 46:7, 46:14
**sign** [3] - 19:11, 74:4, 82:3
**signatories** [1] - 75:12
**signatory** [1] - 51:3
**signature** [1] - 75:16
**signatures** [1] - 32:22
**signed** [13] - 35:23, 51:2, 58:13, 70:9, 70:13, 70:15, 70:20, 70:22, 73:7, 73:12, 73:22, 74:22, 75:5
**significant** [5] - 13:13, 46:6, 64:17, 82:1, 82:15
**signing** [5] - 66:8, 66:24, 71:2, 82:6
**silos** [1] - 46:3
**similar** [5] - 11:8, 24:14, 49:3, 85:12, 109:15
**similarly** [3] - 1:5, 84:5, 94:15
**simple** [3] - 9:14, 9:18, 48:10
**simply** [13] - 16:17, 17:11, 18:17, 24:16, 53:15, 54:1, 71:11, 86:14, 89:19, 98:4, 100:22, 101:1, 103:15
**single** [10] - 18:13, 20:2, 20:10, 20:17, 66:16, 69:15, 70:4, 70:12, 70:22, 88:18
**sink** [1] - 84:12
**sister** [1] - 110:21
**sit** [5] - 10:12, 33:25, 49:5, 74:8, 77:7
**situated** [4] - 1:5, 47:10, 56:1, 94:15
**situation** [7] - 10:2, 10:19, 24:14, 39:21, 39:22, 41:10, 72:15
**situations** [4] - 41:9, 81:17, 102:7, 105:3
**six** [1] - 74:1
**slide** [1] - 9:2
**slightly** [2] - 65:11, 104:17
**Smith** [1] - 93:7
**solicit** [1] - 30:19
**solitary** [4] - 57:22, 58:1, 58:3, 62:5
**someone** [1] - 24:25
**soon** [8] - 16:20, 16:21, 16:22, 63:7, 77:6, 82:8, 111:7, 111:21
**Sorry** [1] - 92:17
**sorry** [3] - 23:13, 72:17, 90:8
**sort** [6] - 25:9, 37:20, 49:21, 65:4, 91:2, 96:9
**sorts** [3] - 20:4, 20:5
**sought** [2] - 6:1, 16:15
**sounds** [3] - 21:2, 66:13, 84:21
**South** [1] - 22:11
**SOUTHERN** [1] - 1:1
**Southern** [31] - 2:22, 52:25, 54:7, 57:7, 57:13, 58:24, 61:3, 61:5, 61:10, 61:16, 62:13, 64:3, 66:3, 66:22, 67:15, 69:2, 69:16, 69:21, 70:6, 71:10, 71:12, 71:16, 72:21, 72:22, 72:24, 73:21, 74:8, 74:10, 77:1, 77:10, 112:10
**space** [1] - 64:22
**spaces** [1] - 41:7
**speaking** [2] - 44:11, 66:17
**specific** [7] - 38:10, 38:16, 39:10, 75:15, 89:18, 95:17, 95:18
**specifically** [4] - 11:10, 66:9, 82:25, 85:20
**specificity** [1] - 86:1
**specified** [1] - 67:14
**specifies** [3] - 58:14, 66:9, 75:19
**specter** [2] - 10:3, 16:11
**speculative** [2] - 8:18, 8:19
**speech** [6] - 29:17, 30:20, 31:2, 31:12, 32:11, 32:25
**speed** [1] - 85:3
**splashed** [1] - 68:1
**SPLC** [1] - 85:18
**spoken** [1] - 27:6
**spot** [1] - 105:16
**staff** [2] - 19:4, 19:5
**stage** [3] - 25:17, 49:8, 49:9
**stand** [2] - 39:2, 40:5
**stand-up** [1] - 40:5
**standalone** [2] - 56:12, 56:23
**standard** [12] - 25:6, 29:8, 32:3, 32:5, 33:3, 37:10, 50:7, 52:10, 63:19, 64:12, 106:1, 107:21
**standards** [20] - 36:11, 36:12, 36:23, 50:4, 50:10, 51:22, 58:18, 58:19, 58:20, 60:8, 60:14, 60:15, 60:16, 63:3, 75:24, 83:14, 84:4, 108:7
**standing** [14] - 16:25, 48:24, 49:4, 49:14, 49:19, 49:21, 50:16, 91:19, 91:22, 92:4, 93:13, 93:14, 93:15
**standpoint** [1] - 87:16
**standpoints** [1] - 30:14
**stands** [2] - 14:7, 75:10
**start** [3] - 4:25, 80:24, 94:13
**started** [2] - 16:21, 56:7
**state** [123] - 4:5, 4:7, 13:3, 15:22, 17:25, 18:4, 18:13, 18:18, 22:24, 25:4, 26:10, 26:18, 28:17, 34:25, 35:3, 35:6, 35:17, 37:7, 37:14, 38:22, 41:4, 44:12, 48:16, 50:9, 51:6, 51:8, 52:19, 52:20, 56:9, 56:20, 56:23, 57:7, 57:10, 57:12, 59:3, 59:5, 59:6, 59:8, 59:18, 59:20, 59:25, 60:4, 60:6, 61:4, 61:10, 61:14, 61:21, 62:16, 63:14, 63:22, 64:6, 65:6, 65:9, 66:2, 66:5, 66:7, 67:18, 68:11, 68:17, 68:25, 69:1, 69:6, 69:7, 69:14, 69:15, 69:18, 70:1, 70:3, 70:5, 70:12, 70:15, 70:17, 70:22, 71:10, 71:12, 71:15, 71:18, 71:20, 71:21, 72:4, 73:4, 73:7, 73:12, 73:17, 73:23, 74:7, 74:9, 75:2, 75:3, 75:9, 76:16, 76:25, 77:9, 77:15, 77:22, 78:8, 78:13, 78:18, 78:24, 79:10, 79:20, 79:23, 82:21, 85:20, 86:8, 87:4, 87:6, 87:12, 88:17, 99:25, 100:24, 101:22, 104:21, 108:8, 110:2, 110:17, 111:15
**state's** [1] - 104:18
**state-federal** [1] - 71:21
**statement** [2] - 11:16, 11:19
**statements** [1] - 27:5
**STATES** [3] - 1:1, 1:13, 2:16
**states** [4] - 5:22, 31:18, 36:7, 106:23
**States** [9] - 1:9, 2:22, 30:24, 31:1, 35:21, 35:23, 42:1, 81:21, 112:9
**stating** [2] - 7:15, 104:22
**status** [2] - 56:18, 92:1
**statute** [5] - 39:11, 40:15, 54:25, 56:19, 110:12
**statutory** [2] - 46:22, 110:20
**stay** [2] - 12:21, 38:3
**steal** [1] - 81:12
**STENOGRAPHICALLY** [1] - 2:19
**step** [11] - 9:14, 9:19, 20:18, 37:13, 37:18, 60:25, 63:7, 70:7, 76:19, 77:6
**stepping** [3] - 84:13, 87:23, 89:21
**still** [20] - 15:16, 16:9, 22:1, 26:6, 26:10, 34:1, 37:6, 39:12, 45:6, 51:16, 61:13, 69:15, 70:4, 78:21, 78:23, 79:1, 88:18, 95:25, 96:22, 97:1

**stipulation** [5] - 6:24, 11:7, 15:25, 41:14, 44:23
**stood** [1] - 23:3
**stop** [1] - 45:19
**stopped** [1] - 42:20
**Street** [6] - 1:19, 1:23, 2:3, 2:9, 2:11, 2:17
**stroke** [1] - 95:20
**strongly** [1] - 46:20
**structure** [1] - 18:25
**struggle** [1] - 47:15
**struggling** [2] - 59:1, 63:17
**stuck** [1] - 78:8
**studying** [1] - 77:5
**styled** [1] - 92:13
**subclasses** [1] - 103:21
**subject** [2] - 34:9, 47:9
**subjects** [1] - 99:12
**submissions** [1] - 111:21
**submit** [2] - 89:17, 109:14
**subpoint** [1] - 55:11
**Subsection** [2] - 50:15, 55:23
**subsections** [1] - 47:12
**substantial** [12] - 45:22, 47:7, 47:9, 49:11, 55:13, 55:25, 58:24, 60:9, 65:18, 72:10, 72:11, 99:18
**substantiate** [1] - 66:4
**subsume** [1] - 53:16
**success** [21] - 25:6, 25:8, 29:22, 33:6, 39:4, 45:22, 49:11, 49:13, 87:16, 87:22, 88:3, 90:10, 91:2, 92:7, 93:10, 93:22, 95:1, 96:6, 96:7, 99:19
**sued** [2] - 66:22, 74:10
**suffered** [5] - 58:1, 81:8, 81:25, 87:1, 104:3
**sufficient** [2] - 51:16, 87:22
**suggest** [3] - 59:14, 98:4, 101:16
**suggestion** [1] - 53:2
**suggests** [2] - 29:24, 45:13
**suit** [1] - 47:2
**Suite** [6] - 1:23, 2:3, 2:9, 2:11, 2:14, 2:17
**supervised** [1] - 52:14
**supervision** [3] - 52:9, 52:15, 69:22
**supervisory** [1] - 51:21
**supplement** [7] - 5:17, 20:25, 45:13, 47:24, 64:5, 64:10, 76:5
**supplemental** [4] - 4:17, 8:20, 9:8, 25:21
**supplemented** [1] - 25:14
**supplying** [1] - 77:22
**support** [7] - 25:8, 30:8, 46:9, 59:5, 63:23, 68:21, 82:21
**supporting** [1] - 80:5
**supports** [1] - 59:12
**supposed** [1] - 28:4
**Supreme** [10] - 38:2, 38:13, 43:22, 44:4, 89:1, 89:11, 90:5, 90:17, 91:20, 95:16
**surmise** [1] - 37:3
**suspicion** [1] - 67:19
**swallowing** [1] - 38:12
**swath** [1] - 7:18
**sweep** [1] - 38:14
**sworn** [1] - 28:17
**synopsis** [1] - 14:11
**system** [1] - 15:1

**T**

**table** [1] - 4:10
**talks** [1] - 104:2
**Tallahassee** [2] - 2:12, 71:4
**tangentially** [1] - 54:5
**tantamount** [2] - 14:15, 29:3
**TEAM** [1] - 2:5
**team** [3] - 37:10, 57:6, 99:7
**technically** [2] - 38:15, 74:4
**technology** [1] - 4:11
**teed** [2] - 110:13, 110:22
**temporary** [1] - 46:11
**terminate** [1] - 11:11
**terms** [8] - 21:7, 36:22, 86:3, 87:9, 99:11, 105:5, 110:24, 111:3
**test** [4] - 34:13, 65:15, 101:14
**tests** [1] - 101:19
**tether** [1] - 73:18
**that'll** [1] - 110:3
**THE** [121] - 1:13, 1:17, 2:2, 3:2, 3:14, 4:1, 4:12, 6:12, 8:2, 8:23, 9:16, 9:22, 11:5, 11:23, 12:19, 15:21, 20:18, 21:15, 23:11, 23:14, 25:4, 25:25, 27:20, 29:5, 33:2, 34:7, 34:18, 37:1, 39:15, 39:19, 40:2, 40:5, 40:13, 40:21, 41:2, 41:22, 42:6, 44:17, 48:7, 48:22, 49:12, 49:17, 51:4, 51:20, 51:25, 52:5, 52:8, 52:17, 54:12, 54:17, 55:23, 56:6, 58:25, 60:20, 62:2, 62:15, 62:19, 63:1, 63:5, 63:12, 65:12, 65:17, 65:22, 66:12, 67:4, 67:7, 67:17, 70:7, 70:22, 71:13, 72:17, 73:10, 74:2, 74:16, 74:19, 75:12, 76:3, 78:23, 79:1, 79:4, 81:9, 81:11, 82:18, 84:12, 87:3, 88:15, 90:7, 91:15, 92:8, 92:16, 93:24, 95:8, 95:10, 95:21, 96:18, 97:8, 98:10, 99:16, 100:6, 101:11, 101:15, 102:10, 102:24, 103:10, 103:13, 104:5, 104:9, 104:16, 104:23, 105:21, 105:24, 107:13, 109:3, 109:10, 109:23, 110:1, 110:7, 111:14, 111:17, 111:20, 111:23
**theme** [1] - 59:23
**themselves** [19] - 1:4, 4:16, 27:5, 27:6, 27:9, 27:14, 27:16, 33:1, 57:13, 57:18, 57:25, 62:11, 66:7, 68:9, 73:21, 83:21, 83:23, 86:4, 91:24
**theory** [22] - 30:5, 30:8, 35:2, 35:4, 40:25, 43:1, 62:22, 63:13, 67:19, 68:3, 68:9, 68:21, 70:8, 70:18, 71:17, 71:19, 76:7, 76:10, 76:18, 76:24, 76:25, 80:4
**therefore** [2] - 32:3, 100:21
**thereof** [1] - 100:14
**they've** [6] - 16:7, 20:15, 33:17, 41:6, 50:7, 99:22
**third** [3] - 36:10, 55:3, 105:22
**thoroughly** [1] - 56:16
**thoughts** [1] - 65:13
**threat** [3] - 97:16, 98:4, 98:8
**three** [14] - 7:10, 8:13, 17:16, 22:3, 37:24, 38:16, 40:6, 42:23, 53:22, 54:24, 55:1, 55:5, 55:10, 56:3
**threshold** [1] - 91:17
**throughout** [3] - 60:14, 104:19
**thunder** [1] - 81:12
**Thursday** [3] - 4:18, 57:2, 78:2
**timeliness** [4] - 30:6, 83:10, 85:1, 86:17
**timely** [5] - 14:14, 14:17, 81:15, 85:21, 86:4
**timing** [1] - 22:18
**today** [31] - 4:13, 10:12, 10:23, 11:24, 14:7, 26:4, 31:9, 33:9, 33:23, 35:5, 42:11, 48:23, 49:5, 59:25, 60:18, 64:1, 76:5, 77:8, 77:19, 79:5, 80:9, 80:23, 81:8, 94:24, 96:21, 104:8, 105:2, 108:3, 108:21, 109:24, 111:4
**today's** [3] - 3:7, 12:3, 104:19
**together** [2] - 47:4, 52:21
**token** [1] - 99:6
**took** [1] - 65:16
**tool** [1] - 86:2
**Torres** [1] - 85:19
**total** [8] - 14:8, 20:22, 30:2, 33:11, 45:4, 84:16, 84:17
**touch** [2] - 14:9, 29:11
**touched** [2] - 29:6, 99:11
**track** [1] - 28:15
**tracking** [1] - 28:23
**traditional** [1] - 94:2
**traffic** [1] - 23:5
**train** [1] - 108:16
**transactional** [7] - 55:24, 56:2, 62:14, 67:6, 67:12, 69:1, 75:17
**transcription** [1] - 112:4
**transfer** [3] - 78:12, 78:19, 80:10
**transferred** [5] - 17:17, 18:4, 22:6, 22:12, 98:24
**transform** [2] - 45:11, 101:2
**travel** [1] - 54:22
**traveling** [2] - 33:3, 56:14
**trial** [1] - 93:19
**tried** [1] - 111:5
**Troiano** [1] - 99:3
**trojan** [1] - 42:12
**troubles** [1] - 63:20
**true** [5] - 20:1, 43:3, 46:19, 48:6, 50:6
**truly** [1] - 110:2
**truth** [1] - 40:23
**try** [12] - 4:22, 24:8, 25:4, 41:8, 43:2, 56:3, 68:7, 88:5, 92:24, 93:5, 93:18, 96:21
**trying** [11] - 28:13, 30:4, 43:24, 59:22, 64:1, 68:19, 69:18, 91:25, 93:1
**tune** [3] - 7:15, 7:20, 7:23
**tuned** [1] - 83:9
**turn** [2] - 42:17, 106:13
**Turner** [11] - 29:11, 31:22, 89:2, 89:12, 101:14, 101:17, 102:11, 105:25, 106:23, 107:1
**two** [10] - 6:17, 10:17, 14:6, 17:14, 22:4, 57:23, 73:19, 80:14, 87:15
**tying** [1] - 71:16
**type** [7] - 39:21, 41:13, 52:1, 65:24, 68:8, 104:14, 107:21
**types** [1] - 105:2
**typicality** [8] - 92:20, 92:23, 93:18, 94:3, 94:9, 95:3, 96:1, 103:6

## U

**U.S** [2] - 19:21, 95:16
**U.S.C** [1] - 60:8
**ultimately** [7] - 22:12, 58:5, 87:10, 91:1, 92:23, 93:17, 110:16
**unaccompanied** [1] - 29:17
**unambiguous** [2] - 10:16, 11:13
**under** [51] - 9:5, 20:25, 26:6, 26:11, 31:20, 32:10, 33:3, 33:14, 35:3, 35:8, 37:19, 40:7, 42:22, 45:13, 47:16, 48:4, 51:9, 53:8, 53:20, 53:23, 54:22, 54:25, 55:1, 55:11, 56:13, 56:14, 56:21, 56:25, 61:9, 65:24, 68:8, 76:13, 76:23, 76:25, 78:19, 94:1, 94:3, 94:4, 94:6, 94:12, 95:14, 95:23, 95:24, 100:15, 102:22, 104:10, 104:25, 106:23, 108:7, 110:18
**undercurrent** [1] - 107:14
**undergo** [1] - 96:14
**underlies** [1] - 15:11
**underlying** [1] - 42:14
**underscore** [1] - 106:7
**understandably** [1] - 10:5
**undisputed** [2] - 16:18, 18:9
**unfortunately** [1] - 7:6
**unifying** [1] - 33:13
**UNION** [2] - 1:18, 1:22
**unique** [1] - 10:10
**UNITED** [3] - 1:1, 1:13, 2:16
**United** [9] - 1:8, 2:22, 30:24, 31:1, 35:21, 35:23, 42:1, 81:21, 112:9
**unprecedented** [2] - 81:3, 83:13
**unwieldy** [1] - 94:20
**up** [22] - 15:14, 16:25, 23:3, 23:12, 26:4, 28:11, 39:22, 40:5, 61:18, 73:11, 76:5, 77:6, 79:12, 80:14, 83:14, 88:4, 93:15, 104:11, 108:18, 109:12, 110:13, 110:22

## V

**vacuum** [1] - 38:18
**Valdes** [3] - 22:3, 22:4, 22:6
**Valley** [1] - 96:14
**valuable** [1] - 96:22
**variety** [1] - 31:7
**Vega** [3] - 51:13, 59:16, 60:5
**Velazquez** [2] - 18:1, 18:6
**venue** [77] - 4:21, 26:4, 26:21, 34:19, 37:4, 37:17, 45:21, 46:4, 46:5, 46:7, 46:14, 46:16, 46:18, 47:14, 47:15, 50:7, 50:11, 50:18, 51:17, 52:20, 53:7, 53:20, 54:2, 54:18, 54:25, 55:21, 55:24, 56:2, 56:21, 56:22, 57:13, 57:24, 58:1, 58:2, 58:4, 61:2, 62:4, 62:7, 62:8, 62:14, 63:23, 65:1, 65:9, 65:14, 65:15, 65:20, 66:11, 66:17, 67:6, 67:14, 68:8, 68:21, 69:1, 71:5, 71:7, 72:14, 72:19, 75:17, 77:8, 77:22, 78:3, 78:5, 78:7, 78:18, 79:19, 87:6, 87:14, 87:24, 88:3, 88:7, 88:8, 100:8, 110:12, 110:14, 110:17
**venued** [4] - 53:8, 55:11, 57:10, 69:6
**venues** [1] - 57:23
**versus** [2] - 3:3, 30:10
**viability** [1] - 33:25
**viable** [12] - 6:8, 26:6, 49:5, 54:22, 55:6, 68:4, 72:19, 79:16, 90:16, 91:3, 103:18, 105:1
**vicarious** [1] - 35:4
**video** [1] - 33:17
**videoconference** [4] - 18:20, 19:2, 19:3, 27:22
**videoconferences** [11] - 13:14, 13:20, 14:16, 14:17, 18:21, 27:3, 27:7, 27:17, 28:4, 86:16, 86:19
**view** [23] - 12:1, 12:7, 13:2, 30:4, 37:9, 38:8, 39:6, 48:9, 63:23, 68:10, 71:24, 72:24, 73:13, 73:20, 75:13, 77:20, 84:20, 87:21, 96:2, 96:5, 100:19, 102:13, 104:9
**violate** [1] - 15:17
**violated** [4] - 31:13, 61:5, 82:10, 106:13
**violation** [22] - 5:23, 14:3, 15:17, 32:16, 34:16, 48:17, 48:21, 50:21, 63:19, 65:7, 68:17, 71:25, 77:15, 82:12, 88:14, 88:19, 97:11, 103:3, 103:4, 104:12, 107:3, 107:4
**violations** [17] - 32:10, 32:24, 34:10, 53:19, 64:7, 66:4, 77:20, 77:23, 82:11, 84:7, 84:9, 85:23, 85:25, 100:12, 100:22, 107:5, 107:11
**Virgien** [1] - 3:18
**VIRGIEN** [2] - 1:21, 3:18
**visit** [1] - 86:11
**visitation** [8] - 13:15, 14:14, 83:22, 83:24, 85:21, 86:3, 106:14, 106:16
**visits** [3] - 14:14, 15:10, 28:18
**voluntary** [13] - 7:3, 7:4, 12:2, 44:25, 82:3, 82:7, 98:18, 104:20, 104:22, 104:23, 105:3, 105:12
**Voluntary** [2] - 10:1, 12:8
**voluntary-cessation** [1] - 12:2
**vs** [1] - 1:7

## W

**wait** [3] - 17:16, 86:10, 86:13
**waited** [1] - 22:3
**Wal** [1] - 95:17
**Wal-Mart** [1] - 95:17
**walk** [1] - 27:11
**walking** [1] - 24:21
**warden** [3] - 85:15, 89:5, 89:11
**warned** [1] - 66:19
**warranted** [2] - 25:17, 104:24
**Washington** [3] - 1:20, 51:1, 51:2
**waste** [1] - 110:12
**watching** [2] - 49:19, 107:17
**ways** [5] - 21:18, 47:1, 47:17, 48:8, 67:25
**website** [3] - 9:1, 12:13, 105:17
**week** [4] - 14:7, 46:5, 52:1, 56:7
**weeks** [10] - 4:16, 10:17, 17:16, 22:3, 23:21, 24:16, 39:23, 86:13
**weighs** [1] - 29:22
**Weiser** [7] - 17:15, 17:23, 22:2, 23:17, 24:1, 24:10, 28:25
**Weiser's** [2] - 17:24, 27:23
**well-established** [1] - 49:2
**whatsoever** [3] - 69:20, 91:18, 91:21
**whereas** [2] - 17:18, 92:13
**whole** [2] - 43:11, 84:12
**wide** [1] - 7:18
**wield** [1] - 86:2
**window** [1] - 42:13
**wise** [1] - 80:20
**wish** [2] - 99:12, 108:14
**word** [1] - 60:10
**wording** [1] - 57:4
**words** [1] - 73:21
**workable** [1] - 93:19
**world** [4] - 37:6, 56:16, 94:10, 105:18
**worried** [3] - 66:12, 66:14, 85:8
**worse** [2] - 10:18, 105:16
**wrap** [1] - 80:3
**writing** [3] - 12:3, 90:12, 111:10
**wrongful** [3] - 7:5, 10:7, 97:19

## Y

**years** [1] - 8:13
**yesterday** [1] - 78:2
**you-all** [2] - 4:2, 80:22

## Z

**ZACHERL** [8] - 2:13, 4:6, 92:18, 95:5, 95:9, 95:11, 96:5, 97:7
**Zacherl** [1] - 4:6
**Zachrel** [1] - 92:18